

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00237-CR

———————————————

JIMMIE LEE HANCE, III Appellant

V.

THE STATE OF TEXAS

On Appeal from the 90th District Court
Young County, Texas
Trial Court No. 10943

Before Kerr, Birdwell, and Walker, JJ.
Opinion on Rehearing by Justice Birdwell

**OPINION ON REHEARING**

We begin with a simple question: Does significant—or even overwhelming—evidence of guilt supporting a conviction foreclose an appellate court from determining that an error affecting the trial's fundamental fairness caused the defendant harm? The obvious answer to that question is no. *See, e.g.*, *Howard v. State*, 482 S.W.3d 249, 260 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) ("Although error is not harmless 'simply because the reviewing court is confident that the result the jury reached was objectively correct,' the presence of 'overwhelming evidence of guilt is a factor to be considered.'" (quoting *Snowden v. State*, 353 S.W.3d 815, 818 (Tex. Crim. App. 2011)). "A fair trial in a fair tribunal is a basic requirement of due process." *Ex parte Lewis*, 688 S.W.3d 351, 351 (Tex. Crim. App. 2024) (quoting *In re Murchison*, 349 U.S. 133, 136, 75 S. Ct. 623, 625 (1955)).

With that answer in mind, the primary issue in this opinion is simple to articulate but more complex to answer. Did the appellant suffer harm justifying reversal of his conviction, and a remand for a new trial, when—in the face of substantial and compelling probative direct and circumstantial evidence of guilt—the trial court abused its discretion by (1) initially granting a continuance for a defense expert to examine a laptop hard drive that had been forensically examined by law enforcement but that neither the prosecution nor the defense knew was in law enforcement's possession until midtrial—after the jury had already heard highly probative, inculpatory evidence related to the laptop and its contents—but then (2) before the defense expert could perform

2

an examination of the laptop, unilaterally withdrawing that remedy and effectively foreclosing the appellant's right to independently and meaningfully examine the laptop hard drive before the end of trial so as to determine whether he could challenge the probative evidence already presented by the State? Inherent to this question is the standard of harm this court must apply to the trial court's error: the nonconstitutional harm standard for statutory error—for a violation of Articles 39.14 and 39.15 of the Code of Criminal Procedure (the Michael Morton Act)—or the constitutional harm standard for federal due-process error, specifically under *Ake v. Oklahoma*. Although we believe *Ake* constitutional error is fairly included in Hance's preserved and briefed complaints—and that the trial court's error here affected the fundamental fairness of the trial and was of constitutional dimension—we also analyze Hance's Michael Morton Act complaint for nonconstitutional statutory error. We conclude that the trial court's error in this case was harmful under either standard. But in so doing, we must begin by addressing his preserved evidentiary issues that do not show error, as described in more detail below.

## I. Issues on Appeal and Initial Memorandum Opinion

A jury found Jimmie Lee Hance, III guilty of aggravated sexual assault of a child under six years, *see* Tex. Penal Code Ann. § 22.021(a)(1)(B)(i), (2)(B), and assessed his punishment at fifty years' confinement and a $10,000 fine. The trial court sentenced Hance in accordance with the jury's verdict.

Hance raises six issues on appeal. In his first three issues, Hance argues that the trial court improperly admitted evidence that he (1) had watched adult pornography depicting daddy–daughter role-playing, (2) had engaged in consensual daddy–daughter role-playing with his wife during sexual intimacy, and (3) had "Googled the subjects of commonality of daddy–daughter molestation and the signs of toddler molestation." He contends in his fourth issue that the trial court improperly denied his motions for continuance and mistrial when the State failed to produce the laptop to permit a digital forensic examination for exculpatory and impeachment evidence by the forensic expert appointed for his defense by the court, particularly concerning his alleged inculpatory Google search history for the signs of toddler molestation and the prevalence of daddy–daughter incest. In his fifth issue, Hance argues that the trial court abused its discretion by failing to compel the State to comply with the trial court's midtrial order so that his court-appointed digital forensic expert could confirm whether the laptop's hard drive contained exculpatory and impeachment evidence. Hance finally asserts in his sixth issue that the trial court erred by failing to grant his motion for new trial on the grounds he previously urged for mistrial and continuance.

In this court's April 21, 2022 memorandum opinion, the original panel[1] reversed the trial court's judgment, holding that "denial of [Hance's] request for his forensic

---

[1]A long-serving and well-respected member of this court before her retirement in December 2016, Justice Lee Ann Dauphinot was the author of our original memorandum opinion, sitting by assignment. With her untimely passing this past August, Justice Walker assumed her place on the panel. Nevertheless, this opinion

4

expert to examine the computer and denial of sufficient time to examine the computer constituted a denial of counsel and denial of a fair trial." *Hance v. State*, No. 02-19-00237-CR, 2022 WL 1183335, at *5 (Tex. App.—Fort Worth Apr. 21, 2022, no pet.) (mem. op., not designated for publication). Consequently, we concluded that "the trial court abused its discretion by continuing the trial rather than giving [Hance] the opportunity to examine the [computer's] hard drive." *Id.* We further held that "because evidence of [Hance's] proclivities featured heavily in the trial, and at the time of the laptop's discovery the defense could not unring the bell as to what the jury had already heard, the trial court should have concluded that [Hance] had been prejudiced and granted [his] new-trial motion." *Id.*

The State has filed a motion for rehearing,[2] asking us to overrule Hance's sixth issue because his counsel withdrew Hance's motion for new trial at the hearing thereon and to re-evaluate the harm caused by Hance's inability to access the computer. After reviewing the State's motion for rehearing, we grant the motion as to our ultimate disposition of Hance's sixth issue, but we withdraw our April 21, 2022 memorandum opinion and substitute the following opinion on rehearing in its place. We also withdraw

---

reflects her considerable contribution. She will be sorely missed. *Requiescat in pace.* https://www.txcourts.gov/media/1459024/judge-dauphinot-memoriam.pdf."

[2]The motion for rehearing and corresponding supplemental briefing in this case were filed by the State Prosecuting Attorney.

the prior judgment and issue a new one so that its date of issuance corresponds with the date of this substituted opinion on rehearing.

We conclude (1) that the trial court did not abuse its discretion by admitting the evidence challenged in Hance's first and third issues, for which he preserved error, but (2) that it did abuse its discretion by first granting Hance a continuance but then unilaterally curtailing it before his expert could independently examine the laptop, thereby failing to give Hance an ample opportunity to forensically examine the laptop for exculpatory and impeachment evidence in violation of his federal due-process right to expert assistance with his indigent defense as contemplated by *Ake v. Oklahoma*, 470 U.S. 68, 105 S. Ct. 1087 (1985), and his statutory right to discovery pursuant to subsections (a), (h), and (k) of Article 39.14—and (c) and (d) of Article 39.15—of the Texas Code of Criminal Procedure. Because the record reflects that Hance did, in fact, withdraw his motion for new trial, and because we hold that Hance is entitled to relief on his fourth and fifth issues, we need not address his sixth issue. *See* Tex. R. App. P. 47.1. Thus, we overrule Hance's first three issues, sustain his fourth and fifth issues, and do not reach his sixth issue. Accordingly, we reverse Hance's conviction and remand this cause to the trial court for a new trial.

## II. Factual and Procedural Background[3]

Hance was convicted of a single count of aggravated sexual assault of his five-year-old stepdaughter, Gina.[4] Evidence presented at trial included the testimony of Lorraine—Hance's wife and Gina's mother—regarding certain of his sexual proclivities and an outcry[5] that Gina had made to Lorraine the morning of July 28, 2017, and testimony from the following witnesses: a member of the investigation team for the Young County Sheriff's Office (YCSO); a sexual-assault nurse examiner (SANE) who interviewed both Gina and Lorraine; a forensic interviewer who interviewed Gina after

---

[3]Because Hance does not challenge the sufficiency of the evidence to support his conviction but limits his appeal to certain procedural, discovery, and evidentiary rulings of the trial court, we will discuss the evidence of guilt presented by the State only to provide context and to the extent required for addressing the rulings challenged on their merits.

[4]We use a pseudonym when referring to the child complainant. *See* Tex. R. App. P. 9.10(a)(3). To further protect her identity, we also use a pseudonym when referring to her mother. *See* Tex. Const. art. I, § 30(a)(1); 2d Tex. App. (Fort Worth) Loc. R. 7.

[5]As applicable to this prosecution, an "outcry" statement is a hearsay statement made by the victim of one or more prohibited sexual offenses, including aggravated sexual assault of a child, if the victim is under the age of fourteen, and the statement describes the alleged offense and is made to an individual eighteen years of age or older who is the first person to whom the victim describes the offense. Act of May 29, 2009, 81st Leg., R.S., ch. 284, 2009 Tex. Gen. Laws 744, 744 (current version at Tex. Code Crim. Proc. Ann. art. 38.072); Act of May 27, 2009, 81st. Leg., R.S., ch. 710, 2009 Tex. Gen. Laws 1780, 1780–81 (same).

her outcry; Gina's older brothers, minors who had witnessed the sexual assault; and

Gina herself. Based upon this evidence, the jury found Hance guilty as charged.[6]

## A. Testimony About the Laptop and Inculpatory Google Searches

The events giving rise to Hance's appeal began on the second day of trial,

Monday, April 8, 2019, the first day of testimony.[7] As the first witness called by the

---

[6]Although the indictment alleged the assault occurred on or about June 26, 2017, the State presented no evidence that any assault occurred on June 26, 2017, electing to rely instead upon evidence that Hance committed the assault on or about the morning of Gina's outcry, July 28, 2017. After the State argued July 28, 2017, as the date of the assault during closing arguments, the jury sent out a note asking for clarification of the "on or about June 26, 2017" portion of the court's charge in relation to its reference to September 21, 2017, the day of the indictment. Upon both the State's and Hance's no-objection statements, the trial court declined to provide the requested clarification and simply referred the jury to that portion of the charge giving the following instruction:

> The indictment alleges that the offense was committed on or about June 26 of 2017. The [S]tate is not required to prove that alleged offense happened on that exact date. It is sufficient if the [S]tate proves the offense was committed before September 21st, 2017, the date the indictment was filed.

Hance does not challenge the indictment, the charge, or the trial court's handling of the jury's question.

[7]Jury selection and empanelment had taken place the previous Friday, April 5, 2019, and the trial court told the jurors empaneled, "It's estimated that the trial will take all of next week, Monday through Friday." During voir dire, defense counsel observed that when he came to the courthouse that day, there were "blue ribbons everywhere" in recognition of "Child Abuse Awareness Week." He neither questioned any of the venire concerning whether this public display could prejudice their view of the evidence nor otherwise objected to the trial's being conducted during a timeframe dedicated to child-abuse awareness or prevention. *See Camarillo v. State*, No. 08-02-00318-CR, 2004 WL 100526, at *5-6 (Tex. App.—El Paso Jan. 22, 2004, pet. ref'd) (mem. op., not designated for publication) (affirming defendant's conviction for indecency with a child absent showing of prejudicial effect or outside influence due to public-service

State, Lorraine had been testifying about her sex life with Hance when she said that Hance had enjoyed sexual role-playing in which she called him "daddy." After eliciting this testimony without objection from defense counsel, the district attorney (DA) asked to approach the bench where she informed the trial court that she intended to ask Lorraine about Hance's proclivity for "daddy/daughter" and incest pornography, observing that the State had given notice of its intent and that not only had Lorraine "seen" this preference personally but also Hance himself had confessed to it in a custodial statement to law enforcement. The DA then extended her intended proffer by observing that Lorraine had also "seen" where Hance had "Googled how common it is for a father to –" whereupon defense counsel interjected that he had an objection to that statement, to which the DA replied, "We've given notice." Although this is the first mention of Hance's alleged Google search history in either the clerk's record or the reporter's record, defense counsel did not categorically dispute the DA's assertion of notice, stating merely, "It's fine to give notice, but I can still object to it." Because defense counsel told the trial court that he wished to offer his objections outside of the jury's hearing, the trial court dismissed the jury to take up Hance's objections.

> After the jury left the courtroom, the following colloquy occurred:
>
> [The Court]: . . . Ms. Peavy [the DA], you had indicated that you were about to go into some evidence concerning some pornography or something at the bench. Can you summarize that, or do you need to get that from the witness? Where are you going?

announcements in the courthouse during trial in the form of banners, cutouts, and posters proclaiming April to be Child Abuse Prevention Month).

[The DA]: Well, I can summarize that he -- the defendant enjoyed role playing, and he frequented porn sites called daddy/daughter porn and incest porn. He wanted her to call him daddy, and he would call her princess. That was a word that he also used when he talked about [Gina], the victim. [Lorraine] also saw where he had Googled how common is it for a father -- you'll have to answer. How common is it --

[Lorraine]: How common is daddy/daughter molestation and what are the signs.

[The DA]: And what are the signs. This is all relevant to our inquiry about, you know, whether or not this defendant had an interest in having sex with the little girl that calls him daddy.

Defense counsel then took Lorraine on voir dire:

Q. Did you ever see the pornography?

A. Yes.

Q. Was it adult pornography? Like the daddy[/]daughter pornography, was it adult pornography or children pornography?

A. There [were] no children involved.

Q. It was just titled, and it was role playing.

A. Uh-huh.

When asked by the trial court to state his objections, defense counsel initially conceded that Lorraine's testimony concerning role-playing with Hance had already been admitted. But he then objected to the anticipated Google search-history testimony on the grounds that it was hearsay that could not otherwise be proven beyond a reasonable doubt and that it was substantially more prejudicial than probative in violation of Rule 403 of the Texas Rules of Evidence. Defense counsel finally urged the court to exclude

10

the evidence of his viewing of adult incest pornography due to Rule 403 substantial prejudice because Hance stood "accused of penetrating the vagina with his penis of a five-year-old girl, not anything to do with adult pornography."

The State responded through both the DA and the assistant district attorney (ADA) in the following colloquy with the court and defense counsel, eventually obtaining a favorable ruling:

> [The DA]: And, Your Honor, I will be happy to flush this all out that it's not children in the pornography, but she did observe where he was Googling how common is daddy/daughter molestation and what are the signs. I mean, that's very indicative.
>
> [Defense]: I think it's hearsay, Your Honor. She says she saw it, but there's no - -
>
> [The ADA]: May I? Judge, if she saw it, she's not testifying about what somebody told her he was looking at. She's testifying about what she saw, and so she's entitled to testify about what she saw on his cell phone or his computer or wherever she saw it.
>
> In the context of it, I think, what we're talking about is, at the end of the day, it's going to go to kind of his mindset of looking at daddy/daughter role play and then, you know what, he did some other things that will come out through text messages where's he's wanting to educate children about sex. And I think it's all going to tie in to his general state of mind as far as the commission of these crimes. And so it is relevant, and I don't think the objections are valid objections under the circumstances, Judge.
>
> [Defense]: I think 403 is always a valid objection, Your Honor.
>
> [The Court]: Well, yes, it is a valid objection. I'm going to overrule it in that what I'm seeing from the first hearing[8] that we had that I've

_____

[8]This hearing took place outside the jury's presence on the first day of trial. Although the forensic interviewer testified at that hearing that Hance had showed Gina

11

already made a finding on is going to be admissible that there was something about him having porn movies or something that he showed the little girl.

[The DA]: That he showed – yes.

[Defense]: On his phone. She's testifying regarding a computer.

[The Court]: I understand that, but I think that is relevant to show what was testified about what the little girl said, so I'm going to overrule your objection. I'll note your exception.

[Defense]: May I have a running objection?

[The Court]: Yes, you may. Okay.

Summarizing this back-and-forth, (1) the DA modified her proffer to include adult pornography only, then argued that Lorraine had seen Hance's alleged Google search history, (2) defense counsel complained that there was no corroboration of what Lorraine allegedly saw, (3) the ADA interjected that what Lorraine allegedly saw was not hearsay, but eyewitness testimony, whether viewed "on [Hance's] cell phone or his computer or wherever," suggesting the source of her testimony to be no different than had she watched Hance type the queries himself, (4) the trial court overruled defense counsel's objections on the basis of evidence he previously received concerning the admissibility of Gina's outcry statements to the forensic interviewer that Hance had showed her pornographic movies, (5) defense counsel clarified that Gina's statements

---

pornographic movies on his phone, Lorraine did not. The trial court ruled at the end of the hearing that *the forensic interviewer* could testify that Gina had said Hance showed her pornographic movies on his cell phone.

12

had involved a cell phone while the testimony proffered from Lorraine involved a computer, and then (6) the trial court confirmed its understanding of that clarification, but still overruled the objections. This colloquy is the first mention of a computer by the State, either before or during trial.[9]

---

[9]The State's original and amended notices of intent to use extraneous offenses and prior convictions had previously disclosed to Hance that it intended to offer evidence that, in the approximately three-year period before and around the indicted assault (from on or about January 1, 2014, through on or about September 1, 2017), he had "accessed and viewed internet sites for incest pornography and 'daddy–daughter' pornography" and had shown "pornographic images and videos to [Gina]." The State's original and amended notices of intent to use outcry statements, in turn, identified Hance's phone as the medium by which he allegedly had shown pornographic movies to Gina. Finally, the State's original and amended certificates of discovery had disclosed a forensic examination of Hance's phone but made no mention of the laptop computer. Nor did the forensic examination of Hance's phone include any Google search history that could corroborate Lorraine's anticipated testimony.

Moreover, as will become significant later, none of these pretrial notices or certificates characterized any of the pornographic images or videos allegedly accessed and viewed by Hance, or shown by him to Gina, as "child pornography" as that term is defined by Section 43.26(a) of the Texas Penal Code. Section 43.26(a) defines the possession or promotion of child pornography to be an offense if a person "knowingly or intentionally possesses, or knowingly or intentionally accesses with intent to view, visual material that visually depicts a child younger than 18 years of age at the time the image of the child was made who is engaging in sexual conduct, including a child who engages in sexual conduct as a victim of" criminal child trafficking, and "the person knows that the material depicts the child" so described. *See* Tex. Penal Code Ann. § 43.26(a). And during a trial for aggravated sexual assault of a child—and notwithstanding its general inadmissibility under Rules 404 and 405 of the Texas Rules of Evidence—evidence that the defendant has committed the separate "extraneous" offense of possession or promotion of child pornography is admissible "for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant." Tex. Code Crim. Proc. Ann. art. 38.37, § 2(a)(1)(E), (H), (2)(b). Critically, any use of such evidence at trial

13

The trial court having overruled Hance's objections, the jury returned. Lorraine continued her testimony, testifying that Hance had shared adult role-playing, pornographic websites with her depicting "daddy/stepdaughter or daddy/daughter" pornography and other types of incest pornography. She further testified that Hance would call her "daddy's little girl or princess," which bothered her because he also called Gina "princess." Lorraine also confirmed that the websites Hance frequented to view pornography were "[j]ust adult role[-]playing, daddy/daughter" websites.

The DA then asked Lorraine whether she had ever noticed "that [Hance] had Googled anything that [she] found disturbing." When defense counsel renewed his objection to this line of questioning, which the trial court again overruled, the DA asked another question as a predicate: "Let's go back. Did [Hance] have a laptop?" Lorraine answered, "He had my laptop."[10] When the DA asked whether Lorraine had found Hance's Google search history on her laptop, Lorraine said, "No, ma'am." She then explained that she had discovered it via a shared Google search history: "We shared an email address, so anything I Googled showed in our search engine and anything he Googled showed up in my search engine. Because we shared the same email, anything

during the State's case-in-chief required notice of intent given to Hance "no later than the 30th day before the date of [his] trial." *See id.*, § 3.

[10]The DA's line of questioning is the first mention in the record of the laptop *as a laptop*.

14

that is Googled on something that shares the same email[,] it shows up on that other device."

Lorraine testified that she found two searches disturbing: "One was how common is daddy/daughter molestation and what are the signs of toddler molestation." After having Lorraine describe how she confronted Hance about these two searches and he said they had just "popped up" after he clicked on an ad—and despite Lorraine's denying that she had found evidence of these disturbing searches on the laptop—the DA immediately asked, "What happened to that computer?" Lorraine then testified as follows:

> A. He took it to work with him on the truck, and it was -- whenever the detectives took it, it was completely destroyed. Something had been spilt all over it. The battery was destroyed. It didn't work.
>
> Q. Was it in good shape before he took it?
>
> A. Well, I mean, it wasn't in perfect shape. The screen was cracked, but it worked.

She later clarified that her dog had stepped on the screen and broke it but that the computer "still worked when [Hance] took it to work."

On cross-examination, Lorraine said that she saw the Google searches in "February or March of 2017." She confirmed that she had confronted Hance with the Google searches at that time but admitted that she had not done anything else. She further testified that she had retrieved her laptop from Hance's work truck—Hance hauled sand to drilling sites in West Texas—and had turned it over to the sheriff's office

15

around August 3, 2017, after Hance was arrested. She confirmed that she had given her laptop to the sheriff's office "for them to go through it."

Still on cross-examination, Lorraine clarified that she had seen the Google searches on her phone but that she did not give her phone to the sheriff's office. Nor did she have a copy of the Google searches. When Hance's counsel asked her why, the following exchange occurred.

Q. Why do you not have a copy of that?

A. Because it was removed from my phone. I screen shotted it, and it was deleted out of my phone.

Q. And when was that done?

A. Maybe a few weeks after I did it. I'm not exactly sure when it was deleted.

Q. But it was -- it came to your email; is that correct?

A. No. It was in my search engine.

Q. Okay. But even though the picture was removed, couldn't you go back through your phone and your computer and pull that back up?

A. Not if you clear the history.

Lorraine then clarified on redirect:

Q. Okay. Now, you said that the screen shot was deleted, the screen shot of signs of molestation and what was the other one?

A. How common.

Q. How common is it for --

A. Daddy/daughter molestation.

16

Q. Who deleted that?

A. So I took a screen shot of it, and actually I sent it to a friend of mine, and then I removed it from my phone so that she would have it, and it was deleted out of her phone as well.[11]

The clear inference from this part of Lorraine's testimony is that although she saw these Google searches on her phone, Hance was using some other device—possibly her laptop—to run these searches, and that she could see them from her phone because of their shared email address. In other words, Lorraine's testimony strongly suggested—and did not rule out—her laptop as the source of these searches she attributed to Hance.

Taking the stand after Lorraine, retired YCSO Deputy Tim Bay testified that he was the captain in charge of investigations at the time of Hance's arrest. During cross-examination, he initially denied having obtained a search warrant for the laptop. But after defense counsel asked Bay to confirm matters in his investigative report—which had been provided to the defense as discovery but which was not admitted into evidence—Bay testified that Lorraine had brought the laptop to him personally sometime after Hance's arrest on August 1, that he had obtained a search warrant for

---

[11]During a brief recross, Lorraine testified that she had asked her friend to also delete the screen shot from her phone when Lorraine took Gina to the hospital after the outcry.

its contents,[12] and that it was probably sent to the Texas Department of Public Safety (DPS) along with Hance's cell phone for digital forensic examination. He testified that he did not know where the computer was at the time of trial.

Yet after defense counsel confronted Bay with YCSO evidence records—which also had been provided to defense counsel before trial according to the State's Article 39.14 disclosures—Bay confirmed that he had placed the laptop into the YCSO's evidence locker in August 2017. He also testified that Chief Deputy John Orr may have taken the laptop "to the lab" based on notes that Orr had checked the laptop out of the evidence locker and that it had been "sent to the lab." But Bay did not recall receiving a report about the computer's contents from DPS or any other lab and confirmed that the evidence records noted only that the cell phone had been returned from DPS.

On redirect examination, the ADA asked Bay, "So the mere fact that you've looked at the Property Disposition Reports and it's basically been moved around within the evidence locker at the SO, does that indicate nobody sent it off?" Bay answered unequivocally, "Correct." The ADA then asked, "And so they made a judgment call based on its condition that it wasn't worth sending off; is that correct?" And Bay answered—again unequivocally—"Someone did, yes." After confirming that the YCSO had received various evidentiary reports from items such as Hance's cell phone, the ADA again drove the point home that the laptop had not been sent to a lab for

---

[12]This search warrant was not provided to the defense according to the State's Article 39.14 disclosures.

examination: "And did you in fact receive reports on the items that were actually sent?" Bay replied, "Yes."

Before Bay left the stand, the State offered and the trial court admitted, without objection, a redacted copy of his custodial interrogation of Hance and played it for the jury. During the following exchange on the video, Bay referenced both Hance's internet history and child pornography:

Q. What am I going to find when I start pulling up internet histories and stuff like that?

A. You'll find me lookin' at fuckin' porn.

Q. What kind of porn?

A. Incest porn.

Q. Okay.

A. Father/daughter porn.

Q. Alright. I don't know. I just want to see if you['re] gonna be honest with me. You know, I've already seen it, you know, seen your internet history and stuff. I just want to see if you['re] gonna be honest with me about it. Do you have a . . . let's say, a knowledge of it . . . of incest child porn? You know, not saying child porn, but father/daughter porn and stuff like that? Not really an interest, but something you've looked at before that kinda leads me to believe that something like this can take place?

A. The reason I like that is cuz, you know, I like role-play.

Q. Sure. That don't have no problem with husband/wife role-play, I mean, that happens a lot. But . . . with that and this? Buddy, you need some help, man. Let's get it. Let's start it now.

After the State finished showing this video, the ADA asked Bay to confirm that Hance had admitted that he liked to watch incest and "father/daughter" pornography, which Bay did. Then, the ADA asked Bay whether he had to assume this pornography was "adult-on-adult" in nature, to which Bay responded, "I don't know."

As the last prosecution witness for the day, the SANE who conducted Gina's sexual-assault examination on July 29, 2017, testified that during the exam Lorraine had made the same father–daughter pornography-watching allegations that she testified to at trial. The SANE further testified, and her report reflects, that Lorraine said that a few months before the examination, she had "caught [Hance] Googling signs of child molestation and how common is father/daughter molestation."

By the conclusion of the first day's testimony, therefore, the jury had heard testimony from three prosecution witnesses from which a reasonable juror could have inferred (1) that an examination of the contents of the laptop could possibly have confirmed Lorraine's testimony concerning Hance's proclivity for adult father–daughter and incest pornography and alleged Google search history about father–daughter molestation and the signs of toddler molestation, (2) that Hance may have attempted to avoid an examination of the laptop's contents by spilling something on it, (3) that Lorraine retrieved the laptop from Hance and then delivered it to Bay to facilitate its examination by law enforcement, (4) that although Bay had obtained a warrant for a digital forensic examination of the laptop, the YCSO never had the laptop examined due to its poor condition, and (5) that, based upon his review of Hance's

20

laptop and cell-phone internet search history, had such a forensic examination of the laptop been conducted, Bay could not have ruled out the possibility of finding child pornography on it.

## B. The State's Discovery of the Laptop and Hance's Omnibus Motion for Relief

Before trial continued the next day, Tuesday, April 9, 2019, Hance filed, and the trial court heard, an omnibus motion seeking a dismissal, mistrial, or continuance. In his motion, Hance claimed that the State had contacted his counsel after trial the day before, at 6:15 p.m., to inform him that the laptop and a digital forensic-examination report from the Irving Police Department Electronic Evidence Unit (Irving PD EEU) "had been found at the YCSO" and that neither of them had been previously forwarded to the DA's office. Hance's motion also alleged,

> The lab report, as described by [the] ADA . . ., did not contain an examination of the search history for sites relating to child molestation. Whether such search history exists would tend to impeach the testimony of various [S]tate witnesses including the outcry witness and mother of the alleged victim.

Hance's motion further asserted,

> The failure to provide the report and access to the physical evidence (laptop) is a clear violation of [Texas Code of Criminal Procedure Article] 39.14 and *Brady* [*v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963)]. Additionally, it *violates fundamental fairness* and due process under both the Texas and U.S. Constitutions to a point where [Hance's] right to effective assistance of counsel is jeopardized. Finally, the concealment of the evidence requires the court to presume that it is exculpatory and material. [Emphasis added.]

21

And, finally, as an alternative to dismissal or mistrial, the motion sought both a continuance and the appointment of an expert to assist defense counsel in evaluating the laptop evidence withheld by the State:

> In the alternative, Defense Counsel requests a continuance so he may review the evidence which would require the assistance of an expert witness because the evidence in question is a hard-drive and not subject to Counsel's limited expertise.[13]

Printed the day before and provided to Hance's counsel the morning of April 9, 2017, were the following two Irving PD EEU incident reports—dated October 5, 2017, and August 31, 2017, respectively—which the trial court later admitted for record purposes:

---

[13]Significantly, for purposes of this appeal, neither the express language of Article 39.14 nor *Brady* provided a basis for the expert assistance requested by Hance's counsel in the alternative. *See State v. Heath*, 696 S.W.3d 677, 703 (Tex. Crim. App. 2024) ("Article 39.14 has never included a provision concerning the remedy for a discovery violation . . . ."); *Cohen v. State*, 966 S.W.2d 756, 763 (Tex. App.—Beaumont 1998, pet. ref'd) (holding that remedy for midtrial *Brady* violation is a continuance with possibility of post-continuance-request mistrial). Nor had the State at that time invoked the production restrictions imposed upon a defendant's discovery of child-pornography evidence in Article 39.15(c). As a result, the alternative relief requested in Hance's omnibus motion asserted only his federal and state due-process rights particular to expert appointments. *See Ake v. Oklahoma*, 470 U.S. 68, 74, 76–77, 105 S. Ct. 1087, 1091–93 (1985) (holding due process requires an indigent criminal defendant be given "access to the raw materials integral to the building of an effective defense" including the appointment of forensic experts); *Rey v. State*, 897 S.W.2d 333, 345 n.13 (Tex. Crim. App. 1995) ("We have recognized the relationship between the fundamental right to effective assistance of counsel and the indigent's right to the appointment of an expert." (citing *McBride v. State*, 838 S.W.2d 248, 251–52 (Tex. Crim. App. 1992) (holding that due process and right to effective assistance of counsel provide basis for indigent defendant's right to appointment of forensic expert), *superseded by statute on other grounds as stated in Watkins v. State*, 619 S.W.3d 265, 286–88 (Tex. Crim. App. 2021))).



305 N O'Connor Rd

Irving TX 75061

(972)721-2437

**17-19461**    Supplement No
0001

Reported Date
10/05/2017
Report Type
INFO ONLY
Officer

## Administrative Information

| Agency | Report No | Supplement No | Reported Date | Reported Time | CAD Seq No |
|---|---|---|---|---|---|
| Irving Police Department | 17-19461 | 0001 | 10/05/2017 | 15:01 | 170800661 |

| Status | Report Type |
|---|---|
| REPORT SUSPENDED/CLOSED | INFORMATION ONLY |

| Location | City | Rep Dist | Area | Beat |
|---|---|---|---|---|
| 305 N OCONNOR RD | Irving | 3409 | PD1 | 34 |

| From Date | From Time | Officer | Assignment | Entered by | Assignment |
|---|---|---|---|---|---|
| 08/31/2017 | 09:00 | | | | |

| RMS Transfer | Prop Trans Stat | Approving Officer | Approval Date |
|---|---|---|---|
| Supplement Transfer Complete | Successful | | 10/11/2017 |

Approval Time
15:31:39

## Property

| Item | Involvement | In Custody? | Log No | Item No |
|---|---|---|---|---|
| 1 | EVIDENCE | Yes | | 1 |

| Description | Typ | Cat |
|---|---|---|
| Forensic Exam Files on removable media drive | A | EVIDENCE |

| Article | RMS Transfer |
|---|---|
| DISK, COMPUTER (FLOPPY OR HARD DISKETTES) | Successful |

## Narrative

A copy of the examination files were placed on a removable media drive and logged into property for release to Investigator T. Bay or Chief Deputy John Orr of the Young County Sheriff's office.

*****PROPERTY DISPOSITION SUPPLEMENT*****

- **Release to Owner:**

Log#: _____

Item# : _____ 1 & 2 _____

Owner: _____ Young County Sheriff's Office Representative _____

Log#: _____

Item# : _____ 1 _____

Owner: _____ Young County Sheriff's Office Representative _____

\*\*\* If the Property owner is not already listed in a original or supplement ARS report which is related to this Report/Case Number, then they must be added to this supplement on the Persons Tab with the involvement _PO_. Please include as much contact information as possible for the person; i.e. addresses and phone numbers so that Property Personnel can make proper contact with the individual.. \*\*\*

<----------------------------------------------------------------->

DEFENDANT'S
EXHIBIT
5
4/5/19

| Report Officer | Printed At | |
|---|---|---|
| | 04/08/2019 15:27 | Page 1 of 1 |

# Incident Report
# Irving Police Department



305 N O'Connor Rd

Irving TX 75061

(972) 721-2437

Reported Date
08/31/2017
Report Type
INFO ONLY
Officer


## Administrative Information

| Agency | Report No | Supplement No | Reported Date | Reported Time | CAD Seq No |
|---|---|---|---|---|---|
| Irving Police Department | 17-19461 | ORIG | 08/31/2017 | 08:00 | 170800661 |

| Status | Report Type |
|---|---|
| REPORT SUSPENDED/CLOSED | INFORMATION ONLY |

| Location | City | Rep Dist | Area | Beat |
|---|---|---|---|---|
| 305 N OCONNOR RD | Irving | 3409 | PD1 | 34 |

| From Date | From Time | Officer | Assignment |
|---|---|---|---|
| 08/31/2017 | 09:00 | | |

| Entered by | Assignment | RMS Transfer | Prop Trans Stat | Approving Officer | Approval Date |
|---|---|---|---|---|---|
| | | Successful | Successful | | 09/07/2017 |

| Approval Time |
|---|
| 06:22:47 |

| # Offenses | Statute Code | Description | Complaint Type |
|---|---|---|---|
| 1 | IC0060 | INFORMATION REPORT | |

## Property Summary

| Involvement | Description |
|---|---|
| EVD | ARTICLE: EVIDENCE DCOMPL H PACK   HP Laptop with cracked screen |

| Involvement |
|---|
| EVD |

Description
ARTICLE: EVIDENCE DDISK    HGST laptop Hard drive; taken out of laptop by
EEU

| Involvement |
|---|
| EVD |

Description
ARTICLE: EVIDENCE DDISK    Hard Drive containing Full Examination
Files/image

## Summary Narrative
Assistance to outside agency.

| Based Officer | Printed At | |
|---|---|---|
| | 04/08/2019 15:27 | Page 1 of 3 |

# Incident Report
# Irving Police Department

## Property

| Item | Involvement | In Custody? | Log No | Item No | | | Typ | Cat |
|------|-------------|-------------|--------|---------|---|---|-----|-----|
| 1 | EVIDENCE | Yes | | 1 | | | A | EVIDENCE |

**Description**
HP Laptop with cracked screen

**Article**
COMPUTER LAPTOP (ELECTRONIC NOTEBOOK)    **Brand** HEWLETT-PACKARD COMPAMY

| Item | Involvement | In Custody? | Log No | Item No | | | Typ | Cat |
|------|-------------|-------------|--------|---------|---|---|-----|-----|
| 2 | EVIDENCE | Yes | | 2 | | | A | EVIDENCE |

**Description**
HGST laptop Hard drive; taken out of laptop by EEU

**Article**
DISK, COMPUTER (FLOPPY OR HARD DISKETTES)

| Item | Involvement | In Custody? | Log No | Item No | | | Typ | Cat |
|------|-------------|-------------|--------|---------|---|---|-----|-----|
| 3 | EVIDENCE | Yes | | 3 | | | A | EVIDENCE |

**Description**
Hard Drive containing Full Examination Files/image

**Article**
DISK, COMPUTER (FLOPPY OR HARD DISKETTES)

## Narrative

### Summary
The Electronic Evidence Unit (EEU) was requested to provide assistance to an outside agency in the form of an laptop examination. Investigators successfully imaged and examined the laptop. Artifacts of internet search history and websites viewing history revealed evidence of "daddy daughter" pornography. A review of videos and images on the device yielded an abundance of adult pornography as well as pornography depicting adults intentionally posed to appear younger or juvenile in nature.

### Priority of Evidence
The priority of processing of this evidence was determined to be of high priority due to the following facts and or circumstances;
1) This case involves the aggravated sexual assault of a child.
2) This examination is needed to corroborate victim testimony.

### Legal Authority
HP Laptop (Log# 1_____ Item# 1); Investigator T. Bay of the Young County Sheriff's office obtained a signed search warrant signed by the Honorable Stephen Bristow

### Scope of Investigation
The scope of this investigation has been narrowed by Young County Chief Deputy John Orr to include pornography of any kind (to include child exploitation materials, adult pornography, and pornography depicting incest), evidence of the possession or transmission of such materials and depictions of the victim in sexualized or inappropriate photos or videos.

### Results of Investigation
On 08/31/2017, I, Detective _____ was contacted by Young County Chief Deputy John Orr for assistance in an aggravated sexual assault of a child investigation. Specifically, Chief Deputy Orr had reason to believe that the suspect's computer contained evidence of child pornography or incest pornography that would corroborate the victim's testimony. Chief Deputy Orr transported the device to the Irving Police Electronic Evidence Unit and surrendered custody of the laptop directly to me.

The Irving Information Report #17-19461 was assigned for this examination. The laptop was logged into the Irving Property Room (Log# _____ Item# 1). Chief Deputy Orr stated that the laptop's screen was cracked and had a soda spilled on the device. The device was found to be powered off. The device is a silver and black, HP laptop (model 15-n061nr, serial 5CD34106Pb) with visible damage to the screen. The laptop was disassembled to allow for direct access to and removal of the hard drive (HGST, 500GB, Hard drive, s/n: 130913TM85134T2NGGGL). The hard drive was logged into property as a separate piece of evidence (Log# _____, Item# 1). Photos were taken of the laptop, the removed hard drive and the removal process.

The hard drive was connected to a forensic workstation via a Tableau hardware write blocker. FTK Imager (v. 3.4.3.3) was used to successfully obtain a verified image (.E01) of the suspect hard drive. Magnet Forensics IEF

| Report Officer | Printed At | |
|----------------|------------|---|
| | 04/08/2019 15:27 | Page 2 of 3 |

25

## Narrative

(v.6.3.2.0002) was ran on the resulting image file. A review of the resulting artifacts revealed google searches and significant internet history corroborating the victim's testimony of the presence of incest porn on the laptop. The following were found but is not an exhaustive listing:

*Google Searches (manually entered):*
"Daddystrailerparkvids.com"
"daddy trailer park xxx"

*Pornography Internet History (Chrome and Internet Explorer):*
"Teens tell DADDY to NOT tell MOMMY - XNXX.COM"
"taboo-bribing-dad - XNXX.COM"
"PervCity Assfucking Time For Barely Legal Babe"
"Daughter Homemade Reality Creampie sex with Daddy - XNXX.COM"
"Daughter Group gangbang family orgy sex with old dad and uncle - XNXX.COM"
"'dads creampie' Search - XNXX.COM"
"Daddy CREAMS his young daughters HOLES - XNXX.COM"
"Dad Thnks Daughter Is Wife - XNXX.COM"
"Dad fuck his own daughter - XNXX.COM"



Finally the hard drive contained at least five (5) images that depict females intentionally presented/posed in a manner that intends to convey a juvenile age (including "school girl" outfits). The resulting IEF case, hard drive image, exam photos and carved videos were placed on separate storage media and placed into property (Log# _____ Item# 3). Chief Deputy Orr was notified of the results of this investigation.

Containing the results of the Irving PD EEU's forensic examination, the August 2017 report (the Irving PD Forensic Report) confirmed the presence "of [G]oogle searches and significant internet history corroborating the victims' testimony of the presence of incest porn on the laptop"—without mentioning any searches related to signs of toddler molestation and prevalence of daddy–daughter molestation—and also reflected that the Irving PD EEU had conducted its examination under the legal authority of a search warrant signed by the district judge who eventually presided over the trial.[14]

Responding to Hance's motion during the hearing, the ADA confirmed that the laptop had been located and that he had delivered the Irving PD EEU reports to defense counsel. Explaining the circumstances of this discovery, he stated, "[R]ight after the trial had ended yesterday, I received a text message, [']Call me when you can,['] from the sheriff." The ADA then called and went to the sheriff's office where the sheriff handed him the Irving PD EEU's reports. The sheriff had also inquired about the laptop because of Bay's testimony that the computer's location was unknown and discovered that it had been sent to the Irving PD. When defense counsel noted that the State's request for twenty days' notice for expert designations had expired, thereby preventing him from complying, not only did the State not object to the requested appointment, but the ADA also waived the deadline on behalf of the State. Defense

---

[14]Neither the search warrant nor any supporting affidavit presenting the grounds therefor are a part of the appellate record.

counsel named a digital forensic expert in Fort Worth who had estimated that it would take ten to fourteen days to examine the computer. The trial court declined at that time to grant a mistrial and dismiss but, without objection from the State, granted Hance a continuance for purposes of facilitating a forensic examination of the computer. The ADA personally assured the court that the computer would be delivered to Hance's digital forensic expert in Fort Worth the next morning, Wednesday, April 10, 2019.

The trial court then brought in the jury and notified them that an evidentiary issue had arisen for which neither the trial court, the State, nor Hance was responsible, and that resolution of the issue required a recess for up to two weeks, stressing, "[W]e cannot go forward properly without this issue being resolved." The trial court asked the jury members to check their schedules for a resumption of trial on April 24, the Wednesday after Easter. One juror indicated that he had a business trip scheduled for the third or fourth week of April but could not be more specific about the day. The trial court confirmed that it would call the jury back sooner if the evidentiary issue was resolved before April 24.

## C. Despite Continuance, Hance Prevented From Examining Laptop

The trial court issued two written orders the next day, Wednesday, April 10. The first denied the motion to dismiss and motion for mistrial but granted a continuance until April 24. The second appointed the digital forensic expert recommended by defense counsel and approved funds for a forensic examination of the laptop by the expert. It also ordered the State to "immediately" turn over to the expert the laptop,

the hard drive removed from the laptop, the copy of the hard drive made by the Irving PD EEU, all related investigative reports, and any other evidence in the State's possession pertaining to the laptop.

Rather than immediately turning over the computer and related materials as ordered, however, the State decided to have another look at the laptop to see if it contained child pornography. To that point in the trial, the State had presented no evidence to support such a possibility. Indeed, Lorraine had testified that the only "daddy/daughter" or incest pornography she ever saw Hance access featured adults, not children. And the DA, when making her original proffer, had expressly represented to the trial court that she would "be happy to flush this all out that it's not children in the pornography."

Moreover, the Irving PD Forensic Report confirmed that the Irving PD EEU had searched for child pornography on the laptop according to the YCSO's specific request to search for "pornography of any kind (to include child exploitation materials, adult pornography, and pornography depicting incest) [and] evidence of the possession or transmission of such materials" in keeping with the YCSO's "reason to believe that the suspect's computer contained evidence of *child pornography* or incest pornography that would corroborate the victim's testimony." [Emphasis added.] According to the report's summary, "[a] review of *videos* and *images* on the device revealed an abundance of *adult* pornography as well as pornography depicting *adults* intentionally posed to appear younger or juvenile in nature." [Emphasis added.] The report also noted that

29

examination of the laptop's "internet search history and websites viewing history" corroborated the victim's testimony and yielded evidence of "incest porn"—specifically listing examples of such searches without noting the actual content of the associated websites. Importantly, the report did not note that the examiner had found evidence of any Google searches for the signs of toddler molestation and prevalence of daddy–daughter molestation.

Nonetheless, communicating with defense counsel the evening of Tuesday, April 9, by both text message and telephone call, the DA informed him that, based upon her personal and her office's examination of the laptop, she was concerned that she could not produce the laptop as ordered due to the possible presence of child pornography on it, thereby implicitly invoking the restrictions on production established by Articles 38.45 and 39.15 of the Texas Code of Criminal Procedure. Tex. Code Crim Proc. Ann. arts. 38.45, 39.15 (forbidding production to defendants of any materials containing child pornography except when made available for inspection at State-controlled facilities). But despite raising this issue with counsel at the beginning of the continuance period, the State neither objected to nor otherwise formally sought relief from or modification of the trial court's order[15] until the following Monday, April 15, during an afternoon status conference called and conducted by the trial court because the juror with a

---

[15]The trial court indicated at the status conference that it had "received some multiple texts or some conversations between defense and the [S]tate conceding that evidence [the laptop], it not being ever transported or anything to this location."

business-travel commitment had indicated he could not continue his service beyond the coming weekend, on which fell Easter Sunday.

Nothing in the record suggests that between April 9 and April 15 the State even informally offered to facilitate the digital forensic examination ordered by the trial court by producing the laptop to Hance's court-appointed expert via the reasonable accommodations contemplated by Article 39.15(d), for example, at either the YCSO or the Irving PD EEU.

At the status conference, the trial court began by acknowledging its awareness of certain communications between the State and defense counsel concerning the State's failure to produce the laptop, but it nevertheless asked the DA for a formal explanation of why the State had not yet complied with its orders. The DA explained that "based on [her] review of the evidence contained in that hard drive, there are certain images that cannot definitively be classified as nonchild pornography." She recounted that her office did not learn that the computer's hard drive had been sent to the Irving PD EEU for analysis until after defense counsel had raised his objections to Lorraine's testimony and that her office also did not know that the YCSO had a mirrored copy of the hard drive. The DA then represented that she had relayed her concern to defense counsel on the evening of Tuesday, April 9—the day that the trial court heard Hance's omnibus motion and the day before the trial court entered the order compelling production of a "copy" of the laptop's hard drive—telling him that "she had viewed [the computer's hard drive, and] her office had viewed it, and they believe[d] there could be some child

pornography on there." Thus, over the weekend, the DA had sent the mirrored hard drive, which was sealed in the YCSO's evidence room, to the Irving PD EEU for a second look to confirm her suspicions about the presence of child pornography.

Specifically, the ADA went to the Irving PD EEU on Saturday, April 13—three days after the prosecution team's alleged discovery of possible child pornography on the hard drive, and the weekend of Palm Sunday —and asked an unidentified technician whether he was comfortable producing the computer. The DA represented that the technician said that he was "somewhat apprehensive about that based on the images that [he] ha[d] seen." He was also represented to be concerned that the State "would be in violation of the laws if [it] were to release anything that contained child pornography to a nonlaw enforcement agency." Finally, according to the DA, the technician "just went through [the hard drive] again and provided a report with that."

Conceding he was in town that afternoon to review whatever laptop evidence the State would make available to him, but categorically denying that he had yet seen any such evidence in compliance with the trial court's order, defense counsel offered— and the trial court admitted into evidence for purposes of the conference only—the Irving PD Forensic Report previously produced by the State, observing that the Irving PD had not found any child pornography on the hard drive, and argued that the expert appointed by the trial court, not the DA, was the proper person to make a contrary determination. He further noted that he had not had a chance to speak to the technician who had performed the weekend examination, having just heard about it. Defense

counsel then argued that knowledge of the hard drive and the Irving PD Forensic Report was imputed to the State, even though the prosecution team had just learned about them on the second day of trial. He then reiterated his request for the court-appointed forensic expert to examine the hard drive because of the limited forensic examination originally performed by the Irving PD EEU, specifically reasserting his effective-assistance-of-counsel, Article 39.14, *Brady*, and federal and state due-process arguments.

In an obvious reference to Article 39.15—under which a court must grant an "ample opportunity" for a defendant, his counsel, *and his expert* to examine evidence containing child pornography at a State-controlled facility, *see* Tex. Code Crim. Proc. Ann. art. 39.15(d)—and *Ake*, defense counsel argued that the State's actions had limited his effectiveness as counsel and that it was "pretty ridiculous" to expect him to come down "half a day before we resume"—apparently, counsel knew that the trial court had planned to resume the trial the next day although there were eight days left on the fourteen-day continuance—"to look at something after [he] had asked for an expert to do it." Defense counsel continued,

> I think that *fairness* demands that a decision be made about whether there's child pornography on there so a decision can be made regarding whether my expert looks at it at his lab or goes to another person, a state-run lab, to look at it. Just giving me a report, again, just less than 24 hours before we start back in trial doesn't satisfy those things.[16] [Emphasis added.]

---

[16]Defense counsel's reference to a report appears to be in anticipation of receiving the report mentioned by the DA when discussing her office's weekend consultation with the Irving PD EEU technician. Nothing in the record reflects that

33

Thus, he asserted that Hance's "right to a fundamentally fair and due process trial with due process under both Texas and U.S. Constitutions" was being violated and that he was being denied "effective use of counsel because [he had not had] access to that evidence." Defense counsel then re-urged Hance's omnibus motion for continuance to permit the DA time to determine if the laptop actually contained child pornography and for him to have ten to fourteen days for a defense expert to perform the digital forensic examination the trial court had already ordered.

The response of the DA bears quoting:

Your Honor, first I would say that this argument is somewhat premature inasmuch as he has not even viewed the evidence that I have available for him at this time. He might be able to make that determination immediately. We don't even - - we will not even be offering this evidence at trial.

And, as I said, from what I could tell, there was not any exculpatory evidence, if anything, very inculpatory, and so I didn't misstate something. On Tuesday afternoon when I went over to the Sheriff's Office after we broke, there was a - - the mirrored hard drive we had not found yet that was all sealed and everything, but there was a hard drive that had the evidence that came with that report, and that's where I had seen some images that concerned me, very much concerned me. And then in this mirrored hard drive there's some that it's hard to tell. I would, you know - - but the mere fact that we're not even planning on offering this at trial, I would think in itself makes the point moot as far as any of the inculpatory evidence that might be available.

As far as him saying there's exculpatory - - or at least impeachment material, that is something he ought to be able to ascertain on his own

any such report was provided to either defense counsel or the trial court, particularly after defense counsel offered the Irving PD Forensic Report into the status-conference record for purposes of demonstrating that there was no child pornography on the laptop, and the State did not offer the purported weekend report in rebuttal.

without an analyst. And I will make this available to him, and he can review it. If he does at that point feel he cannot ascertain one way or the other, then perhaps the answer is to let him go to a state lab and let our state lab person walk him through the steps on what's exactly on this mirrored image. But I really do not think that this is even material evidence inasmuch as we are not going to be admitting it at trial.

In summary, the DA (1) denied the materiality of any images found on the mirrored hard drive that might constitute child pornography by prophylactically forswearing the State's offer thereof, (2) argued defense counsel could personally confirm her representations of exclusively inculpatory, yet immaterial, evidence without the assistance of his court-appointed forensic expert even though she herself had sought the assistance of the Irving PD EEU technician over the weekend, (3) in the event he could not, suggested for the first time that State facilities and personnel could be made available to defense counsel personally to, again, confirm her representations of exclusively inculpatory, yet immaterial, evidence but (4) did not extend this offer to the forensic expert appointed by the trial court.

Considering these arguments, the trial court confirmed that it had already communicated to the parties that the trial would resume the next day because the one juror who had needed to check his availability had confirmed that he was scheduled to leave on a business trip the next Sunday, April 21, 2019 (Easter Sunday) and could not return at the end of the continuance on Wednesday, April 24. The trial court expressed that it was hopeful that the three days remaining in the week, excluding Good Friday, would be sufficient to conclude the trial. The trial court then stated that in accordance

with the State's representation, it would exclude evidence from the laptop during the remainder of trial, but it agreed with the State's suggestion to recess the hearing to "give [defense counsel] an opportunity to view what we have" and recessed the status conference for about an hour for him to do so.

When the status conference resumed, defense counsel stated that the evidence he had reviewed was "the refined search as requested by the investigation team," which contained hundreds of thousands of files. More specifically, he described the access offered by the State during the break in the following manner:

> Your Honor, [the DA], as she claimed, she made the hard drive available to me. I started looking at it. There's a section that was entitled IEF Refined Results, which is the results that the [YCSO] sent off to request. It's the refined search as requested by the investigation team. And that was the first section, and it contained a number of things. I went through them. I couldn't open a lot of the URLs, and a lot of things didn't have dates or anything like that.
>
> The next section was I think the remainder of the hard drive that they didn't look at, or I guess they probably did key word searching, but it didn't come back as part of the investigation. And I just made some notes just because of how voluminous it is. There are 413 PDF documents, 986 RTF documents, over 2100 text documents. There are almost 900 - - I'm sorry. There are almost 1500, or actually over 1500 videos, over 137,000 pictures, 6,000 cash [sic] records, Chrome cash [sic] records, almost 1400 Chrome website visits, 6,000 plus Internet Explorer content, just under 14,000 potential browser activity, and 13,000 plus Windows event logs.
>
> I can't spend a couple of hours in the afternoon during trial to dig through all that information, plus I don't know what - - when I pull it up on the screen, it gives me a little bit of information, but I don't know how to read it, and so I would just reurge my motion.

In a brief response, the DA reiterated that the State did not intend to offer any of the evidence made available to defense counsel during the remainder of the trial even though she thought the evidence was inculpatory, and then asserted that, although defense counsel should have been able to determine whether the laptop contained impeachment evidence without an expert, the State would be amenable to accommodating both defense counsel and his court-appointed forensic expert with access to the mirrored hard drive at the Irving PD:

> And [defense counsel] has made it clear that what he is looking for is some sort of impeachment evidence, which I don't think he's going to find. But should this Court want to entertain allowing him to come to the Irving Police Department with his expert or whomever. We can have John Orr bring the evidence and we can meet at the Irving PD and go through all of this with him so that he can find that there's mainly inculpatory evidence against his client, something of which we're not even admitting into evidence. But we would be happy to accommodate [defense counsel] in that manner.
>
> I don't really think he's entitled to it. He has - - he's been able to look at this. From what he can tell, I mean, it's a typical hard drive that has everything that you would have - - your kids have been using it. There's lots of things on there. And hidden in there there's some pretty lewd images, which I think we can attribute to this defendant by his own testimony and the testimony of his wife.
>
> But I will defer to the Court with regard to giving this defendant additional time to look at evidence that we're not even planning on admitting at trial.

She again offered no evidence of any child pornography found on the mirrored hard drive, nor did she challenge defense counsel's assertion that the "IEF Refined Results" he had viewed were those originally obtained by the YCSO's investigative team from

the Irving PD EEU instead of those purportedly obtained during the weekend forensic examination.[17] And at no time did she indicate that the prosecution team had sought confirmation of Lorraine's Google search-history testimony vis à vis the laptop. In conclusion, defense counsel argued, "[I]t's clear that we're entitled to more time to have it looked at and to have an expert look at it."

The trial court thereafter concluded the status conference by overruling Hance's objections, finding the entirety of the laptop evidence immaterial, forbidding its introduction into evidence during the remainder of the trial, and reconvening the trial for the next morning. Notably, the trial court did not issue a new order rescinding or otherwise amending its prior order compelling a forensic examination of the laptop by the digital forensic expert it had appointed to assist Hance in his defense.

**D. Despite No Defense Expert Examination of Laptop, Trial Resumes**

During a brief recess after the first witness had finished testifying the next morning, defense counsel asked the trial court to admit photographs he had taken— essentially, screen shots or screen grabs—to memorialize the statistics he had discussed

---

[17]The Irving PD Forensic Report indicated that "Magnet Forensics IEF (v.6.3.2.0002) was ran [sic] on the resulting image file [of the mirrored hard drive]" and "the resulting artifacts revealed google searches and significant internet history corroborating the victim's testimony of the presence of incest porn on the laptop." *See Stitz v. United States*, No. 3:19-cv-141-RJC, 2020 WL 6591646, at *2 (W.D.N.C. Nov. 10, 2020) ("The forensic tool Internet Evidence Finder (IEF) utilized by the FBI identified approximately 549 files that were downloaded using the ARES program. Most of the titles for the downloaded files were indicative of child pornography."). The DA did not indicate whether the weekend examination had employed the same or a newer extraction tool to identify possible child pornography on the mirrored hard drive.

during the status conference and to demonstrate his inability to properly examine the results of the Irving PD EEU's forensic examination of the laptop. Without objection from the State, the trial court admitted the photographs for purposes of the status-conference record only. The photograph of the "Recovered Artifacts" list, which included "IEF Refined Results," showed the presence of just thirty-two Google searches—none of which are confirmed in this record to include the signs-and-prevalence queries to which Lorraine had testified.

After the recess, Gina's brother testified that on the day of the sexual assault, Hance had made him and his younger brother leave the children's room and shut the door. When Gina's brother tried to go into the room to get a toy, he saw Hance touching Gina's "butt" with his "middle part." Gina then testified as the State's last witness, confirming what she had told Lorraine, the SANE, and the forensic interviewer: that Hance had "humped" her from behind, that he had ejaculated, and that while he was "humping" her, he made her watch a pornographic movie. According to Gina, the video was on Hance's phone.

During the rest of the trial, the State made no further mention of the laptop, other than to object when defense counsel attempted to confirm with Hance—who testified on his own behalf—that Lorraine had gotten into his truck to take the laptop. After Hance answered, "Yes," the State objected that the question and answer mischaracterized the laptop as his and not hers, to which the trial court reminded both sides that it had "forbidden" its use. When Hance's counsel indicated that he wanted

only to clarify that Lorraine had retrieved the laptop from Hance's truck, the trial court declined to rule on the State's objection and told defense counsel to "move on."

The State did, however, reference both Hance's proclivity for daddy–daughter and incest pornography and suggest that this proclivity extended to viewing child pornography. On direct examination, Hance acknowledged an addiction to daddy–daughter and incest pornography, as evidenced by his admission during his custodial interrogation by Bay, but categorically stated that all the pornography he watched involved adults who were role-playing, not actual children. Hance also categorically denied ever showing Gina or her brothers any type of pornography—daddy–daughter, incest, or otherwise—via his phone or "on a computer or tablet or any other kind of computer."

During cross-examination, the DA asked Hance why he would visit incest pornography websites if he was not aroused by "the idea of incest." She then questioned Hance about his relationship with a couple with whom he had resided when he first came to Texas, confirming that during that time he had engaged in a sexual relationship with the wife—with the husband's knowledge and participation—and then asking, "Isn't it true that they are both locked up in the federal penitentiary for child pornography specifically involving their granddaughter?" The trial court had allowed the question on an "if he knows" basis over a "facts not in evidence" objection of Hance's counsel, but the only possible inference for the jury to draw was that Hance

shared their proclivity for child pornography. Hance conceded that he knew they were incarcerated but not for what offense.

Then, after taking over the cross-examination, the ADA specifically highlighted Hance's incest-pornography admissions during Bay's custodial interrogation by asking Hance, "So you wouldn't have looked for a little girl to fulfill that kind of fantasy, would you," to which Hance said, "No, sir."

**E. Jury's Verdict and Post-Trial Proceedings**

Eventually, on Thursday morning, April 18, 2019, the day before Good Friday, the jury returned a verdict of guilty on the sole count of the indictment. The next day, after the State and defense reoffered the guilt–innocence evidence and briefly questioned both Gina's brother and Lorraine, the jury assessed a sentence of fifty years' incarceration and a $10,000 fine. The trial court accepted the jury's verdict and pronounced a sentence consistent therewith. The trial court then entered its written judgment.

Hance filed his motion for new trial on May 13, 2019, asserting the same grounds stated in his prior omnibus motion as well as that the forensic expert appointed was never able to provide services because of the State's withholding the laptop and the trial court's early resumption of trial. Three days later, the trial court issued a written order denying Hance's re-urged motions from April 15, 2019. The order appears to have been drafted in April but was not signed and filed until May 16, 2019. Although the trial court had expressly found the laptop evidence to be immaterial, and therefore not subject to

41

discovery under Article 39.14(a) or (h) via Article 39.15, the order inexplicably required the State to "make the 'laptop and its contents' available to the Defendant, the Defendant's Attorney[,] and/or the Defendant's designated expert." This mandate appears nowhere else in the record. Although the trial court's order was signed twenty-seven days after the trial ended, it concludes as follows: "IT IS THEREFORE ORDERED that the jury trial shall resume at 9:00 a.m. on April 16, 2019."

Although the trial court called the motion for new trial for a hearing, Hance withdrew the motion because he had filed his notice of appeal the preceding day. The trial court denied the motion on the record, and this appeal followed.

### III. Discussion

On appeal, Hance raises six issues, asserting that the trial court erred by (1) admitting evidence that he had watched "daddy/daughter" pornography; (2) admitting evidence that he had engaged in "daddy/daughter" role-playing with Lorraine during sexual intimacy; (3) admitting Lorraine's Google search-history testimony; (4) denying his re-urged motions for mistrial and for continuance; (5) failing to require the State to produce Lorraine's laptop to determine whether it contained material evidence; and (6) denying his motion for new trial. Implicit and fairly included in his fourth through sixth issues are the complaints (1) that the State violated the Michael Morton Act and (2) that by prematurely ending the continuance it had previously granted and resuming trial instead of granting a mistrial, the trial court

42

violated Hance's due-process right to have an expert examine the laptop to try to rebut the evidence already admitted by the State, to impeach Lorraine, or both.

## A. Standards of Review

We review all of Hance's preserved complaints for an abuse of discretion. *See Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018) (evidentiary decisions); *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009) (mistrial); *Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App. 2007) (continuance); *see also State v. Heath*, 696 S.W.3d 677, 703 (Tex. Crim. App. 2024) (applying standard of review for particular remedy denied to Article 39.14 violation).

When reviewing evidentiary complaints under the abuse-of-discretion standard, we will uphold the trial court's decision if it is within the zone of reasonable disagreement. *Beham*, 559 S.W.3d at 478. If the evidentiary ruling is correct on any applicable theory of law, we will not disturb it. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

To establish that a trial court abused its discretion by denying a motion for continuance, the appellant must show that he was "actually prejudiced by the denial." *Gallo*, 239 S.W.3d at 764. Likewise, a mistrial is appropriate only when the record reveals highly prejudicial and incurable error "of such character as to suggest the impossibility

of withdrawing the impression produced on the minds of the jurors." *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999).[18]

## B. Evidentiary Issues

In his first three issues, Hance contends that the trial court abused its discretion by admitting evidence that he had watched daddy–daughter pornography, had engaged in daddy–daughter role-playing with Lorraine during sexual intimacy, and had "Googled whether 'daddy/daughter' molestation is common and what comprises the signs of toddler molestation." Given that the record reflects that the trial court's rulings on the two preserved evidentiary objections discussed in Hance's first three issues factor into our ultimate harm analysis of his fourth and fifth issues, we will begin our discussion with the preserved evidentiary complaints.

### 1. Preservation

Hance asserts on appeal that none of the challenged evidence was relevant and that it was unduly prejudicial under Rule 403 of the Texas Rules of Evidence. Hance timely objected to the adult daddy–daughter pornography evidence and Google search-

---

[18]When reviewing whether a mistrial was warranted for prosecutorial misconduct, we balance three factors: (1) the severity of the misconduct (the magnitude of the prejudicial effect of the misconduct); (2) the measures adopted to cure the misconduct (the efficacy of any remedial measures implemented by the judge); and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *See Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g). We view the evidence in the light most favorable to the trial court's ruling, consider only those arguments before the court at the time of the ruling, and will uphold the ruling if it is within the zone of reasonable disagreement. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009).

history evidence under Rule 403 and received a ruling, thus preserving those two complaints for appeal.[19] *See* Tex. R. App. P. 33.1(a)(1). But he did not timely object to Lorraine's daddy–daughter role-playing testimony, nor did he object to any of the challenged evidence on general relevancy grounds. Accordingly, we will address only his two preserved complaints. *See Robinson v. State*, No. 02-22-00265-CR, 2023 WL 4780547, at *4 (Tex. App.—Fort Worth July 27, 2023, pet. ref'd) (mem. op, not designated for publication) (observing that error preservation concerning the admission of evidence requires both an objection at the time offered and an objection comporting with the opponent's complaint on appeal).

### 2. Rule 403

Even relevant evidence can be excluded under Rule 403 if the danger of unfair prejudice substantially outweighs the evidence's probative value. *McNeil v. State*, 398 S.W.3d 747, 756 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see also* Tex. R. Evid. 403 (permitting courts to exclude relevant evidence if its probative value is substantially

---

[19]As observed above, *see supra* note 9, the record reflects that the State notified Hance of its intent to use Lorraine's daddy–daughter pornography and sexual role-playing testimony under Rule 404 and Article 38.37 of the Texas Code of Criminal Procedure, but it failed to notify Hance of its intent to use Lorraine's Google search-history testimony at all. *See* Tex. Code Crim. Proc. Ann. art. 38.37, § 2 ("Evidence of extraneous offenses or acts"); Tex. R. Evid. 404 ("Character Evidence; Crimes or Other Acts"). Hance did not object to the Google search-history testimony under either of these provisions, nor did he object generally that the State did not provide notice. He likewise has not raised an issue related to these provisions on appeal. Thus, we do not address the State's failure to provide notice or the trial court's admission of the Google search-history testimony under Rule 404 or Article 38.37, other than to note that Hance had no formal notice of it for purposes of preparing his defense.

outweighed by the danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence"). "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence is more probative than prejudicial." *James v. State*, 623 S.W.3d 533, 546–47 (Tex. App.—Fort Worth 2021, no pet.) (first citing *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1990) (op on reh'g); and then citing *Emich v. State*, No. 02-18-00059-CR, 2019 WL 311153, at *7 (Tex. App.—Fort Worth Jan. 24, 2019, no pet.) (mem. op., not designated for publication)). This presumption places the burden on the party opposing admission to show that the evidence's probative value is substantially outweighed by one or more of the dangers listed in Rule 403. *James*, 623 S.W.3d at 547; *Wells v. State*, 558 S.W.3d 661, 669 (Tex. App.—Fort Worth 2017, pet. ref'd); *Sanders v. State*, 255 S.W.3d 754, 760 (Tex. App.—Fort Worth 2008, pet. ref'd).

To determine whether evidence is admissible in the face of a Rule 403 objection, the trial court must conduct a balancing test. *Montgomery*, 810 S.W.2d at 389; *see Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). This test requires the court to balance (1) the evidence's inherent probative force and (2) the proponent's need for that evidence against the evidence's tendency (3) to suggest a decision on an improper basis or (4) to confuse or distract the jury from the main issues, (5) the possibility that a jury that is ill-equipped to evaluate the evidence's probative force would give it undue weight, and (6) the likelihood that the evidence's presentation will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco*, 210 S.W.3d at 641–42. "In reviewing the trial court's balancing determination under Rule 403, we are to 'reverse the trial court's judgment rarely and only after a clear abuse of discretion.'" *Martinez v. State*, 468 S.W.3d 711, 718 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (quoting *Kappel v. State*, 402 S.W.3d 490, 494 (Tex. App.—Houston [14th Dist.] 2013, no pet.)).

Hance argues that the first two *Gigliobianco* factors weighed heavily against admission of the pornography and search-history evidence because of other evidence admitted at trial, including the victim's testimony. He contends that the pornography and search-history evidence was also "inherently inflammatory," adding that the daddy–daughter pornography (as with the admitted sexual role-playing evidence) did not involve children and that the Google search-history allegation was not "criminal or bad behavior in and of itself." Thus, Hance argues that the challenged evidence was not "comparable to the charged offense" and that the third *Gigliobianco* factor also weighed against its admission. He further asserts that because this evidence "threatened to confuse or distract the jury from the main issues," the fourth and fifth factors weighed against admission. He contends that the sixth factor is neutral because presenting the testimony at issue did not take an inordinate amount of time. Although we agree with his assessment of the last factor, we disagree that the balance of the remaining factors favored exclusion of both types of evidence, which were strongly probative indicators that Hance had moved beyond fantasizing about incest-like conduct to actually engaging in it.

### 3. Adult Daddy–Daughter and Incest Pornography

Hance was charged with aggravated sexual assault of a child. *See* Tex. Penal Code Ann. § 22.021(a)(1)(B)(i), (2)(B). "'[I]ntent to arouse or gratify sexual desire' is an implicit element of aggravated sexual assault of a child." *Sarabia v. State*, 227 S.W.3d 320, 323 (Tex. App.—Fort Worth 2007, pet. ref'd) (quoting *Ochoa v. State*, 982 S.W.2d 904, 908 (Tex. Crim. App. 1998)); *see also Evans v. State*, 299 S.W.3d 138, 142 (Tex. Crim. App. 2009) (explaining that intent-to-arouse-or-gratify element need not be expressly stated in the penal code section describing aggravated sexual assault of a child because of its descriptive title and because the required conduct is so severe "that the statute would not be applied to any legitimate handling of the child"). Intent may be inferred from circumstantial evidence, "such as acts, words, and the conduct of the appellant." *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

In a case involving a sexual offense against a child, evidence that a defendant possessed or viewed adult role-playing pornography can be admissible in the face of a Rule 403 objection when, as here, there is a clear nexus between the pornography and the victim or the pornography and the circumstances of the offense. *See Hubbard v. State*, No. 02-23-00067-CR, 2023 WL 7399135, at *3 (Tex. App.—Fort Worth Nov. 9, 2023, pet. ref'd) (mem. op., not designated for publication) ("Evidence that Hubbard visited pornographic websites with domain names suggesting that they contained content relating to incest . . . is highly probative of his intent to arouse or gratify his sexual desire by sexually abusing his stepdaughter.") (first citing *Sarabia*, 227 S.W.3d at 324; and then

48

citing *Darby v. State*, 922 S.W.2d 614, 620 (Tex. App.—Fort Worth 1996, pet. ref'd)); *see also Lewis v. State*, 676 S.W.2d 136, 139 (Tex. Crim. App. [Panel Op.] 1984) ("The photographs [of the complainant] are relevant in helping the jury to determine whether appellant had the intent to arouse or gratify his sexual desires when he touched the complainant during the photography sessions."). Thus, despite its inherently inflammatory nature, evidence that Hance possessed, viewed, or searched for content that depicted daddy–daughter or incest pornography, whether actual or simulated, was highly probative of Hance's intent to sexually assault his stepdaughter—not necessarily because of her age but because of her relationship to him. *See Mays v. State*, No. 05-21-01033-CR, 2023 WL 8014507, at *3 (Tex. App.—Dallas Nov. 20, 2023, pet. ref'd) (mem. op. not designated for publication) ("Thus, the internet searches and frequently visited site history directed at "'dad,' 'daughter,' and 'free daughter porn' were admissible under Rule 404(b) because they tended to show May's intent or motive to arouse or gratify his sexual desire with his daughter."); *Hubbard*, 2023 WL 7399135, at *3 (holding that evidence of defendant's visiting pornographic websites with domain names suggesting that they contained content relating to incest or to the sexual exploitation of children was highly probative of his intent to arouse or gratify his sexual desire by sexually abusing his stepdaughter); *Roe v. State*, 660 S.W.3d 775, 783–84 (Tex. App.—Eastland 2023, pet. ref'd) (holding defendant's internet search history, including searches of websites containing incest and daddy–daughter pornography, admissible to show intent to arouse or gratify his sexual desires and to rebut his disclaimer of such

intent during custodial interrogation); *see also Spaniol v. Young*, 981 N.W.2d 396, 398, 406 (S.D. 2022) (describing defendant's cell phone internet searches "for content depicting role-playing father/daughter sexual encounters" as "highly inculpatory evidence" in affirming conviction for rape of his four-year-old autistic daughter); *cf. Foster v. State*, No. 05-14-01186-CR, 2015 WL 8039901, at *4 (Tex. App.—Dallas Dec. 7, 2015, no pet.) (mem. op., not designated for publication) (holding that evidence that defendant searched for and viewed child pornography, particularly searching for terms like "daddy-daughter" and "Lolita," was highly probative of his intent to arouse or gratify his sexual desire by sexually abusing a child); *Wooley v. State*, No. 05-09-00455-CR, 2010 WL 5395650, at *4, *11-12 (Tex. App.—Dallas Dec. 30, 2010, no pet.) (not designated for publication) (holding that defendant's confession that he viewed child pornography obtained by employing search term "Peto" was admissible to show his intent to arouse himself sexually with a child); *Sarabia*, 227 S.W.3d at 324 (holding two contact sheets of photographs depicting underage boys engaged in sex was admissible to show defendant's intent to arouse and gratify his sexual desires via underage boys); *Darby*, 922 S.W.2d at 620–22 (holding that magazine containing sexually explicit photographs of young adult female posing with teddy bear was probative of intent supporting allegations that defendant committed indecency by posing minor victim with teddy bear during impromptu photo shoot). *But cf. Johnson v. State*, No. 06-19-00222-CR, 2020 WL 5948804, at *6–8 (Tex. App.—Texarkana Oct. 8, 2020, no pet.) (mem. op., not designated for publication) (holding voluminous adult-only pornographic images and

internet search results containing links to pornographic websites—found in a search removed in time from the offense, the details of which included showing the child pornography—inadmissible in prosecution for aggravated sexual assault of a child when State had presented evidence of two eyewitnesses to charged offenses); *Akin v. State*, No. 06-14-00178-CR, 2015 WL 5439354, at *4–5 (Tex. App.—Texarkana Sept. 16, 2015, pet. ref'd) (mem. op., not designated for publication) (holding evidence of defendant's internet searches for and viewing of adult pornography involving violent and forced sex, but not child pornography, inadmissible in prosecution for sexual assault of a child).

Although not brought to our attention by either Hance or the State, in *Watkins v. State*, this court held substantially similar search-history evidence admissible to demonstrate the defendant's intent in affirming a conviction for continuous sexual abuse of a child. No. 02-12-00024-CR, 2013 WL 531062, at *3–4 (Tex. App.—Fort Worth Feb. 14, 2013, pet. ref'd) (per curiam) (mem. op., not designated for publication). In that case, the mother of the victim had become suspicious of her husband's relationship with their two oldest daughters after the oldest hinted to her boyfriend that her father was sexually abusing her and the mother had found child pornography[20] on

---

[20]Although there is a clear legal distinction between possessing and viewing adult pornography portraying sexual activity between fathers and daughters and possessing and viewing incestuous child pornography, the legislature's determination that the State may introduce the latter in the prosecution of sexual crimes against children—"for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant"—informs our

his computer. *Id.* at *1. When the oldest daughter subsequently made an outcry to her mother of sexual abuse by her father, the other daughters confirmed that he had sexually abused them as well. *Id.* After the father was arrested, the police searched his laptop and found "searches for 'daddy' plus 'daughter' plus 'videos or images' and found search terms associated with child pornography." *Id.* "Police also found child pornography videos stored on the laptop." *Id.* At trial, the oldest daughter testified that her father had shown her child pornography on his computer and told her "that the young girls in the videos were having sex with their fathers and that it was normal to do so." *Id.*

On appeal, Watkins argued that the trial court abused its discretion by admitting testimony about what was found on his laptop when he was arrested, asserting that he did not "open the door" to this testimony, that the State could not introduce it to prove character conformity, and that even if admissible it was more prejudicial than probative. *Id.* at *2. In rejecting these arguments, this court held that the defendant's "viewing of child pornography, particularly father–daughter pornography, is relevant circumstantial evidence of his intent to arouse or gratify his sexual desire." *Id.* at *3. We further observed that the discovery of child pornography and father–daughter image and video

---

view of the probative value of the former in the prosecution of similar crimes. Tex. Crim. Code Proc. Ann. art. 38.37, §§ 2(a)(1)(H), (b). And if "a proclivity for child pornography" demonstrates "a prurient interest in children[,]" *see Wise v. State*, 364 S.W.3d 900, 907 (Tex. Crim. App. 2012), a proclivity for arousing and gratifying oneself sexually by viewing adult pornography portraying such illicit activity is similarly probative of intent.

searches on the defendant's laptop demonstrated that he "viewed the father-daughter relationship as a sexual one." *Id.*

In addressing the defendant's Rule 403 objection, we observed that "his viewing of child pornography, specifically father-daughter pornography—even on a different computer than the one he had used when he lived with his family—tended to corroborate [the oldest daughter]'s testimony" that he had shown her such pornography and the mother's testimony that she had found child pornography on his computer during their marriage. *Id.* at 4. We reiterated that the defendant's viewing of father–daughter pornography tended to show that he viewed the father–daughter relationship as a sexual one and that his internet searches for such pornography by employing queries including "daddy" plus "daughter," plus "images" or "videos," lent credibility to his daughter's accusations, especially since they had previously denied any abuse. *Id.* Given the State's need for such testimony under the circumstances, we held that the trial court did not abuse its discretion in admitting this evidence for the jury's consideration. *Id.*

Hance argues that the State's need for the evidence here was low, considering that the complainant herself testified, as well as her brother, who had seen the offense the State elected to rely on. But both of these witnesses were young minors at the time of trial. And, as we explain later in this opinion, Hance presented probative evidence that shed some doubt on whether he was even at home on the date on which Lorraine testified the offense elected by the State occurred. Additionally, the evidence regarding

53

the elected offense's date came solely from Lorraine, who was subject to impeachment. Thus, we cannot say that the State's need for the evidence was as insignificant as Hance urges. *See Hammer v. State*, 296 S.W.3d 555, 562 (Tex. Crim. App. 2009) ("[T]he Rules of Evidence, especially Rule 403, should be used sparingly to exclude relevant, otherwise admissible evidence that might bear upon the credibility of either the defendant or complainant in such "he said, she said" cases.").

Finally, the jury had already heard evidence that Hance and Lorraine regularly engaged in incest role-playing that Lorraine testified made her uncomfortable,[21] and it

---

[21]Such evidence is admissible to demonstrate incestuous or pedophilic intent when the purpose or foreseeable consequence was to arouse or gratify the defendant's sexual desires. *See Ex parte Ingram*, 533 S.W.3d 887, 899 (Tex. Crim. App. 2017) ("Such role play . . . involves two or more adults mutually pretending that one or more of them is a child."). A jury could reasonably infer that by Hance's deliberately engaging in this type of fantasy during sexual intimacy, he first contemplated, and then engaged, in turning the fantasy into reality—in moving from ideation to predation. *See Richert v. State*, No. 01-10-00901-CR, 2012 WL 3775979, at *3–4 (Tex. App.—Houston [1st Dist.] Aug. 30, 2012, pet. ref'd) (mem. op., not designated for publication) (holding admissible testimony from the mother of the child victim that, during their former marriage, the defendant would ask her to act out certain sexual fantasies during intercourse, with a coercive father–daughter fantasy being his "favorite"); *see also State v. Monebrake*, Nos. CA2021-04-004, CA2021-04-005, CA2021-04-006, 2022 WL 278145, at *1–5 (Ohio App. Jan. 31, 2022, app. denied) (considering, in sufficiency challenge, testimony of victims' mother that she and defendant father "would engage in sexual role play, which often involved the acting out of incest fantasies" during their marriage and noting that "[o]ver time, Monebrake moved on from simply talking about sexual scenarios and began formulating plans to act on his fantasies," eventually leading to his attempted rape and attempted gross sexual imposition of their minor children during a camping trip). Because the probative value of the sexual role-playing is arguably higher than indulging in pornographic autoeroticism—the fantasy having objectively crossed the threshold from thought or ideation into physical sexual intimacy with another—Lorraine's testimony concerning Hance's viewing daddy–daughter and incest pornography and engaging in daddy–daughter role-playing during their moments of

had before it Hance's phone records, which included within the voluminous pages a thread between Hance and Lorraine in which he appears to be pushing her to let the children watch or participate in their sexual activity. In light of that highly probative evidence, the adult daddy–daughter pornography evidence did not risk unduly confusing or prejudicing the jury. Accordingly, we hold that the trial court did not abuse its discretion in its balancing of the *Gigliobianco* factors in favor of admitting this evidence. *See Roe*, 660 S.W.3d at 784–85 (applying *Gigliobianco* factors and holding that probative value of defendant's internet search history, including searches of websites featuring incest and father–daughter pornography, was not substantially outweighed by its prejudicial effect).

### 4. Google Search-History Testimony

As with the adult role-playing pornography evidence, the Google search-history testimony was probative evidence that Hance had actually acted upon his fantasy and predilection with a person in a family-type relationship with him.

Although *Watkins* does not support Hance's balancing of the *Gigliobianco* factors as applied to Lorraine's testimony concerning his alleged Google search history— particularly given the direct references to father–daughter incest and toddler molestation and the State's need for testimony to show that Hance had sought information related to sex with a child close to Gina's age—the nature of the queries

---

sexual intimacy was highly probative of his intent, particularly of his viewing the father–daughter relationship as a sexual one.

55

ascribed to him by Lorraine provides additional support for their admissibility: they provide evidence of planning, preparation, and consciousness of guilt, all of which are probative of intent. *See* Tex. R. Evid. 404(b)(2); *Peoples v. State*, 874 S.W.2d 804, 809 (Tex. App.—Fort Worth 1994, pet. ref'd). For example, we have previously held that Google searches conducted by a defendant regarding the purchase of firearms and the legality of silencers—and employing "several alarming terms, including 'vigilante,' 'murderer,' and 'murder'"—and Google Street View images of the victim's residence and its surroundings evidenced extensive research and planning admissible to show his intent to commit the underlying attempted murder. *Fowler v. State*, No. 02-17-00154-CR, 2018 WL 4781570, at *4 (Tex. App.—Fort Worth Oct. 4, 2018, pet. ref'd) (mem. op., not designated for publication). Similarly, in *Jones v. State*, our sister court in Houston held that internet searches extracted from the defendant's cell phone seeking information about Plan B pills, lap-dance music, and a local hotel on or before the alleged date of the minor victim's sexual assault were admissible because they corroborated her testimony concerning the circumstances and location of the assault, as well as the defendant's intent through his preparation beforehand. No. 01-18-00154-CR, 2019 WL 3022677, at *11 (Tex. App.—Houston [1st Dist.] July 11, 2019, no pet.) (mem. op., not designated for publication). Finally, in *Russo v. State*, our sister court in Austin held that the defendant's internet history, particularly his visitation of sites related to and his viewing images of and stories describing sexual activity involving ligature and manual strangulation of women from a website called "necrobabes.com"

56

was admissible to show intent and motive in the capital murder of a woman by ligature strangulation. 228 S.W.3d 779, 805–06 (Tex. App.—Austin 2007, pet. ref'd). In each of these instances, the internet searches conducted by the defendant before the alleged crime demonstrated some degree of planning or preparation consistent with intending its commission.

Similarly, "[a] defendant's conduct after the commission of a crime which indicates a 'consciousness of guilt' is admissible to prove that he committed the offense." *Hedrick v. State*, 473 S.W.3d 824, 830 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (quoting *Ross v. State*, 154 S.W.3d 804, 812 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd)). "A 'consciousness of guilt' may be one of the strongest indicators of guilt." *Lee v. State*, 866 S.W.2d 298, 302 (Tex. App.—Fort Worth 1993, pet. ref'd) (quoting *Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.)). For example, acts that are designed to reduce the likelihood of prosecution, conviction, or incarceration are admissible to show the defendant's "consciousness of guilt." *Hedrick*, 473 S.W.3d at 830. Such acts include attempts to avoid, destroy, or otherwise conceal incriminating evidence. *See Ex parte Weinstein*, 421 S.W.3d 656, 668 (Tex. Crim. App. 2014) (holding that defendant's attempts to conceal victim's body were "strong evidence of [his] consciousness of guilt"); *Guevara*, 152 S.W.3d at 50 ("Attempts to conceal incriminating evidence . . . are probative of wrongful conduct and are also circumstances of guilt."); *Armstrong v. State*, No. 02-19-00256-CR, 2020 WL 5552624, at *12 (Tex. App.—Fort Worth Sept. 17, 2020, pet. ref'd) (mem. op., not designated for

57

publication) (holding that evidence that the gun used in a murder had been wiped down was admissible to show defendant's consciousness of guilt).

Lorraine's Google search-history testimony strongly suggested that Hance had researched the signs and prevalence of the very act of which he was accused with an eye to (or acknowledgement of) its commission and avoidance of prosecution. Although this evidence was not further developed—as we discuss further later in this opinion—it supports a reasonable inference that Hance was seeking information either to prepare for or to cover up Gina's sexual assault, or both. *See Guevara*, 152 S.W.3d at 50. Such evidence was admissible as highly probative of his intent under the circumstances. *See Hedrick*, 473 S.W.3d at 830; *Lee*, 866 S.W.2d at 302.

In urging the predominant prejudice of this testimony, however, Hance has failed to show that the significant probative value of the challenged evidence was substantially outweighed by one or more of the dangers listed in Rule 403. *See James*, 623 S.W.3d at 547. Hance even later corroborated Lorraine's daddy–daughter pornography and sexual role-playing testimony although he denied committing the offense. Although the jury heard of Hance's alleged Google search history during Lorraine's testimony on the second day of trial, the State's need for what could effectively be viewed as a hand-typed admission of his consciousness of guilt was high, unique among the other consistent and more substantial evidence presented by the State, including detailed testimony from Gina and her brother. Thus, the challenged evidence did not suggest a

decision on an improper basis. *See Gigliobianco*, 210 S.W.3d at 641. The evidence was also not scientific or technical in nature, so there was little risk of jury confusion. *See id.*

We cannot, therefore, say that the tendency of any of Lorraine's challenged testimony to confuse or distract the jury from the main issues in the case substantially outweighed its probative value. *See id.* at 642. Nor can we say that the evidence was unduly prejudicial or that the trial court's decision to admit it was outside the zone of reasonable disagreement. *See Beham*, 559 S.W.3d at 478. Accordingly, we overrule Hance's first and third issues.

## C. Denial of Hance's Motions for Continuance or Mistrial and Failure to Require State to Provide Hance's Expert with Access to Laptop

Arguing his preserved fourth and fifth issues together, Hance asserts, as he did below, that the trial court failed to provide a reasonable opportunity for his court-appointed digital forensic expert to examine the laptop. He frames this argument in his fourth issue thusly: "The trial court erred by denying Hance's motions for mistrial and continuance when it was discovered that the forensic expert appointed by the trial court on April 10, 2019 was prevented from examining 'the laptop and its contents' because of actions by the State in failing to turn 'the laptop and its contents' over to said forensic expert." His fifth issue reads as follows: "The trial court abused its discretion in failing to require the State to produce appellant's laptop seized from him by the State pursuant to a search warrant to allow him to determine whether the laptop contained evidence material to any matter involved in this action."

59

In arguing his issues, Hance describes the purpose of his trial motions as follows: "These motions related to the trial court's failure to require the State to produce appellant's laptop seized from him by the State pursuant to a search warrant to allow him *to determine whether the laptop contained evidence material* to any matter involved in this action." [Emphasis added.] Although Hance expressly cites only *Brady* and Article 39.14(h) of the Michael Morton Act in his brief, he expressly acknowledges that neither of those authorities helps him if he must prove definitively on appeal that the laptop contained material exculpatory evidence: "[T]o argue that there was no materiality to anything on the laptop or that Hance could provide not more than a possibility that the contents of the laptop would help his defense or affect his trial outcome ignores the fundamental flaw in a process that would require him to show proof of a proposition *where he has no access to* the very thing which might prove that proposition." Thus, although he does not expressly cite authority supporting a complaint about a due-process or statutory violation of his right to a court-appointed forensic expert under either *Ake* or Article 39.15(d), he fairly raises such complaints. Because Hance clearly urged these due-process and statutory violations in the trial court in seeking a continuance for the express purpose of conducting an independent forensic examination of the laptop or, barring that, a mistrial—and because they are fairly

included in his appellate complaints—we will consider them as legal bases in support of his complaints on appeal.[22]

In its motion for rehearing, the State contends that any statutory or constitutional error committed by the trial court in failing to compel the forensic examination of Lorraine's laptop was harmless, given the considerable evidence of guilt supporting the jury's verdict. More specifically, the State listed the following evidence as more than enough to overcome any harm the trial court's denial of a continuance or mistrial may have caused under the circumstances[23]:

- The ultimate issue on trial was whether [Hance] penetrated [the victim's] sexual organ with his own.

- There was no suggestion that the computer [Hance] wanted examined before trial continued was used to show the victim pornography. He used his phone.

- The victim testified to the offense occurring using her own words, as well as [demonstrative] acts of oral sex and anal contact.

---

[22]We also sought and obtained additional briefing from both parties on the harm standard to apply, depending on what type of complaint Hance has raised. *Cf. Heath*, 696 S.W.3d at 694 ("Even though it did not raise the argument on appeal until its petition for discretionary review, the State argued before the trial court that Article 39.14 only applied to prosecutors."); *Sanchez v. State*, 209 S.W.3d 117, 121 (Tex. Crim. App. 2006) ("But errors that are subject to procedural default may not be remedied by the appellate court as unassigned error unless the error was in fact preserved in the trial court."); *Pena v. State*, 191 S.W.3d 133, 136 (Tex. Crim. App. 2006) ("We recognize that many, if not most, of the types of error that would prompt sua sponte appellate attention need not be assigned because the error involved constitutes an obvious violation of established rules. Novel constitutional issues are a different matter.").

[23]We have quoted the State's motion but omitted its record references.

- Her outcries conveyed unusual experiential details. (comparing odor she knew of her daddy's "bad spot" to her mom's "butt"); (demonstrating oral sex for SANE); (dad spitting on his "bad spot" before "humping" her).

- Swabs from her anus, inner labia, and perianal area all were presumptively positive for semen, although the analyst could not confirm [the substance found] was semen [via additional testing].

- Her outcry to her mother on the day of the offense was immediately corroborated by her older brothers.

- One brother testified that he saw [Hance] standing behind her while she was bent over the bed, touching her butt with his middle spot, and when he left it sounded like a cat whining.

- What [Hance] believed he would find on the laptop was potential impeachment evidence.

- The only known evidentiary piece that the laptop figured into at trial was that he may have used it for Google searches for the incidence of father-daughter porn and symptoms of child molestation.

- [Hance] admitted to police and in his testimony that he liked to watch incest porn and father-daughter porn.

- [Hance] admitted saying that, to him, the appeal of incest was that he didn't have to "go out and look for [sex]" and that "it's just the idea of knowing it's there."

- What was known to be on the computer was inculpatory, including Google searches that corroborated his ex-wife's testimony and eight father-daughter pornographic websites.

Thus, the State asks us to "reevaluate how [Hance's] inability to investigate the computer impacted this trial . . . and affirm the conviction." Stated differently, the State argues that even if the trial court abused its discretion by failing to grant a mistrial or

continuance due to the State's failure to produce the laptop for forensic examination, the evidence of Hance's guilt is so overwhelming as to render any such error harmless, whether reviewed as either constitutional or nonconstitutional error.

We first set out basic statutory and constitutional law applicable to pretrial discovery in criminal cases.

### 1. Applicable Law

#### a. Article 39.14

As amended by the Michael Morton Act in 2013, Article 39.14(a) of the Texas Code of Criminal Procedure requires the State to produce—upon timely request and subject to the limitations set forth in Article 39.15—"objects or other tangible things not otherwise privileged that constitute or contain evidence material to any matter involved in the action and that are in the possession, custody, or control of the [S]tate or any person under contract with the [S]tate." Tex. Code Crim. Proc. Ann. art. 39.14(a). Evidence is material under Article 39.14 if it has "a logical connection to a consequential fact." *See Watkins v. State*, 619 S.W.3d 265, 290 (Tex. Crim. App. 2021); *see also id.* at 278 n.49, 288–91 (acknowledging that "material" for purposes of Article 39.14 is synonymous with "relevant" and is broader than materiality under *Brady*'s standard for exculpatory or impeaching evidence).

Without waiting for a request, the State must also "disclose to the defendant any exculpatory, impeachment, or mitigating document, item, or information in the possession, custody, or control of the [S]tate that tends to negate the guilt of the

defendant or would tend to reduce the punishment for the offense charged." Tex. Code Crim. Proc. Ann. art. 39.14(h). "If at any time before, during, or after trial the [S]tate discovers any additional document, item, or information required to be disclosed under Subsection (h), the [S]tate shall promptly disclose the existence of the document, item, or information to the defendant or the court." *Id.* art. 39.14(k).

These statutory imperatives extend to documents, items, or information in the possession of law enforcement "even if law enforcement's possession of [that] evidence is unknown to counsel for the State." *Heath*, 696 S.W.3d at 693; *see also* Tex. Code Crim. Proc. Ann. art. 2.1397 (recognizing that, effective September 1, 2021, the State's duty to produce discoverable information extends beyond the prosecutor to items in the possession of law enforcement by imposing written verification obligation). "[J]ust as defense counsel has an obligation to investigate the case before he goes to trial, the prosecutor has a duty to know what evidence is at his disposal." *Heath*, 696 S.W.3d at 704 & n.122 (quoting *Hollowell v. State*, 571 S.W.2d 179, 180 (Tex. Crim. App. [Panel Op.] 1978)).

### b. Article 39.15

Under Article 39.15(a)(1), in turn, "a court *shall* allow discovery under Article 39.14 of property or material . . . that constitutes child pornography, as described by Section 43.26(a)(1), Penal Code." *Id.* art. 39.15(a)(1) (emphasis added). But the court "shall deny any request by a defendant to copy . . . or otherwise reproduce" such material. *Id.* art. 39.15(c). Rather, child-pornography material must be made only

"reasonably available to the defendant" by the State's providing, at a State-controlled

facility, an "*ample opportunity* . . . for the inspection, viewing, and examination of the

property or material by the defendant, the defendant's attorney, and any individual the

defendant seeks to qualify to provide expert testimony at trial." *Id.* art. 39.15(d)

(emphasis added).[24]

Although we have not located any authority defining "ample opportunity" under

Article 39.15(d) when the issue of a forensic examination for child pornography arises

at trial,[25] federal case law interpreting the Adam Walsh Child Protection and Safety Act

---

[24]Article 38.45 concurrently restricts a defendant's access to child pornography during the course of a criminal hearing or proceeding by prohibiting the trial court from making any such property or material available to the defense for copying or dissemination with the sole proviso that "the defendant, the defendant's attorney, and any individual the defendant seeks to qualify to provide expert testimony at trial *shall* be provided access" to such property or material "[i]n the manner provided by Article 39.15." Tex. Crim. Code Proc. Ann. art. 38.45(a), (c) (emphasis added).

[25]For example, in *Loveday v. State*, our sister court in Beaumont held that the State had complied with its ample opportunity obligation under Article 39.15(d) by making a pornographic video of the child victim—disclosed to the defense the morning of the second day of trial—available to the defendant's expert for review before its presentation to the jury, either in the courtroom itself or by allowing a detective to take the video to the expert. No. 09-12-00240-CR, 2013 WL 5874280, at * 5–6 (Tex. App.— Beaumont Oct. 30, 2013, pet. ref'd) (mem. op., not designated for publication). In so holding, the court did not employ a definition for or otherwise describe what constitutes an ample opportunity under Article 39.15(d), suggesting that the mere opportunity to view the video before its presentation to the jury was sufficient under the circumstances, particularly since the defendant did not include any explanation for how he was harmed by the inability of his expert to examine the video outside the confines of the State's mandated possession. *See id.* Moreover, the court dealt with the video as more of a forensic interview of the victim since defense counsel did not raise any of the forensic authentication issues common in child-pornography prosecutions. *See id.*

of 2006, which contains the same provision restricting a defendant's access to child-pornography evidence, provides some guidance. *See* 18 U.S.C.A. § 3509(m)(2)(B) ("[P]roperty or material shall be deemed to be reasonably available to the defendant if the [g]overnment provides ample opportunity for inspection, viewing, and examination at a [g]overnment facility of the property or material by the defendant, his or her attorney, and any individual the defendant may seek to qualify to furnish expert testimony at trial."). Federal courts have determined that "ample opportunity" under the Adam Walsh Act means "a more than adequate opportunity to inspect, view, and examine the evidence in question." *United States v. O'Rourke*, 470 F. Supp. 2d 1049, 1056 (D. Ariz. 2007). An ample opportunity to forensically examine "computer items" means

---

The only other decisions to address the State's ample-opportunity obligation under Article 39.15(d) involved challenges to its prohibition against providing copies of forensic victim interviews; all those decisions held that the State provided reasonable access to such interviews by providing defense counsel with an opportunity to view them before their presentation at trial, particularly if counsel's cross-examination of the victim demonstrated the access did not impair the defense. *See In re State ex rel. McCain*, 670 S.W.3d 776, 779–80 (Tex. App.—Texarkana 2023, orig. proceeding); *McCloure v. State*, No. 06-21-00030-CR, 2021 WL 5933158, at *3–4 (Tex. App.—Texarkana Dec. 16, 2021, pet. ref'd) (mem. op., not designated for publication); *Gonzalez v. State*, 522 S.W.3d 48, 59–60 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *In re State*, No. 08-16-00106-CR, 2017 WL 1511338, at *3 (Tex. App.—El Paso Apr. 26, 2017, orig. proceeding) (not designated for publication); *Flores v. State*, No. 04-14-00915-CR, 2015 WL 5730263, at *3 (Tex. App.—San Antonio Sept. 30, 2015, pet. ref'd) (mem. op., not designated for publication); *In re W.E.J.*, 494 S.W.3d 178, 179–80 (Tex. App.—Waco 2015, pet. denied); *see also Dickens v. Ct. of Appeals for 2d Supreme Jud. Dist. of Tex.*, 727 S.W.2d 542, 553 (Tex. Crim. App. 1987) (orig. proceeding) (holding no abuse of discretion when trial court denied defense request for copy and expert review of videotaped forensic interview of child victim before trial where prosecution had already complied with Article 38.071 admissibility predicate by permitting defense counsel and defendant's forensic child psychologist to view the interview).

an examination in which "the government can supply reasonably up-to-date tools (hardware and software) and facilities such that a defendant can construct a reasonable, available forensic defense, if one is available at all, and whereby the analysis will not be impeached because it was not supported by the proper hardware or software." *United States v. Flinn*, 521 F. Supp. 2d 1097, 1101 (E.D. Cal. 2007). This also allows "a defense expert to utilize his or her hardware or software" in a setting that reasonably protects attorney–client privilege and work product and that "is open to the defense at its request during normal working hours, and to the extent feasible, during non-working hours." *Id.*

### c. *Brady v. Maryland*

In addition to the State's statutory duty under the Code of Criminal Procedure to disclose material evidence, "the State has a constitutional duty [under *Brady v. Maryland*] to disclose to a defendant material, *exculpatory* evidence." *Pena v. State*, 353 S.W.3d 797, 810 (Tex. Crim. App. 2011) (emphasis added). "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process [when] the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S. Ct. at 1196–97. "Favorable evidence includes exculpatory evidence as well as impeachment evidence." *Pena*, 353 S.W.3d at 811. "Exculpatory evidence is that which may justify, excuse, or clear the defendant from alleged guilt, and impeachment evidence is that which disputes, disparages, denies, or contradicts other evidence." *Id.* at 811–12. And "even

67

under *Brady*, a prosecutor's duty to disclose exculpatory information has long been understood to require disclosure of information held by law enforcement." *Heath*, 696 S.W.3d at 695–96.

To establish reversible error based on a *Brady* violation, an appellant must meet a three-prong test: (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith; (2) the withheld evidence is favorable to him; and (3) the evidence is material in that there is a reasonable probability that had the evidence been disclosed, the trial's outcome would have been different. *See Pena*, 353 S.W.3d at 809. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Id.* at 812 (quoting *United States v. Agurs*, 427 U.S. 97, 109–10, 96 S. Ct. 2392, 2400 (1976)).

Thus, the statutory materiality standard of Article 39.14(a) is more expansive than the constitutional materiality standard of *Brady*, which incorporates its own harm analysis, *see Watkins*, 619 S.W.3d at 278–79 ("Materiality, as a matter of constitutional due process, is specifically tied to the jury's determination of guilt or punishment and judged in hindsight in relation to all the evidence admitted at trial. By its plain text, Article 39.14(a) is not."), but when the undisclosed evidence is "exculpatory, impeachment, [or] mitigating" in that it "tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged," the constitutional due process afforded by *Brady* and the statutory due process established by Article 39.14(h)

68

appear to overlap for purposes of appellate review, raising the possibility of differing results for the same nondisclosure or suppression depending upon the harm analysis conducted by the reviewing court. *See id.* at 277 ("Our Legislature did not limit the applicability of Article 39.14(h) to 'material' evidence, so this duty to disclose is much broader than the prosecutor's duty to disclose as a matter of due process under *Brady v. Maryland.*"). *But cf. Becerra v. State*, 685 S.W.3d 120, 144 n.129 (Tex. Crim. App. 2024) ("In summary, when only a statutory violation is claimed, the error must be treated as non-constitutional for the purposes of conducting a harm analysis. . . ." (quoting *Gray v. State*, 159 S.W.3d 95, 98 (Tex. Crim. App. 2005))).

### d. *Ake v. Oklahoma*

Finally, under the rule established by *Ake v. Oklahoma*, an indigent criminal defendant has a constitutional due-process right to "access to the raw materials integral to the building of an effective defense" including the appointment of a forensic expert to assist defense counsel in formulating and presenting evidence in support of such defense. 470 U.S. at 74, 76–77, 105 S. Ct. at 1091–93; *Rey v. State*, 897 S.W.2d 333, 337–39 (Tex. Crim. App. 1995). Though the State need not "purchase for [the] indigent defendant all the assistance that his wealthier counterpart[s] might buy," it must provide him with the basic tools necessary for the presentation of an adequate defense within our adversarial system. *Id.* (quoting *Ake*, 470 U.S. at 77, 105 S. Ct. at 1093); *see In re City of Lubbock*, 666 S.W.3d 546, 559 (Tex. Crim. App. 2023) (orig. proceeding) ("The Supreme Court reasoned that the due process guarantee of fundamental fairness

mandated that a defendant could not be denied the opportunity to meaningfully participate in a judicial proceeding in which his liberty is at stake simply because he is indigent.").

In determining whether to appoint and compensate a forensic expert for an indigent defendant, a trial court must consider the following three factors:

> The first is the private interest that will be affected by the action of the State. The second is the governmental interest that will be affected if the safeguard is to be provided. The third is the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided.

*Ake*, 470 U.S. at 77, 105 S. Ct. at 1093. As to the first two factors, *Ake* concluded that both the defendant and the State maintain an interest in the accuracy of the verdict and that the State's interest in judicial economy may, but generally does not, outweigh the defendant's liberty interest. *See id.* at 78–79, 105 S. Ct. at 1093–94; *Rey*, 897 S.W.2d at 337. As a result, the third factor is of the greatest emphasis, imposing upon the defendant a burden of establishing "a substantial need for an expert, without which the fundamental fairness of his trial will be called into question." *Rey*, 897 S.W.2d at 337–38 (citing *Ake*, 470 U.S. at 82–83, 105 S. Ct. at 1096, and cases applying it); *see Ex parte Jimenez*, 364 S.W.3d 866, 876 (Tex. Crim. App. 2012) ("This analysis is conducted with a view towards whether failing to provide the defendant with the expert help he claims is necessary creates 'a high risk of an inaccurate verdict.'" (quoting *Busby v. State*, 990 S.W.2d 263, 271 (Tex. Crim. App. 1999))).

70

Stated differently, the defendant bears the burden to "provide concrete reasons for requiring the appointment of any particular expert." *Id.* at 878. The question in each case is the importance of the scientific issue to resolution of the case and the degree of assistance a defense expert can provide; "[t]he nature of an expert's field and the importance and complexity of the issue will bear directly upon whether the appointment of an expert will be helpful." *Id.* at 877 (quoting *Rey*, 897 S.W.2d at 338). In this regard, the defendant must make a preliminary showing of a significant fact issue "based upon more 'than undeveloped assertions that the requested assistance would be beneficial.'" *Id.* at 881 & n.49 (quoting *Williams v. State*, 958 S.W.2d 186, 192 (Tex. Crim. App. 1997)). "Courts uniformly stress that the showing of need must set forth in detail what assistance is being requested and why it is needed. The defense must identify the expert, explain what the expert will do, and explain why that will be important in representing the defendant." *Id.* at 878 & n.35 (quoting 3 Wayne R. LaFave et al., Criminal Procedure § 11.2(e) (3d ed. 2007)).

A sufficient showing is not made if a defendant "has failed to support his motion with affidavits or other evidence in support of his defensive theory, an explanation as to what his defensive theory was and why expert assistance would be helpful in establishing that theory, or a showing that there was a reason to question the State's expert and proof." *Ehrke v. State*, 459 S.W.3d 606, 615–16 (Tex. Crim. App. 2015) (quoting *Rey*, 897 S.W.2d at 341, and concluding that Ehrke had "failed to make a preliminary showing of a significant issue of fact[ by] provid[ing] no concrete

reasoning" as to why an expert was needed), *superseded by statute on other grounds as stated in Watkins*, 619 S.W.3d at 287–88; *see also Jimenez*, 364 S.W.3d at 878 ("Thus, courts have held that a trial judge does not err in denying funds for an appointed expert if the defense fails to set out the name of the requested expert in his motion, why the expert is necessary in the particular case, and the approximate cost of appointing that expert."); *Izquierdo v. State*, No. 04-22-00505-CR, 2024 WL 2306305, at *5 (Tex. App.—San Antonio May 22, 2024, no pet.) (mem. op., not designated for publication) (holding trial court did not abuse its discretion by denying a continuance and declining to appoint an expert given defendant's failure to demonstrate indigency; to move for the appointment of an expert "before, during, or after the continuance hearing"; or to "mention a need to retain an expert or needing assistance to do so, other than vaguely stating he had identified one and a continuance would give the expert time to prepare"). With a threshold showing, however, the defendant is entitled to the appointment of at least one expert "who, even if he cannot or will not testify to the defense's theory of the case, is 'available to consult with counsel, to interpret records, to prepare counsel to cross-examine [the] State's witnesses, and generally to help present [the defendant's] defense in the best light.'" *Jimenez*, 364 S.W.3d at 877 & n. 29 (quoting *DeFreece v. State*, 848 S.W.2d 150, 160 n.7 (Tex. Crim. App. 1993)).

### 2. Trial Court's Error is Reversible Under *Ake*

Hance has alleged both statutory and constitutional violations. As we have explained, the Michael Morton Act has a broader scope for required disclosure than

72

*Brady*, but a more demanding showing of harm must be made to obtain a reversal. *Ake*, on the other hand, requires us to decide whether Hance was deprived of the tools to provide a meaningful defense such that his conviction was fundamentally unfair. To show the import of the trial court's errors in their proper context and to apply the appropriate standard in each case, we first explain why Hance's conviction must be reversed for the preserved and fairly raised *Ake* error. To further highlight the nature and significance of the harm from the *Ake* error, we explain why evaluating harm for *Brady* error is problematic. Nevertheless, we conclude that on these facts—even without knowing what else might be found on the laptop's hard drive—the error is reversible even under the nonconstitutional harm standard applicable to statutory Michael Morton Act violations.

### a. *Ake* Error Occurred

As set out above, due process requires a trial court to grant an indigent criminal defendant, such as Hance, access to an expert if the expert's assistance is likely to be a "significant factor" at trial. *Jimenez*, 364 S.W.3d at 876 (quoting *Ake*, 470 U.S. at 74, 105 S. Ct. at 1091–92). "Fundamental fairness requires only that the State provide assistance if the denial of that assistance would frustrate a fair proceeding under our adversarial system." *Taylor v. State*, 939 S.W.2d 148, 152 (Tex. Crim. App. 1996) (citing *Ake*, 470 U.S. at 77, 105 S. Ct. at 1093). In determining whether the appointment of an expert will facilitate due process for the defendant, the question is "how important the scientific issue is in the case, and how much help a defense expert could have given"

considering "[t]he nature of an expert's field and the importance and complexity of the issue." *Jimenez*, 364 S.W.3d at 877 (quoting *Rey*, 897 S.W.2d at 338). To that end, we examine the state of the record at the time of the trial court's ruling prohibiting the laptop's examination by Hance's expert.

### i. Lorraine's Credibility Subject to Challenge

As an initial matter, the evidence presented by the State was sufficient to establish Hance's guilt beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) (describing an evidentiary sufficiency review as viewing all of the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017) (same). Gina's own testimony—although understandably limited by the vocabulary and understanding of a then six-year-old girl—recounted at least two sexual encounters with Hance, using terms like "bad spot" and "naughty square" that she had been taught by both Hance and her mother for male and female sexual anatomy. *See, e.g.*, *Wishert v. State*, 654 S.W.3d 317, 328 (Tex. App—Eastland 2022, pet. ref'd) ("The uncorroborated testimony of a child victim is alone sufficient to support a conviction for a sexual offense."); *see also* Tex. Code Crim. Proc. art. 38.07(a), (b)(1) (exempting uncorroborated child-victim testimony from outcry predicate).

Gina described how Hance had "humped" her from behind—once in the bedroom she shared with her brothers and another in the bathroom—by putting his

74

naughty square inside her naughty square, how on at least one of these occasions Hance showed her a pornographic video of "a boy and a girl" engaged in the same "humping" activity,[26] and how this activity "hurt" her sufficiently to prompt her to tell her mother about the assault shortly after it occurred. She also testified that Hance had made her put her mouth on his naughty square, and how "white stuff" came out of Hance's naughty square, then turned "clear" before he wiped it up with her brother's shirt.[27] And she finally testified that Hance had made her engage in the same type of activity with both of her brothers. The forensic interview Gina gave to the SANE was

---

[26]Because Gina described "a boy and a girl" as being the couple "humping" in the video, the jury could have reasonably inferred from her testimony that Hance showed her child pornography on his phone. The jury could also have simply concluded that she was referring to an adult male and an adult female using six-year-old terminology. Nevertheless, the State never argued that the video Gina saw was child pornography, nor presented any such evidence from its forensic examination of Hance's phone.

[27]Such evidence is highly probative of a child's involvement in age-inappropriate sexual activity. *See In re C.N.*, No. 01-05-00309-CV, 2006 WL 3752884, at *2 (Tex. App.—Houston [1st Dist.] Dec. 21, 2006, no pet.) (mem. op) (recounting testimony from forensic interviewer in juvenile prosecution for aggravated sexual assault that complainant's description of appellant's ejaculation and her re-enactment of her reaction to his odor were "the kinds of details that a six-year-old, unless they've been involved in sexual activity, usually has no knowledge of"); *see also Joven v. Cates*, No. 1:22-cv-00168-ADA-SKO (HC), 2022 WL 4586471, at *1 & *14 (E.D. Cal. Sept. 29, 2022) (finding eight-year-old complainant's description of "the sight, taste and smell of ejaculate" credible as "sexual knowledge that is unexpected in a child of his age"), *magistrate's finding and conclusions adopted in full by* 2023 WL 1997633, *1 (E.D. Cal. Feb. 14, 2023) (denying habeas relief); *State v. A.D.M.*, 701 P.2d 999, 1000 (Mont. 1985) (recounting testimony of psychologist in sexual-assault prosecution of father that five-year-old complainant's description of the color, taste, and smell of ejaculate "far exceeded that which could be expected from someone who had not engaged in those activities").

reasonably consistent with her trial testimony, excepting that the SANE never said Gina used the phrase "naughty square" to describe either Hance's or her own sexual anatomy.

Gina's older brother somewhat corroborated her testimony by testifying that on the day of the elected offense, he and his younger brother had been sent from their shared bedroom by Hance, only to see Hance "touching" Gina's "butt" from behind with his "middle spot" when he returned through the closed door to get some more toys. In describing what he saw, he indicated that Hance was standing behind Gina while she leaned over the bed with her feet also on the floor; he was not sure whether she was clothed, however, and did not describe whether Hance himself was in a state of undress. Gina's brother testified that when he left the bedroom, he heard what he thought was Gina "whining" like a cat but could not be sure his sister was making the noise. He did not testify to any sexual activity with his sister, whether directed by Hance or not.

Critically, neither Gina nor her brother provided anything but the most basic details of these encounters with Hance; they provided no dates, nor days of the week, nor time of day, nor were their versions of the assault completely consistent with one another. For example, Gina described Hance humping her from behind on his knees on the bed, while her brother described the assault as taking place with both Gina and Hance having their feet on the bedroom floor. As a result, the State relied exclusively on the timeline provided by Lorraine, anchored to the timing and circumstances of Gina's outcry on July 28, 2017.

Yet Gina's testimony that she told her mother immediately after Hance's assault because it "hurt"[28] was completely inconsistent with Lorraine's description of what prompted her daughter's outcry. At no point in her testimony did Lorraine ever describe Gina's outcry as prompted by the pain caused by Hance's assault. According to Lorraine, Gina's outcry was a spontaneous response to the odor of Hance's fresh ejaculate emanating from Lorraine's panties when horseplaying with her daughter on the couple's bed. More specifically, shortly after Hance left for work that morning, the child face-planted next to her mother's backside and commented spontaneously that Lorraine's "butt" smelled like Hance's "bad spot"; Lorraine, having removed her panties to confirm her daughter's observation, realized that Gina was familiar with the odor of fresh ejaculate and "started freaking out." Lorraine had previously testified that she and Hance "had sex" before he left for work that morning, just before she began horseplaying with Gina.

The reason this inconsistency between mother's and daughter's testimony is significant for purposes of our *Ake* harm analysis is because Lorraine's testimony as to *when* Gina's outcry occurred is the only nonhearsay evidence of the date this particular assault occurred. Thus, Lorraine's credibility was essential to the State's prosecution.

---

[28]Lorraine also testified that Gina had a lot of problems in her genital area, that it was red a lot, and that she had to put a lot of cream on it. But Gina denied these facts during her testimony.

But defense counsel presented disinterested and unrebutted evidence that Hance could have been away working when the alleged assault occurred.

The text records extracted from Hance's cell phone and admitted at trial reflect that at 9:26 p.m. on July 27, 2017, Hance texted a coworker for an address "for the sand place" in Barnhart, Texas. A photograph of a receipt shows that he arrived at his destination at 9:54 p.m. and left at 10:48 p.m. The following excerpt from his text logs shows that Hance texted Lorraine two hours later, at 12:47 a.m., having arrived at his next destination on July 28, 2017, stating, "I made it baby good night I love you."

| 2843 | (940) 212-0517 | * Babe | 28/07/2017 12:47:48 AM (GMT-5) | | Sent | Sent | Phone | Outgoing | I made it baby good night I love you |
|------|------|------|------|------|------|------|------|------|------|
| 2844 | (940) 212-0517 | * Babe | 28/07/2017 09:11:04 AM (GMT-5) | | Sent | Sent | Phone | Outgoing | Good morning I love you baby |
| 2845 | (940) 282-7944 | * Hanks | 28/07/2017 11:06:30 AM (GMT-5) | | Sent | Sent | Phone | Outgoing | I forgot a check I was suppose to brang to Chris in San angilo I was going to see if you can go by my house and get and tack it to him |
| 2846 | (940) 212-0517 | * Babe | 28/07/2017 06:13:48 PM (GMT-5) | | Sent | Sent | Phone | Outgoing | Have you went to your moms yet |
| 2847 | 9402120517 | * Babe | 28/07/2017 06:14:00 PM (GMT-5) | | Read | Inbox | Phone | Incoming | no not yet |
| 2848 | 9402120517 | * Babe | 28/07/2017 06:53:57 PM (GMT-5) | | Read | Inbox | Phone | Incoming | You need to call me now |

Hance testified that he was "[p]robably [in] San Angelo, Big Lake, [or] somewhere in . . . . West Texas" when he sent this "good night" text. Lorraine also testified that Hance "was at work" when he sent the text.

From there, Lorraine's and Hance's timelines conflict. Hance testified that he parked his truck "on a sand facility" after the 12:47 a.m. text message. He claimed that he was working when he next texted Lorraine at 9:11 a.m. on July 28, 2017, stating,

78

"Good morning I love you baby." According to Hance, he was "never shut down that long" because his work was "nonstop." He asserted that he was not back at home in Newcastle at 9:11 a.m. because he would never have driven back to Newcastle after working in West Texas for only a day. Indeed, Hance's next text message, sent at 11:06 a.m. on July 28. 2017, indicated that he could have been back on the road—or at least not then at home; in it, he asked a coworker to pick up a check from his house and deliver it to "Chris in San Angelo."

And the following excerpt from his text log shows an exchange of texts with the same coworker whom he had asked for the Barnhart address, setting forth the deliveries he had made between July 27 and July 31, 2017, for purposes of getting paid:

| 3099 | 9402827944 | * Hanks | 30/07/2017 11:26:37 PM (GMT-5) | | Read | Inbox | Phone | Incoming | You have everything but job name. I need to know what job each of your loads was for. |
|------|-----------|---------|------|--|------|-------|-------|----------|------|
| 3102 | (940) 282-7944 | * Hanks | 31/07/2017 12:00:43 AM (GMT-5) | | Sent | Sent | Phone | Outgoing | Date #7-24-17 Bol 172434 Po END -1715177 Weight 40,780 Sand 40-70 Pinnacle San angelo Miles 150 Truck 260 DEM 4.5 Date 7-27-17 Bol BH- 170727049 Po END- 715175 Weight 37,940 Sand 40-70 Maalt barnhart TX Miles 150 Truck 260 DEM -7 hrs Date-7-28-17 Bol BH -170728042 Po END- 715175 Weight 40,560 Sand 40-70 Maalt barnhart TX Truck 260 DEM 3 Hrs Date 7-29-17 Bol BH- 710729007 Po END- 715175 Weight. 39,400 Sand 40-70 Maalt barnhart TX Miles 150 Truck 260 DEM 0 Date 7-29-17 Bol 172713 Po APP- 71171 Weight 46,920 Sand 100 mesh Pinnacle San angelo Miles 75 DEM 0 Date 7-29-17 Bol 172746 Po APP- 71171 Weight 46,060 Sand 100 mesh Pinnacle San angelo Miles 75 Truck 260 DEM 0 DATE 7-30-17 Bol 172782 Po APP 71171 Weight 43,860 Sand 100 mesh Pinnacle San angelo Miles 75 Truck 260 Date 7-30-17 Bol 172801 Po APP 71171 Weight 46,680 Sand 100 mesh Pinnacle San angelo Miles 75 Truck 260 DEM 0 |
| 3103 | (940) 282-7944 | * Hanks | 31/07/2017 12:22:14 AM (GMT-5) | | Sent | Sent | Phone | Outgoing | I come up with 4,921.99 and you? |
| 3104 | 9402827944 | * Hanks | 31/07/2017 12:38:11 AM (GMT-5) | | Read | Inbox | Phone | Incoming | What's the the correct date on 171965? You have 7/15 |
| 3105 | 9402827944 | * Hanks | 31/07/2017 12:49:19 AM (GMT-5) | | Read | Inbox | Phone | Incoming | Also need PROP TYPE on172306. And I don't know what Big Spring to Approach pays. Did they tell y'all? |
| 3106 | (940) 282-7944 | * Hanks | 31/07/2017 05:52:43 AM (GMT-5) | | Sent | Sent | Phone | Outgoing | The date is rite. We didn't get played for it it slipped through the crack if I don't get played for it it what it is....the prop on the other one is 💯 mesh |

79

This exchange shows that Hance sought payment for loads of fracking sand he delivered to or from Barnhart on July 27, July 28, and July 29; two loads he delivered to or from San Angelo, Texas, on July 29; and two more loads he delivered to or from San Angelo on July 30.

In contrast, Lorraine testified that on July 28, 2017, Hance arrived home after his 9:11 a.m. text message but before 10:30 a.m. She asserted that Hance had texted her at that time to wake her up, but she also asserted that Hance would normally call her to let him in the apartment when he returned home. The record does not reflect a phone call.

Thus, according to Lorraine's timeline, late on July 27, 2017, or early on July 28, 2017, Hance made a delivery to a West Texas location; stopped for the night by 12:47 a.m.; and then after only a few hours spent several hours driving back to Newcastle, where he arrived shortly after 9:11 a.m., at which time she let him into their apartment, and they crawled into bed together. She then asserted that, between crawling into bed with her and her awakening around 10:30 a.m., Hance waited until she fell back asleep, then got out of bed, woke the boys, moved them from their bedroom to hers, then sexually assaulted Gina in her bedroom where Lorraine later found them sitting together on the edge of the bed talking while looking at Gina's tablet, her daughter's wet hair indicating that she had just showered and dressed—all of which occurred within a timeframe of roughly an hour and twenty minutes. Lorraine and

80

Hance then returned to their bedroom where they had sex before she packed him off back onto the road between noon and 1:00 p.m.[29]

And despite her discovery of the assault as soon as he left for work, Lorraine did not call Hance until 6:18 p.m., when they spoke for three minutes and fourteen seconds. At 6:53 p.m., she texted him: "You need to call me now." The call log pulled from Hance's cell phone indicates that he called Lorraine at 6:54 p.m. They spoke for nine minutes and five seconds. Lorraine could not explain the six-hour delay in contacting Hance, despite evidence that she had "freaked out" and was "frantic" when she contacted her mother immediately after Gina's outcry, according to her timeline between noon and 1:00 p.m. Her mother even testified that Lorraine's "frantic" response was out of character.

Despite Lorraine's testimony that her mother told her to take Gina to the hospital, the record also reflects that Gina was not admitted to the hospital until 8:02 p.m. on July 28, 2017. Lorraine also did not explain this eight-hour delay despite her "freaked out" or "frantic" state.

---

[29]The jury certainly could have believed this testimony in the context of the entire record, even had it been able to consider the Irving PD Forensic Report's laptop-examination results. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). For example, in addition to testifying about Hance's incest-related sexual proclivities, Lorraine also testified that Hance's sex drive was "way above average" and that he wanted to have sex "all day if [she] allowed it." He would also become aggravated if she refused him.

Moreover, the SANE testified that although she believed that "[Gina] was telling what [had] happened to her" the day before the exam, she could have been taught or told what to say. And no DNA evidence was obtained or obtainable to confirm Gina's outcry.[30] Considering that the initial outcry came through Lorraine, we cannot say that Hance's inability to impeach or further explore Lorraine's Google-search testimony or rebut the child-pornography-possession inference did not adversely affect the integrity of the process leading to the conviction. *See Wells*, 611 S.W.3d at 410.

---

[30]Medical or physical evidence need not corroborate a child victim's testimony. *See Wishert v. State*, 654 S.W.3d 317, 328 (Tex. App.—Eastland 2022, pet. ref'd); *Sherard v. State*, No. 02-20-00083-CR, 2021 WL 1918770, at *6 (Tex. App.—Fort Worth May 13, 2021, pet. ref'd) (mem. op., not designated for publication) (holding negative presumptive test for semen of "little or no exculpatory value" when absence of spermatozoa explained by possible failure of ejaculation). *But cf. Powell v. State*, No. 02-19-00206-CR, 2021 WL 5370163, at *38 (Tex. App.—Fort Worth Nov. 18, 2021, pet. ref'd) (mem. op., not designated for publication) (op. on reh'g) (recounting expert testimony from forensic analyst with UNT Health Science Center for Human Identification that "when asked to screen samples for any biological materials, presumptive testing is performed first to determine if the item might contain biological materials, and then if a positive result is obtained, the next step is a confirmatory test to determine if the substance is from blood or semen"); *Lumsden v. State*, No. 02-21-00012-CR, 2021 WL 4319602, at *10 n.11 (Tex. App.—Fort Worth Sept. 23, 2021, no pet.) (mem. op., not designated for publication) ("The underwear was tested by UNT for semen and spermatozoa. The presumptive test for semen was negative, and spermatozoa were not detected."); *Benson v. State*, No. 13-18-00450-CR, 2020 WL 4812635, at *2 (Tex. App.—Corpus Christi–Edinburg Aug. 13, 2020, pet. ref'd) (mem. op., not designated for publication) (recounting expert testimony from forensic scientist with Texas Department of Public Safety's Crime Laboratory that a positive presumptive test for semen, absent the observation of spermatozoa, cannot confirm the presence of semen because "other bodily fluids can also yield a positive result"). Initial testing on swabs from Gina's anus, inner labia, and perianal area all were presumptively positive for semen, but subsequent testing could not confirm that the detected substance was, in fact, semen.

## ii. Irving PD Forensic Report Exculpatory

As a matter of law, the Irving PD Forensic Report on its face provided both exculpatory and impeachment evidence favorable to Hance's defense in relation to Lorraine's testimony, and it is undisputed that it was not disclosed to Hance and his counsel until after the admission of that testimony at trial. The Irving PD Forensic Report confirmed that an independent law enforcement agency's search of the laptop had not found (1) child pornography, (2) "child exploitation materials," (3) "depictions of the victim in sexualized or inappropriate photos or videos," (4) "evidence of the possession or transmission[—by email or otherwise—]of such materials," and (5) Google or internet search history corroborating Lorraine's testimony.

Regarding the Irving PD EEU's failure to find actual child pornography on the laptop, an individual's viewing of pornography depicting exclusively adults engaged in sexual role-playing can diminish the probative value of any difference in ages thereby depicted, especially if the particular relationship at issue is not the subject of the sexual proclivity. For example, in *Johnson v. State*, our sister court in Texarkana rejected the probative value of adult pornography in an aggravated-sexual-assault prosecution explaining,

> In its brief, the State appears to imply that the evidence also showed Johnson's intent to arouse or gratify his sexual desire with young girls. That said, the State makes no argument, and points to no evidence, that shows how these images and the graphic description of websites, all of which involve adult pornography, are relevant to show Johnson's intent to arouse or gratify his sexual desire with young girls. Even the images that the State argued at trial resembled younger teenagers were of post-

83

pubescent women. None of the images and websites involved young children, such as Jane.

2020 WL 5948804, at *7.

Similarly, in *Akin v. State*, the same court reached a similar conclusion in another prosecution for sexual assault of a child:

> Other than arguing that the exhibits are relevant to generally show Akin's sexual desires and what actions he might take to satisfy those desires, the State makes no argument, and points to no evidence, that would show how these exhibits, all of which involve adult pornography, are relevant to show Akin's intent to satisfy his sexual desire either by sexually assaulting or sexually contacting a child. The websites and search histories in question all involve pornography involving adults. Barker testified that, of the 50,000 pornographic images, video recordings, and websites found on Akin's computer, all of the material involved adults. Also, although Akin's use of pornography over the past several years involved viewing violent and forced sex, none of it concerned children. . . .
>
> "Evidence of extraneous sexual activity that simply proves certain propensities toward sexual conduct in general is not admissible." Since the record does not show a nexus between Akin's use of adult pornography and either the victim or the nature of the offense, we find that the exhibits were not relevant evidence tending to show Akin's intent to arouse or gratify his sexual desire by sexually assaulting or sexually contacting children.

2015 WL 5439354, at *5–6 (citations omitted) (quoting *Warr v. State*, 418 S.W.3d 617, 621 (Tex. App.—Texarkana 2009, no pet.)); *see also Cox v. State*, Nos. 13-00-00184-CR, 13-00-00185-CR, 2001 WL 34392825, at *4–5 (Tex. App.—Corpus Christi–Edinburg Aug. 9, 2001, no pet.) (not designated for publication) (holding newspaper relating to the availability of adult entertainment in various cities containing numerous articles and advertisements relating to heterosexual sex, and magazine published as a general guide

84

to internet sex, of little probative value versus prejudicial effect in prosecution for indecency with a child by exposure and sexual contact and sexual assault of a child due to absence of "articles . . . that relate to sex with children or any unnatural interest in children").[31]

To the extent the jury could have reasonably inferred from the Irving PD Forensic Report that Hance had an intent to arouse or gratify due to his proclivity for adult father–daughter and incestuous role-playing pornography, the jury could also have reasonably inferred from the absence of child pornography that Hance did not consider sexual activity with actual children—including a prepubescent[32] five-year-old girl such

---

[31]A defense based on the physiological differences in secondary sexual characteristics between prepubescent children and sexually mature but role-playing adults is not inconsistent with our previous discussion of the admissibility of father–daughter pornography in child sexual-abuse cases. It is the depiction of a sexualized father–daughter relationship combined with a corresponding emphasis on the age differences between the role-playing adults that renders such adult pornography highly probative of an intent to arouse or gratify the viewing individual's sexual desires toward sexually immature children. *See Watkins v.* State, No. 02-12-00024-CR, 2013 WL 531062, at *4 (Tex. App.—Fort Worth Feb. 14, 2013, pet. ref'd) (per curiam) (mem. op., not designated for publication) (observing that the discovery of child pornography and father–daughter image and video searches on the defendant's laptop demonstrated he "viewed the father–daughter relationship as a sexual one").

[32]"Prepubescent" generally describes a child who has yet to undergo the physiological changes brought on by puberty, including secondary sex characteristics such as the growth of pubic hair and, in females, the development of breast tissue. *See In re Commitment of Guest*, No. 02-19-00295-CV, 2021 WL 1245087, at *5 (Tex. App.—Fort Worth Apr. 1, 2021, pet. denied) (mem. op.); *Rickard v. State*, No. 02-18-00350-CR, 2019 WL 4866037, at *1–2 (Tex. App.—Fort Worth Oct. 3, 2019, pet. ref'd) (mem. op., not designated for publication); *Gerron v. State*, 524 S.W.3d 308, 326–27 (Tex. App.—Waco 2016, pet. ref'd).

as Gina—to be sexually arousing or gratifying. *See generally Romo v. State*, 663 S.W.3d 716, 718–22 (Tex. Crim. App. 2022) (considering *Dost* factors,[33] the last of which inquires "whether the visual depiction is intended or designed to elicit a sexual response in the viewer[,]" in holding video of naked girls, including one of whom showed "no signs whatsoever that she ha[d] entered puberty," constituted a "lewd exhibition of the

---

"Pedophilia" is a "sexual perversion" by which an individual arouses himself sexually or engages in sexual activity with prepubescent children. *See Lyden v. Aldridge*, No. 02-23-00227-CV, 2023 WL 6631528, at *5 (Tex. App.—Fort Worth Oct. 12, 2023, no pet.) (mem. op.) (defining "pedophilia" as a "sexual perversion in which children are the preferred sexual object[,] specifically . . . a psychiatric disorder in which an adult has sexual fantasies about or engages in sexual acts with a prepubescent child." (quoting *Montano v. Cronan*, No. 09-20-00232-CV, 2021 WL 2963801, at *8 (Tex. App.—Beaumont July 15, 2021, no pet.) (mem. op.) (first citing *Pedophile*, Merriam-Webster, https://www.merriam-webster.com/dictionary/pedophile; and then citing *Pedophilia*, Merriam-Webster, https://www.merriam-webster.com/dictionary/pedophilia))); *Pedophilia*, Black's Law Dictionary 1312 (12th ed. 2024) ("A sexual disorder consisting in the desire for sexual gratification by molesting children, esp. prepubescent children."). As noted above, *see supra* note 20, both the legislature and the court of criminal appeals consider an individual's proclivity for sexually arousing or gratifying himself with child pornography depicting prepubescent children to be highly probative of an intent to act on that fantasy. And an individual's sexual attraction to adults does not necessarily exclude a concomitant sexual attraction to prepubescent children. *See In re Commitment of R.E.A.*, No. 14-22-00742-CV, 2024 WL 807238, at *4 (Tex. App.—Houston [14th Dist.] Feb. 27, 2024, no pet.) (mem. op.) (referencing diagnosis of "[p]edophilic disorder, nonexclusive type" as sexual attraction "to prepubescent children, and the attraction is nonexclusive in that [the individual] also is attracted to adults" according to diagnostic criteria set forth by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, or "the DSM-5").

[33] *See United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986) (listing six factors that may be used to evaluate whether a visual depiction constitutes child pornography), *aff'd sub nom United States v. Wiegand*, 812 F.2d 1239 (9th Cir. 1987), *and aff'd*, 813 F.2d 1231 (9th Cir. 1987).

genitals" in defendant's conviction for possession of child pornography); *Graf v. State*, Nos. 02-23-00130-CR–02-23-00141-CR, 2024 WL 3059556, at *4–5 (Tex. App.—Fort Worth June 20, 2024, no pets.) (mem. op., not designated for publication) (considering *Dost* factors in holding photographs of genitalia of prepubescent girls constituted child pornography); *Webb v. State*, 109 S.W.3d 580, 583 (Tex. App.—Fort Worth 2003, no pet.) (rejecting overbreadth, vagueness, and First Amendment challenges to constitutionality of Texas Penal Code Section 43.26(a) because statute "prohibits only possession of material that depicts an actual child, not material that merely 'appears' to depict a child").

Additionally, although the Irving PD Forensic Report confirmed that the YCSO "narrowed" the scope of Irving PD EEU's forensic examination, thereby conceding the possibility that the examination simply missed the presence of the alleged signs-and-prevalence searches, its internet search findings provided Hance with a reasonable argument that impeached Lorraine's testimony. For example, the forensic exam specifically looked for Google searches "manually entered" and the term "daddy" was common to both the exemplar searches identified and the Google queries to which Lorraine testified. The term "daughter" was similarly common to both Hance's alleged signs-and-prevalence searches and the internet search history found by the Irving PD EEU for Google Chrome and Internet Explorer. Only the term "molestation" did not appear in the Google or internet search-history exemplars set forth in the report—an omission seemingly mitigated by the inclusion of the phrase "child exploitation" within

87

the acknowledged scope of the forensic examination. Had the Irving PD EEU found Google searches for "how common is daddy/daughter molestation and what are the signs of toddler molestation," a reasonable juror could have inferred that the report would have listed them as exemplars. *See Burkhalter v. State*, 493 S.W.2d 214, 217 (Tex. Crim. App. 1973) (drawing a reasonable inference from evidence in the record). In this manner, therefore, the Irving PD Forensic Report itself provided exculpatory and impeaching evidence favorable to Hance's defense and thereby supported a reasonable inference that the forensic examination ordered by the trial court could have produced similar such evidence.

### iii. Resulting Error

By finding the facially exculpatory and impeaching findings in the Irving PD Forensic Report to be immaterial and by prophylactically excluding their admission from the evidence going forward, the trial court prevented the jury from hearing that Lorraine's testimony probative of Hance's consciousness of guilt (and inference that he found sex with actual prepubescent girls arousing in the context of his incest fantasies) had not been confirmed by the State's own forensic examination of the laptop; moreover, the jury was left with the impression that the evidence on the laptop was so inculpatory that it was beyond recovery due to Hance's actions. And since the report contained the findings and conclusions of the State's own forensic expert, granting Hance an opportunity to not only confirm these results but also to possibly confirm the

88

absence on the laptop of the signs-and-prevalence queries attributed to him by Lorraine required the appointment of his own digital forensic expert pursuant to *Ake*.

Given (1) the belated disclosure of facially exculpatory and impeaching evidence during trial and (2) the damning impression from the first day's testimony that a forensic examination of Lorraine's laptop, except for its possible attempted destruction at Hance's hands, would likely have revealed significant evidence of his consciousness of guilt (the Google searches) as well as Hance's possession of child pornography, Hance's omnibus motion—asserting as it did his need to confirm and possibly expand upon the favorable findings of the digital forensic expert who had authored the Irving PD Forensic Report, particularly concerning the absence of the signs-and-prevalence searches attributed to him by Lorraine—made a concrete showing of his need for digital forensic expertise as a matter of due process under *Ake. See id.* at 878. Not only did the State not challenge this showing but also the ADA waived the expert-designation deadline and initially agreed to produce the laptop directly to the digital forensic expert appointed by the trial court the very next morning. The trial court then properly (1) granted Hance a fourteen-day continuance beyond the Easter holiday, (2) appointed and funded the very expert urged by defense counsel, and (3) ordered the production to which the State had agreed, including any mirrored image of the laptop in its possession, all to facilitate the digital forensic examination it had found due process required for Hance's defense. Although Hance's omnibus motion made no mention of *Ake*, it did assert that "[t]he failure to provide the report and access to the physical

89

evidence (laptop)"—in addition to violating *Brady* and Article 39.14—"violates *fundamental fairness* and due process under both the Texas and U.S. Constitutions to a point where Defendant's right to effective assistance of counsel is jeopardized." [Emphasis added.] *Ake*'s due-process holding is expressly based on the principle of "fundamental fairness" underlying Fourteenth Amendment due process. *See* 470 U.S. at 76, 105 S. Ct. at 1087. The trial court's orders thus clearly concluded that Hance had met his threshold burden under *Ake* and properly granted relief. *See id.* at 877.

Then, without the presentation of any motion seeking or evidence justifying reconsideration of the *Ake* relief it had previously granted—but solely based upon the verbal representations of the State (1) that there *might* be child pornography on the mirrored hard drive and (2) that the only evidence available to Hance therefrom was either inculpatory or immaterial—the trial court sua sponte reconsidered and effectively vacated its orders, leaving the State as the only party to have had an opportunity, during the now truncated continuance, to forensically re-examine the mirrored hard drive. Stated differently, the trial court foreclosed the very forensic examination it had found due process required for the preparation and presentation of Hance's defense by ratifying the State's use of the continuance to effectively re-open its criminal investigation and conduct an additional forensic examination of the laptop, thereby blocking the *Ake* relief originally granted by the trial court.

But Hance's need for a digital forensic expert had not changed in that time. If anything, it had increased with the State's representation—now based on the Irving PD

90

EEU's weekend forensic examination—that the hard drive *might* contain child pornography, a clear invocation of the limitations imposed upon its disclosure by Article 39.15. Indeed, defense counsel argued that he needed the assistance of the court-appointed expert to confirm whether the DA's unilateral withholding of the mirrored hard drive was justified by the presence of child pornography. Yet after giving defense counsel approximately one hour to personally view the extracted results of the original Irving PD EEU examination, without the digital forensic expertise it had already found he needed, the trial court ordered the parties back to trial halfway through the continuance—not only putting Hance to his defense in much less time than the State had employed to re-examine the laptop through the weekend, but effectively withdrawing from his defense any use of the exculpatory and impeaching evidence evident on the face of the Irving PD Forensic Report. Thus, the trial court violated Hance's due-process right under *Ake* by depriving him of the expert assistance he required to address significant digital forensic evidence the State had already presented through the Google search-history testimony of Lorraine and the suggestive child-porn question to Bay. *See* 470 U.S. at 74, 105 S. Ct. at 1091–92; *see also Wise v. State*, 364 S.W.3d 900, 903–08 (Tex. Crim. App. 2012) (discussing importance of forensic-expert testimony in authenticating accessibility of deleted child-pornography images by defendant in free space of his computer's hard drive); *Tienda v. State*, 358 S.W.3d 633, 647 (Tex. Crim. App. 2012) (observing that a forensic examination of a computer's internet search history or hard drive could determine whether the person claimed to be

91

the source of offending evidence was indeed the source); *cf. In re Elhindi*, No. 23-1040, 2024 WL 5249569, at *2–3 (Tex. Dec. 31, 2024) (orig. proceeding) (holding that before ordering production of civil discovery possibly constituting child pornography, trial court should have allowed litigant time to have law enforcement review video first to determine whether it could, in fact, be considered child pornography under applicable law, and noting that in criminal cases Article 39.15 "has established safeguards to protect the interest of minors" by allowing defendant, defendant's counsel, and defendant's experts to review the material only at a State-controlled facility).

By reconvening the trial without giving Hance an ample opportunity to forensically examine the State's laptop evidence, or declaring a mistrial if such opportunity could not be given without prejudicially losing a juror, the trial court abused its discretion. *See Lighteard v. State*, 982 S.W.2d 532, 533–35 (Tex. App.—San Antonio 1998, pet. ref'd) (holding trial court abused its discretion by denying defendant's motion for continuance to obtain new clinical psychologist to assist in preparation and presentation of his insanity defense when previous court-appointed expert belatedly informed defense counsel of his discontinuation of his practice). Simply put, a one-hour lay examination of the State's own forensic results by defense counsel did not meet the constitutional requirement of providing Hance with an ample opportunity to prepare his defense—particularly when the timeframe and forensic expertise required for the Irving PD EEU's re-examination of the laptop provided at least some minimal evidence of what constituted an "ample opportunity" by comparison. *See Flinn*, 521 F. Supp. 2d

92

at 1101 (detailing what constitutes an ample opportunity to forensically examine computer materials); *see also Foster v. Illinois*, 332 U.S. 134, 137, 67 S. Ct. 1716, 1718 (1947) ("But process of law in order to be 'due' does require that a State give a defendant ample opportunity to meet an accusation."), *overruled on other grounds by Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792 (1963); *Carter v. Illinois*, 329 U.S. 173, 174, 67 S. Ct. 216, 218 (1946) ("Inherent in the notion of fairness is ample opportunity to meet an accusation."); *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 275, 63 S. Ct. 236, 240 (1942) ("The accused must have ample opportunity to meet the case of the prosecution.").

### b. Error is Harmful Under Rule 44.2(a)

Moreover, as informed by our *Brady* analysis below, and contrary to the State's urging in its motion for rehearing and supplemental briefing, this *Ake* error was not harmless. *Ake* error is subject to a constitutional harm analysis under Rule 44.2(a) of the Texas Rules of Appellate Procedure.[34] *See Lighteard*, 982 S.W.2d at 535; *see also White*

---

[34]In *Rey*, the court of criminal appeals originally held that the denial of due process by refusing to appoint a necessary expert for an indigent defendant was structural error that was not subject to any harm analysis. 897 S.W.3d at 345. In *Cain v. State*, however, the court subsequently held that "[e]xcept for certain federal constitutional errors labeled by the United States Supreme Court as 'structural,' no error, whether it relates to jurisdiction, voluntariness of a plea, or any other mandatory requirement, is categorically immune to a harmless error analysis." 947 S.W.3d 262, 264 (Tex. Crim. App. 1997) (footnote omitted), *superseded by rule as recognized by Aguirre-Mata v. State*, 992 S.W.3d 495, 497–98 (Tex. Crim. App. 1999) (observing that then newly promulgated Rule 44.2 of the Texas Rules of Appellate Procedure bifurcates harm analysis between constitutional and nonconstitutional errors contrary to former Rule 81(b)(2) applicable and used in *Cain*). Subsequent decisions of the court have reaffirmed

*v. Johnson*, 153 F.3d 197, 203 (5th Cir. 1998) (concluding that "if the [S]tate's admission of psychiatric testimony is subject to harmless-error analysis, then the purported *Ake* error is likewise subject to harmless-error analysis"). "For preserved constitutional error that is not structural, the correct standard of harm on direct appeal is, ordinarily, that the error is harmless if the court can determine 'beyond a reasonable doubt that the error did not contribute to the conviction or punishment.'" *Do v. State*, 634 S.W.3d 883, 897 & n.52 (Tex. Crim. App. 2021) (quoting Tex. R. App. P. 44.2(a)). In conducting this analysis, the reviewing court is to "focus, not upon the perceived accuracy of the conviction or punishment, but upon the error itself in the context of the trial as a whole, in order to determine the likelihood that it genuinely corrupted the fact-finding process." *Snowden*, 353 S.W.3d at 819, 821. Stated differently, the reviewing court asks whether the error adversely "affected 'the integrity of the process leading to the conviction'" and "whether there is a reasonable possibility that the . . . error moved the jury from a state of non-persuasion to one of persuasion on a particular issue." *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007) (quoting *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989)). "A ruling that an error is harmless is, in essence, an

---

that a federal error is structural "only if the Supreme Court has labeled it as such." *Lake v. State*, 532 S.W.3d 408, 411 (Tex. Crim. App. 2017). To date, the United States Supreme Court has not labeled *Ake* error as structural. *See Izquierdo v. State*, No. 04-22-00505-CR, 2024 WL 2306305, at *5 n.6 (Tex. App.—San Antonio May 22, 2024, no pet.).

assertion that the error could not have affected the jury." *See Wells v. State*, 611 S.W.3d 396, 410 (Tex. Crim. App. 2020).

### i. State Did Not Meet Its Burden

As the beneficiary of the error, the State bears the burden on appeal to prove that the error is harmless beyond a reasonable doubt. *See Haggard v. State*, 612 S.W.3d 318, 328 (Tex. Crim. App. 2020) (citing *Deck v. Missouri*, 544 U.S. 622, 635, 125 S. Ct. 2007, 2015 (2005)); *Wells*, 611 S.W.3d at 411. "Thus, unlike nonconstitutional error under Rule 44.2(b), the State is required to come forward with reasons why the appellate court should find constitutional error harmless." *Allen v. State*, No. 12-21-00226-CR, 2023 WL 1431213, at *5 (Tex. App.—Tyler Jan. 31, 2023, no pet.) (mem. op., not designated for publication); *see Lamb v. State*, 603 S.W.3d 152, 162 n.16 (Tex. App.— Texarkana 2020, no pet.) (noting same); *see also Arnold v. State*, 786 S.W.2d 295, 298 (Tex. Crim. App. 1990) (interpreting former Rule 81(b)(2) to place the burden on the State to demonstrate harmless constitutional error).

The State addressed harm in neither its original briefing nor its motion for rehearing except to offer a list of evidence in the latter that it argued we should have considered in our original harm analysis—without applying either a constitutional or nonconstitutional harm analysis.[35] After the State filed its motion for rehearing, we

---

[35]Although our original memorandum opinion did not detail the evidence favoring the jury's verdict, we specifically cited Rule 44.2(b)—setting forth the nonconstitutional harm analysis—as the basis for reversal because we held that the trial court abused its discretion by denying the motion for new trial. *See Hance v. State*, No.

ordered the parties to file supplemental briefing, and the State addressed nonconstitutional harm under Rule 44.2(b), but not constitutional harm under Rule 44.2(a). Accordingly, the State offers no argument to satisfy its burden to rebut the presumption of harmful *Ake* error. *See Haggard*, 612 S.W.3d at 328.

### ii. Error Affected Due Process

Even considering the evidence presented by the State's nonconstitutional harm analysis (in its rehearing motion), we conclude that the *Ake* error committed by the trial court was not harmless. As observed in the State's motion for rehearing, there was significantly reliable direct evidence that Hance committed an aggravated sexual assault against Gina. But as we have pointed out, Lorraine's credibility was nevertheless critical to the prosecution, and as we explain below, the laptop evidence could have assisted Hance in defending against the misimpression left in the juror's minds by Lorraine's testimony.

---

02-19-00237-CR, 2022 WL 1183335, at *5 & n.10 (Tex. App.—Fort Worth Apr. 21, 2022, no pet.) (mem. op., not designated for publication) (first citing Tex. R. App. P. 44.2(b); then citing *State v. Herndon*, 215 S.W.3d 901, 909 (Tex. Crim. App. 2007) (new-trial standard); and then citing *Oprean v. State*, 238 S.W.3d 412, 415–16 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd)). After the State filed its rehearing motion, we ordered the parties to file supplemental briefing on four questions related to Article 39.15(d). The State's supplemental briefing addressed harm under Rule 44.2(b) but did not address harm under Rule 44.2(a), even though one of the questions asked whether a violation of Article 39.15(d) could deprive a defendant of effective assistance of counsel—a constitutional violation urged by defense counsel in Hance's omnibus motion and during the status conference.

By the time Hance filed his omnibus motion, the jury had heard testimony from Lorraine, Bay, and the SANE from which the jury could have reasonably inferred (1) that a forensic examination of the contents of the laptop could confirm Lorraine's testimony (a) describing Hance's proclivity for daddy–daughter and incest pornography (and possibly the existence of child pornography) and (b) attributing to him Google queries seeking the signs-and-prevalence of incestuous toddler molestation—indicators of a consciousness of guilt, (2) that Hance had attempted to avoid any examination of the laptop's contents by spilling something on it, (3) that Lorraine retrieved and delivered the laptop to Bay to facilitate its examination by law enforcement, (4) that Bay had interrogated Hance by asking him whether "child porn" would be found in his internet search history, (5) that Bay had obtained a warrant for a digital forensic examination of the laptop but that the YCSO had never arranged for such an examination due to its poor condition, and (6) that had such a forensic examination been conducted, Bay could not say whether Hance had limited his consumption of father–daughter pornography on the internet to "adult-on-adult" fare. In other words, the jury could have inferred that Hance not only aroused himself sexually through incestuous role-playing with Lorraine and by viewing pornography portraying adults engaged in incestuous sexual role-playing, but that he had likely crossed the threshold from ideation to predation—as evidenced by his possible viewing of child pornography and his searching the internet for the signs and prevalence of incestuous toddler molestation. Lorraine's Google-search testimony, in particular, released the proverbial

97

skunk into the jury box by implying that Hance had either done or had considered doing the very thing with which he was charged. *See Dunn v. United States*, 307 F.2d 883, 886 (5th Cir. 1962) ("[I]f you throw a skunk into the jury box, you can't instruct the jury not to smell it."). *But cf. Rose v. State*, No. 02-21-00178-CR, 2023 WL 308170, at *12 (Tex. App.—Fort Worth Jan. 19, 2023, no pet.) (mem. op., not designated for publication) (identifying no skunk and citing *Vela v. Estelle*, 708 F.2d 954, 966 (5th Cir. 1983), in which defense counsel failed to identify or attempt to remove the skunk that the State had dropped in the jury box).

Additionally, although the State never argued thereafter that the laptop contained child pornography or that Hance's possession of child pornography was evidence of his predilection for engaging in incest with prepubescent girls, it reinforced the skunk left in the jury box by gratuitously cross-examining Hance about his sexual relationship with a married coupled subsequently convicted of possession of child pornography involving their granddaughter.

On direct examination, Hance had acknowledged an addiction to daddy–daughter and incest pornography, as evidenced by his custodial interrogation by Bay, but he categorically stated that all the pornography he watched involved adults who were role-playing. Hance also categorically denied ever showing Gina or her brothers any type of pornography—daddy–daughter, incest, or otherwise—via his phone or "on a computer or tablet or any other kind of computer."

During cross-examination, however, the DA asked Hance, why, if he was not turned on by "the idea of incest," he would visit incest pornography sites. She then questioned Hance about his sexual relationship with a couple when he first came to Texas, asking, "Isn't it true that they are both locked up in the federal penitentiary for child pornography specifically involving their granddaughter?" Although the trial court had allowed the question on an "if he knows" basis over a "facts not in evidence" objection by defense counsel, the only possible inference for the jury to draw was that Hance shared the couple's proclivity for incestuous child pornography. After Hance conceded that he knew they were incarcerated but not why, the ADA took over the State's cross-examination and—specifically highlighting the portion of Bay's custodial interrogation—confirmed that when Bay had suggested to Hance that he needed help, Hance understood that Bay was talking about his "pornography problem" or "addiction." But the ADA could not get Hance to agree that his addiction to incest pornography progressed from adults to children or to his sexual molestation of the victim. And with this line of questioning, the State reminded the jury of Bay's testimony that he could not say whether Hance had limited his consumption of father–daughter pornography on the internet to "adult-on-adult" fare. *Cf. Mays*, 2023 WL 8014507, at *3 & n.2 (observing custodial interrogation of defendant concerning his "pornography habits" did not reveal any incest references).

The intended inference for the jury to draw was clear and enabled the prosecution to reinforce the impression that the unrecoverable evidence contained on

the laptop might have included child pornography. And for Hance to rebut that inference with the contrary finding made by the Irving PD Forensic Report—had he been allowed to do so—his counsel risked opening the door for the State to impeach its own forensic expert with the purported inculpatory results of its weekend examination of the mirrored hard drive—without Hance's court-appointed forensic expert having had the opportunity to test the DA's status-conference representations. *See Dabney v. State*, 492 S.W.3d 309, 317 (Tex. Crim. App. 2016). Instead, not only was the State's evidence left unrebutted and Lorraine's testimony unimpeached, but the skunk that had been allowed to permeate the deliberative recollections of the jury during the continuance was bestirred by this suggestive "guilt by association" line of cross-examination. *Cf. Andrew v. White*, 145 S. Ct. 75, 78–79, 82–83 (2025) (holding, in case involving murder trial that featured evidence of defendant's infidelity and provocative dress, that United States Supreme Court precedent clearly establishes "that the Due Process Clause forbids the introduction of evidence so unduly prejudicial as to render a criminal trial fundamentally unfair" (citing *Payne v. Tennessee*, 501 U.S. 808, 825 (1991))).

Ironically, the State's motion for rehearing would have our harm analysis include certain findings and conclusions of the Irving PD Forensic Report that the jury never saw and that the jury had been led to believe was forensically unrecoverable: "What was known to be on the computer was inculpatory, including Google searches that corroborated [Hance's] ex-wife's testimony and eight father-daughter pornographic websites." But the State's exclusion of Hance's Google search history from its weekend

100

examination is problematic. Knowing that the jury had already heard this uncorroborated evidence of a consciousness of guilt, the State failed to ask the Irving PD EEU to confirm Lorraine's testimony attributing those searches to Hance. Given that the State had offered this testimony as inculpatory evidence of Hance's intent, only to hear that Lorraine had cleared her Google search history beyond recovery, deleted her own screen shot of Hance's alleged queries, and asked her friend to delete the same screen shot she had previously texted her—and did so only *after* Gina's outcry—the prosecution's failure to attempt to corroborate her testimony is troubling. Had the Irving PD EEU confirmed that a Google search incorporating the phrase "toddler molestation" did, in fact, exist on the mirrored hard drive by simply checking the thirty-two Google searches extracted as part of its original forensic examination, logic dictates that the DA would have made both the trial court and defense counsel aware of such discovery during the status conference. But she did not. Hance, his counsel, and his court-appointed forensic expert should have been given the opportunity to assess not only the DA's affirmative representations concerning possible child pornography on the laptop but also the omission of any corroboration of the signs-and-prevalence searches.[36]

---

[36]This conclusion finds additional support in the fact that Lorraine herself suggested that the signs-and-prevalence searches might not be recoverable if the Google search history had been cleared. Had the court-ordered forensic examination gone forward and confirmed the absence of these queries, Hance not only could have questioned whether they had ever existed but also possibly could have been able to show that Lorraine herself had "cleared" them in a manner consistent with her request

Considering the reasonable inference that the signs-and-prevalence queries that Lorraine attributed to Hance were not found on the laptop and, combined with Lorraine's deletion of her screen shot memorializing this Google search history and her unexplained request that her friend do the same *after Gina's outcry*, the trial court's abuse of discretion was particularly harmful because it deprived Hance of a reasonable opportunity to impeach Lorraine's credibility and her timeline testimony placing Hance at home at the time of the elected offense. Contrary to the date of commission set forth in the indictment, i.e., June 26, 2017, the State elected to prove and argue that the underlying assault occurred on the morning of July 28, 2017, an election that caused the jury a sufficient degree of confusion to prompt a note during its deliberations, *see supra* note 6. But, as we have already discussed, the disinterested text-log evidence presented by Hance may have persuaded the jury to question Lorraine's timeline placing him at home when the sexual assault purportedly occurred; thus, Hance should have been given an ample opportunity to explore the laptop evidence with the assistance of a digital forensic expert.

For these reasons, we cannot say that the trial court' error was harmless in light of the entire record. Because, by curtailing the continuance and moving forward with the trial, the trial court foreclosed the very forensic examination it had previously found

that her friend delete her screen shot of this history. The examination might also have drawn into question Lorraine's testimony concerning the synchronization of her email account with her electronic devices, including the laptop.

due process required for the preparation and presentation of Hance's defense, the trial court committed constitutional *Ake* error that we cannot say beyond a reasonable doubt did not contribute to Hance's conviction or punishment. *See Lighteard*, 982 S.W.2d at 533–35.

### 3. Judgment Not Reversible Under *Brady*

Because we did not consider whether the trial court committed *Ake* error in a vacuum, and because our consideration of whether the judgment is reversible under *Brady* informed our review of the state of the record as a whole, we include that *Brady* analysis in this opinion.

As noted above, to establish reversible error based on a *Brady* violation, an appellant must meet a three-prong test: (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith; (2) the withheld evidence was favorable to him; and (3) the evidence was material in that there was a reasonable probability that had the evidence been disclosed, the trial's outcome would have been different. *See Pena*, 353 S.W.3d at 809 (citing *Brady*, 373 U.S. at 87, 83 S. Ct. at 1197). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 812 n.11 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 1566 (1995)). A "reasonable probability" of a different result is thereby shown when the State's nondisclosure "undermines confidence in the outcome of the trial." *Id.* (quoting *Kyles*, 514 U.S. at 434,

103

115 S. Ct. at 1566). "The suppressed evidence is considered collectively, rather than item-by-item." *Id.* at 812 (quoting *Kyles*, 514 U.S. at 436, 115 S. Ct. at 1567).

### a. Law Enforcement—and Therefore the State—Knew About Lorraine's Laptop Before Trial but Did Not Disclose

The State contends that "there was no *Brady* violation" because "[t]here was no suppression of evidence." According to the State, (1) Hance "knew as far back as August 2017 that there was information on the laptop computer," and (2) "[n]othing [had] prevented him from seeking access or a mirror[-]image drive at that time." Regardless, the State maintains that "a mirror of the laptop hard drive and the contents had been given to defense counsel." Neither of these contentions is supported by the record.

Although the DA asserted—and Hance's counsel agreed—that she first learned of the State's possession of the Irving PD Forensic Report and the laptop itself after the testimony of Lorraine and Bay on the second day of trial, Monday, April 8, the record reflects that law enforcement knew about the laptop and the likely materiality of its contents in August 2017. Specifically, the Irving PD Forensic Report cites a "search warrant" obtained by the YCSO and "signed by the Honorable Stephen Bristow"—the judge who presided over the trial—as legal authority for the computer's examination.[37]

---

[37]Governor Abbott having appointed him to replace the retiring Judge Bristow in October 2023, ADA Gregory is now the presiding judge of the 90th District Court of Young County.

Additionally, the prosecution team, not a witness, first mentioned the computer at trial. In response to Hance's objections lodged during trial on April 8, ADA Gregory told the trial court that "[Lorraine is] testifying about what she saw . . . on [Hance's] cell phone or *his computer* or wherever she saw it."[38] [Emphasis added.] Then, the DA referenced *a laptop*[39] in asking a predicate question for identifying Lorraine's source for Hance's alleged Google search history: "Let's go back. Did [Hance] have a laptop?" Although Lorraine had told the SANE that she allegedly "caught [Hance] Googling signs of child molestation and how common is father[-]daughter molestation," the nurse's notes do not indicate that Lorraine had described the circumstances of this discovery—whether her laptop or shared email account with Hance was the source of it or the synchronization or "syncing" of her cell phone with her laptop. And although Lorraine testified that she turned her laptop over to the YCSO five days after the SANE examination, she also testified that on the day she took Gina to the hospital, she called the friend to whom she had previously texted the screenshotted search history and asked her to delete it from her phone, raising the question of whether she actually conveyed the Google search history information to Bay when she delivered the laptop to him. Nevertheless, the YCSO's knowledge of the laptop, its forensic examination by

---

[38]The DA had just asserted to the trial court that she intended to ask Lorraine questions about the Googling; therefore, that Hance used either a phone or computer for his Google searches was a reasonable inference.

[39]Again, that Hance might have used a laptop when accessing the internet while away from Lorraine is a reasonable inference.

the Irving PD EEU, and the generated reports was imputed to all members of the prosecution team, *see Heath*, 696 S.W.3d at 693; *Rubalcado v. State*, 424 S.W.3d 560, 574 (Tex. Crim. App. 2014) (holding one law enforcement officer's knowledge imputed to others for right-to-counsel purposes); *Ex parte Adams*, 768 S.W.2d 281, 291–92 (Tex. Crim. App. 1989) ("[W]hether the prosecutor had actual knowledge of the falsity of the testimony is irrelevant. . . . [i]f the prosecutor should have known . . . ."). Moreover, as we explain below, the State's anticipated use of and reliance on Lorraine's Google-search testimony rendered the laptop and its contents material evidence under Article 39.14, and the State was therefore required to produce it thereunder. *See Watkins*, 619 S.W.3d at 290; *see also* Tex. Code Crim. Proc. Ann. art. 39.14(a). The State undisputedly failed to do so.

As to the State's first contention, although it correctly asserts that it did not have a duty to disclose exculpatory information if Hance was aware of it or could have accessed it from other sources, *see Pena*, 353 S.W.3d at 810, at no time did the State ever argue or otherwise demonstrate to the trial court that Hance or his counsel were aware of exculpatory or impeachment evidence obtainable from Lorraine's laptop, let alone its availability through pretrial discovery, either from the State or from other sources. To the contrary, defense counsel did, in fact, seek discovery of all material evidence, including *Brady* and Article 39.14(a) and (h) evidence, by pretrial motion well before trial, and the State's compliance certificates, both original and amended, made no mention of the laptop, the mirrored hard drive, the Irving PD Forensic Report, or any

106

findings of the forensic examination conducted by the Irving PD EEU in August 2017.[40]

Additionally, at the Tuesday, April 9 hearing on Hance's omnibus motion, the State conceded that although the YCSO had informed the ADA the previous day, Monday, April 8, that it was presumably in possession of the laptop, the prosecution team could not yet confirm its actual whereabouts, assuring the trial court that, if so ordered, it could be delivered to the defense's digital forensic expert no later than the next morning. The ADA further confirmed that he had personally received the Irving PD Forensic Report the day before and had given it to defense counsel. Not surprisingly, at no time did the State argue that access to the laptop of which the prosecution team had only just become aware could have been obtained by Hance and his counsel through more diligence than evidenced by the prosecution team.

When the trial court reconvened for the status conference the following Monday, April 15, the DA confirmed that her office did not learn that the laptop's hard drive

---

[40]On the Friday of voir dire, the State filed its certification of compliance with its discovery obligations to Hance pursuant to Article 39.14, setting forth the material evidence it had either provided or made available to Hance in preparation for trial. The State thereby further certified that the evidence listed included "any exculpatory, impeachment, or mitigating documents, items or information that is in the possession, custody, or control of the State that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged." Notably, the evidence listed included a YCSO evidence and property report for Hance's phone, a 419 page "phone examination preview report," and "YCSO SPPL RPT/YCSO EVD/PROP RTP DVD-R - HANCE PHONE," but did not include any reference to a laptop or computer associated with Hance, including any search warrant therefor. The only search warrant referenced was for the Hance's residence.

had been sent to the Irving PD EEU for analysis until after defense counsel had raised his objections to Lorraine's testimony and that her office also did not know that the YCSO had a mirrored copy of the hard drive. She further confirmed that a mirrored hard drive had previously been made but that the prosecution team "did not realize [that it] had the mirrored hard drive" until after defense counsel raised his objections to Lorraine's testimony on Monday, April 8.

Thus, contrary to the State's first contention, the record does not reflect that defense counsel—or even the prosecution team—knew either in August 2017 or at any time before trial—of the Irving PD Forensic Report or of the availability of the laptop for pretrial discovery and forensic examination. The prosecution team, however, could not assert such ignorance as an explanation for its failure to disclose because the YCSO possessed the laptop, the mirrored hard drive, the Irving PD Forensic Report, and the Irving PD EEU's forensic examination results no later than October 2017. *See Heath*, 696 S.W.3d at 693; *cf. Rubalcado*, 424 S.W.3d at 574.

As to the State's contention that it had produced the contents of the mirrored hard drive to defense counsel pursuant to the trial court's order, *see Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999) ("If the defendant received the material in time to use it effectively at trial, his conviction should not be reversed just because it was not disclosed as early as it might have and should have been."), the order compelled production "immediately" directly to the forensic expert appointed by the trial court,

not merely to defense counsel personally. Thus, the State never complied with the trial court's order.

Nor did the State ever seek to vacate or modify the trial court's order, even though purportedly concerned about the possibility of child pornography on the laptop and the statutory restrictions imposed upon such production by Articles 38.45 and 39.15. Not until the afternoon of the status conference did any form of production occur, and only then for a brief review of the Irving PD EEU's forensic examination results by defense counsel personally, without the assistance of his court-appointed expert. Indeed, although he acknowledged the DA's offer of availability during the conference, defense counsel categorically denied having yet had the opportunity to conduct any examination, either personally or forensically as ordered by the trial court: "I understand the DA has made the judg[]ment that there's no exculpatory evidence on there, and I don't know if there is, because I have never even had my hands on this to look at it." And the trial court implicitly concurred with this representation by taking a one-hour break in the conference to let defense counsel examine whatever evidence the State had offered, again, without the assistance of his court-appointed expert. Particularly given the trial court's exclusion of the Irving PD Forensic Report, as discussed in more detail below, this midtrial, mid-continuance disclosure cannot

reasonably be said to have provided defense counsel sufficient time to put whatever laptop evidence was produced to effective use at trial. *See id.* at 866.[41]

Finally, as to both contentions, there is simply nothing in the record that reflects that either Hance or his counsel otherwise knew that the laptop and its alleged contents—and particularly the alleged Google search history attributed to him by Lorraine—were in any manner available through pretrial discovery. As discussed above, *see supra* notes 9, 19, the record belies the DA's assurance to the trial court that the State had given notice of its intent to elicit such testimony. Moreover, Hance was entitled to rely on the absence of this evidence from the State's formal notice of intent to introduce evidence of other crimes, wrongs, or acts, including any acts of uncharged misconduct, and "to assume that these acts were the *only* ones that the State intended to offer." *See McDonald v. State*, 179 S.W.3d 571, 577 (Tex. Crim. App. 2005). Even attributing knowledge of Lorraine's likely testimony to Hance and his counsel due to their receipt

---

[41]In its supplemental briefing, the State incredibly argues that, despite the trial court's immateriality ruling at the end of the Monday, April 15 status conference, defense counsel still could have sought and obtained the forensic examination ordered by the court during the remaining two days of trial and that his failure to do so effectively waived any error in moving forward with the trial. In other words, just like the DA argued that defense counsel should have been able to review the forensic results of the Irving PD EEU without the assistance of an expert despite her own need for the weekend examination of the mirrored hard drive by an expert to confirm the mere possibility of its containing child pornography, the State now argues that defense counsel should have been able to obtain the forensic examination ordered by the court during the last two days of testimony, when the State took fully half the continuance the trial court found necessary for that examination, without the rigorous daily obligations of trial, and without objection by the State, to obtain the weekend forensic review. The State's own conduct belies its argument.

of the SANE's report of her forensic interview, Lorraine did not therein disclose her laptop or its contents as the source of her knowledge, nor did she describe how the synchronization or "syncing" of her phone with the laptop facilitated a shared Google search history with Hance through their shared email account. And the only forensic examination disclosed by the State was that conducted on Hance's phone; neither the laptop nor the Irving PD Forensic Report appeared in the State's *Brady* or Article 39.14(a) and (h) disclosures.

Justifying its failure to produce the mirrored hard drive to Hance's court-appointed forensic expert, the State asserts in it motion for rehearing, as it did during the status conference, that the evidence "known" to be on the laptop was inculpatory. As discussed in our *Ake* analysis above, this is simply not true, and the only evidence presented to the trial court compels that conclusion.

And the State provided no evidence whatsoever during the status conference that the laptop or its mirrored image contained any child pornography: no images, no videos, no testimony, no affidavit, no report. Instead, in justifying the State's failure to comply with the trial court's order, the DA discussed only images on the mirrored hard drive that she found troubling as *possible* child pornography and asserted that the Irving PD EEU technician could not *confirm* these images were *not* child pornography such that the law permitted unfettered access to the laptop by Hance, his counsel, and his

111

court-appointed forensic expert.[42] In summary, the entirety of the State's presentation consisted of the lay interpretations and hearsay attributions of the DA. Indeed, the only evidence presented to the trial court during the conference was the Irving PD Forensic Report, in which the examiner denied finding child pornography as a result of his examination.

Moreover, absent from the State's presentation was any mention whatsoever of whether any forensic examination conducted by the Irving PD EEU—either the original or the trial-weekend search—found or could otherwise corroborate the signs-and-prevalence Google searches attributed to Hance by Lorraine. The DA expressly represented to the trial court that the only evidence found on the mirrored hard drive was inculpatory, but again did not include the alleged signs-and-prevalence queries in any recitation of this evidence. Given that the State had offered this testimony as inculpatory evidence of Hance's intent—only to hear that Lorraine had cleared her Google search history beyond recovery, deleted her own screen shot of Hance's alleged signs-and-prevalence queries, and asked her friend to delete the screen shot she had

---

[42]Although she mentioned her concerns with these images because they could not "definitively be classified as nonchild pornography," the DA never identified the particular concerning images, either descriptively or by offering exemplars into evidence during the status conference. The Irving PD Forensic Report confirmed that "the hard drive contained at least five (5) images that depict females intentionally presented/posed in a manner that intends to convey a juvenile age (including 'school girl' outfits)," but if these were the images causing the DA's concerns, she did not identify them or explain why the Irving PD EEU lab technician was apprehensive to, in her words, "put [the hard drive] in the hands of a nonlaw enforcement agency."

112

texted her and did so only *after* Gina's outcry —the DA's failure to mention whether

the laptop contained any evidence that might corroborate the signs-and-prevalence

evidence the jury had already heard allows at least an inference that such corroborating

evidence was absent.[43] *Cf. Vasquez v. State*, 67 S.W.3d 229, 239 (Tex. Crim. App. 2002)

(observing prosecutor has duty to correct any perjured testimony given by a prosecution

witness, even when not instigated by the prosecutor); *see also* Tex. Code Crim. Proc. art.

39.14(k) ("If at any time before, during, or after trial the [S]tate discovers any additional

document, item, or information required to be disclosed under Subsection (h), the

---

[43]"A person's silence where he is at liberty to speak, and the circumstances naturally call upon him to do so, may be considered as a tacit admission of statements made to him or in his presence, so as to make such statements admissible against him." *Traders & Gen. Ins.*, 99 S.W.2d 1079, 1082 (Tex. App.—Fort Worth 1936, writ dism'd) (quoting 17 Tex. Jur. § 235); *cf. Escalante v. Escalante*, 632 S.W.3d 573, 579 (Tex. App.— El Paso 2020, no pet.) ("It is well established under Texas law that silence, where a denial or rebuttal or other response would be expected, can serve as an admission when offered by a party-opponent against the other party."). More specifically, a prosecutor's silence concerning evidence known (or knowable) only by the State, that conveys an impression to the court favorable to the State regarding a matter under the court's consideration—even if not the result of guile or a desire to prejudice—may nevertheless support a reasonable inference on appeal that the evidence withheld would have been favorable to the defendant had it been disclosed below. *See Burkhalter v. State*, 493 S.W.2d 219, 217–18 (Tex. Crim. App. 1973) (holding prosecutor's silence concerning non-prosecution agreement with counsel for critical witness in the face of his testimony on cross-examination denying the existence of such an agreement deprived defendant of material impeachment evidence). *But cf. Barrera v. State*, No. 04-96-00971-CR, 1998 WL 712915, at *5 n.3 (Tex. App.—San Antonio Oct. 14, 1998, pet. ref'd) (not designated for publication) (declining to construe prosecutor's silence when defense counsel noted that the defense had asked for exculpatory evidence and "they say there is none" as a misleading representation that no exculpatory evidence existed, particularly since the exculpatory nature of the undisclosed witness statements was "tenuous").

[S]tate shall promptly disclose the existence of the document, item, or information to the defendant or the court."). *But cf. Coleman v. State*, 577 S.W.3d 623, 635 (Tex. App.—Fort Worth 2019, no pet.) ("The State has no duty to seek out exculpatory information independently on defendant's behalf." (quoting *Palmer v. State*, 902 S.W.2d 561, 563 (Tex. App.—Houston [1st Dist.] 1995, no pet.)). So instead of complying with the trial court's order, the State effectively reopened its criminal investigation of Hance—in the middle of the continuance allotted for his court-appointed expert to forensically examine the laptop—to re-evaluate whether the images previously determined to be of adults were instead evidence of the presence of inculpatory child pornography evidence and without corroborating evidence of Hance's alleged signs-and-prevalence Google searches. Stated differently, despite a Google search seeking the signs of "toddler molestation" being significant evidence of a consciousness of guilt, the State failed, over the course of six days, to simply check the thirty-two Google searches extracted as part of the original forensic examination's "IEF Refined Results" to confirm whether they included the signs-and-prevalence queries to which Lorraine had already testified.[44]

---

[44]Despite having timely disclosed before trial the State's intent to offer the results of the digital forensic examination performed on Hance's cell phone (State's Exhibit 28), the DA made no mention of any attempt to corroborate her suspicions about the presence of child pornography on the laptop by reassessing the cell-phone results considering Lorraine's synced devices and shared email testimony. Nor did she describe any attempt by the State to retrieve the screen shot taken with Lorraine's cell phone nor the screen shot Lorraine texted to her friend, then told her to delete.

After the filing of the State's motion for rehearing, we looked for State's Exhibit 28 to determine whether its admission placed similar evidence of a cumulative

114

Having been presented with no evidence of child pornography on the mirrored hard drive, or even the forensic report purportedly prepared by the Irving PD EEU over the weekend, the trial court (1) found the entirety of the laptop evidence immaterial, including the Irving PD Forensic Report, (2) ruled the laptop evidence inadmissible for the remainder of the trial unless Hance established a basis for its admission, (3) overruled Hance's objections, and (4) ordered that the trial be reconvened the following day. And in so ruling, the trial court imposed a "Hobson's

_____

nature before the jury for purposes of conducting the harm analysis urged by the State, only to discover that the exhibit had been "sealed [and] not uploaded due to child pornography" according to the exhibit index and "SEALED – contains potential child pornography" according to the exhibit's copy-only page in the exhibit volume of the reporter's record. When the trial court admitted Exhibit 28 for the jury's consideration in accordance with the stipulation of the parties, there was no mention of any child pornography whatsoever contained in the exhibit. The State subsequently requested that Exhibit 28 "be sealed inasmuch as there are some pictures and videos which may depict child pornography." After we ordered Exhibit 28's inclusion in the reporter's record and asked for additional briefing on what harm analysis should apply, our review of the exhibit revealed no child pornography discernable by lay examination, nor any evidence that the contents of Hance's cell phone included any Google search history that could corroborate Lorraine's testimony. Nor did the State ever assert the cumulative-evidence argument we anticipated.

Reviewing the entirety of the existing record as we must under *Brady*, there is no evidence that the forensic examination of Hance's cell phone extracted any child pornography or the Google search history that Lorraine had attributed to Hance. *See Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011) ("At bottom, an analysis for whether a particular constitutional error is harmless should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment.'"). These findings are thus in no way inconsistent with the results memorialized by the Irving PD Forensic Report, which was the only evidence presented to the trial court during the status conference.

115

Choice"[45] upon defense counsel, foreclosing his use of the exculpatory and impeachment evidence available for Hance's defense on the face of the Irving PD Forensic Report unless—had he been allowed to do so—he was willing to call the State's bluff and risk opening the door to rebuttal evidence of child pornography on the laptop, the existence of which he had not had the opportunity to forensically confirm. *See Dabney*, 492 S.W.3d at 317 ("[T]here is an exception to this notice requirement when the defense opens the door to such evidence by presenting a defensive theory that the State may rebut using extraneous-offense evidence."); *Richardson v. State*, 328 S.W.3d 61, 71 (Tex. App.—Fort Worth 2010, pet. ref'd) ("By raising a defensive theory, the defendant opens the door for the State to offer rebuttal testimony regarding an extraneous offense if the extraneous offense has common characteristics with the offense for which the defendant was on trial."); *cf. United States v. Dorvilus*, 357 F. App'x 239, 245–46 (11th Cir. 2009) (rejecting defense counsel's oral-argument characterization of trial court's deferral of ruling on motion to suppress inculpatory Apple iPhone photographs as a "sword of Damocles"[46] hanging over

---

[45]A Hobson's Choice is "a choice with the appearance of several options, but really only one option." *Tutt v. State*, 339 S.W.3d 166, 174 (Tex. App.—Texarkana 2011, pet. ref'd).

[46]"The expression 'sword of Damocles' originated from a Greek fable in which King Dionysius suspended a sword by a hair over the head of Damocles, one of his courtiers, as he dined at a sumptuous banquet, in order to illustrate the grave danger that all rulers are constantly under. Because the presence of the sword caused Damocles great fear for his safety, and robbed him of enjoyment of the banquet, this expression has, thus, colloquially come to be understood to signify a threat of imminent danger."

defense throughout trial engendering fear of opening door to their admission). By so ruling, the trial court thereby compounded any error it committed in effectively rescinding its previous order compelling production of the laptop for an independent forensic examination. *See Little*, 991 S.W.2d at 866. It was as if the Irving PD Forensic Report had never been disclosed in the first place.

Finally, we note that although at the status conference the State initially offered to make the laptop's mirrored hard drive available to Hance's expert, after the trial court indicated its unwillingness to give Hance the full fourteen-day continuance it had previously ordered, the State then resisted allowing Hance's expert to examine the laptop, changing course and arguing that such an examination would be of no use to Hance.

## b. Determining *Brady* Materiality Would Require Speculation

Having concluded that the State failed to disclose and effectively suppressed evidence favorable to Hance's defense by failing to make the mirrored hard drive reasonably available to Hance's court-appointed forensic expert for a forensic examination, *see Flinn*, 521 F. Supp. 2d at 1101 (detailing what constitutes an ample opportunity to forensically examine computer materials, none of which occurred here), we are nevertheless required by *Brady* to determine whether the evidence suppressed, considered collectively, so outweighed the evidence supporting conviction that, in its

---

*Polett v. Public Comms., Inc.*, 126 A.3d 895, 918 n.13 (Pa. 2015) (citing Hendrickson, *Word and Phrase Origins* at 701 (3d ed. 2004)).

absence, Hance did not receive a fair trial, understood as a trial resulting in a verdict worthy of confidence. *Pena*, 353 S.W.3d at 812 & n.11. Here, although there is both exculpatory and impeachment evidence favorable to Hance that the State withheld in the face of its statutory and constitutional duties—as well as a court order—the credibility, weight, and materiality of the evidence depend almost entirely upon the results of the digital forensic examination ordered, but subsequently foreclosed, by the trial court.

For example, had the court-ordered forensic examination confirmed Lorraine's testimony, having (1) found the signs-and-prevalence searches to which she testified, (3) confirmed the laptop as their source, (3) verified her ability to access the searches via a shared email facilitated by the syncing of her phone with the laptop, and (4) otherwise confirmed the timeframe of their entry, her discovery, and their deletion——not to mention confirming the presence of child pornography contrary to her testimony—the trial court's immateriality finding would likely withstand a comprehensive *Brady* review, given the weight of inculpatory evidence presented at trial. But had the court-ordered forensic examination discovered that (1) there was no child pornography on the mirrored hard drive, contrary to the State's representations, (2) the forensic examination conducted by the Irving PD EEU was sufficiently broad to have extracted the alleged Google searches, if they existed, (3) the signs-and-prevalence searches were not present on either the laptop or the mirrored hard drive, (4) there was no evidence of a shared email account or of the syncing of Lorraine's phone and the

laptop, or (5) there was evidence that someone other than Hance had conducted the searches,[47] such evidence would tend to impeach that part of Lorraine's testimony and possibly cast doubt on her testimony about the date of the sexual assault and the circumstances of Gina's outcry.

Standing alone, therefore, the absence of child pornography and the alleged Google searches, as confirmed by the Irving PD Forensic Report, was inferentially favorable to Hance. Such evidence was both (1) exculpatory of his alleged intent to arouse and gratify his sexual desires through sexual activity with a prepubescent female child and (2) impeachment of Lorraine's attribution of the signs-and-prevalence queries as evidence of his preparation and consciousness of guilt. Nevertheless, by refusing to compel the digital forensic examination it originally ordered, based solely upon the verbal representations of the State concerning the alleged results of the weekend forensic examination the trial court neither authorized nor considered as evidence, the

---

[47]We observe here that the signs-and-prevalence queries Lorraine attributed to Hance would support not only the "predatory pedophile" scenario offered by the State, but also either a "concerned mother" or a "vindictive spouse" defense excluding Hance as their source. Concerning the former, a reasonable inference could be urged that Lorraine suspected Hance of sexually molesting Gina well before the outcry that precipitated his prosecution and, instead of evidencing his preparation and consciousness of guilt, evidenced her maternal concern for the well-being of her daughter and an understandable attempt to gain information from the internet to either confirm or assuage her suspicions. Concerning the latter, a reasonable inference could be urged that Lorraine intended to frame Hance for sexually abusing Gina and sought to gain information from the internet in preparation for executing such a scheme. The fact that the jury could have discounted the credibility and weight of such inferences does not negate the importance of providing Hance with an opportunity to develop either or both possible defenses.

trial court made it virtually impossible for this court to determine the materiality of this laptop evidence pursuant to *Brady* absent impermissible speculation. Only the State and the Irving PD EEU have conducted a digital forensic examination of the mirrored hard drive. And we have only the State's assurance that only inculpatory, immaterial evidence was on the mirrored hard drive. *See Cary v. State*, 507 S.W.3d 750, 755 (Tex. Crim. App. 2016) (observing that "[t]he arguments of the parties and their trial theories are not evidence").

Ultimately, although this record reflects that the mirrored hard drive withheld by the State in violation of *Brady* under the bald assertion that its contents included possible child pornography *might have* contained exculpatory and impeachment evidence of a material nature for *Brady* purposes—or, by confirming the Irving PD Forensic Report's lack of a finding of child pornography and the Google searches attributed by Lorraine to Hance, confirmed the materiality of that evidence—without the actual results of the forensic examination ordered, but subsequently foreclosed by the trial court, we are left to merely speculate concerning the cumulative materiality of not only the contents of Lorraine's laptop, but the effective loss of the Irving PD Forensic Report for use by the defense. And mere speculation is not sufficient to find a deprivation of due process under *Brady. See Lopez v. State*, Nos. 07-23-00106-CR, 07-23-00107-CR, 2023 WL 7178023, at *4 (Tex. App.—Amarillo Oct. 31, 2023, no pet.) (mem. op., not designated for publication); *see also Agurs*, 427 U.S. at 109–10, 96 S. Ct. at 2400 ("The mere possibility that an item of undisclosed information might have helped the defense, or

might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."); *Lindsey v. State*, 582 S.W.3d 810, 821 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (quoting *Agurs*). By successfully asserting—and obtaining more than—the statutory restrictions imposed by Article 38.45 and 39.15—without any evidence of actual child pornography—the State effectively foreclosed appellate review of the trial court's immateriality ruling.[48] Accordingly, we cannot conclude that the entirety of the laptop evidence the State failed to disclose—even compounded by the

---

[48]The State argues in its supplemental briefing that (1) because Hance did not request that the mirrored hard drive be included in the record under seal, as had the State for State's Exhibit 28, and (2) because Hance had the opportunity to obtain the forensic examination ordered by the trial court post-verdict, and could have presented any exculpatory or impeachment evidence as part of his motion for new trial, his failures to do so should foreclose his *Brady* complaint as speculative. As to the first argument, the State does not explain how providing this court with a sealed mirrored hard drive facilitates appellate review without this court's having the expertise or means to conduct the forensic examination foreclosed to Hance. As to the second argument, given the State's exclusive possession of the laptop and its failure to present any evidence of child pornography justifying its failure to comply with the trial court's original order, we decline to impose a motion for new trial as an additional error-preservation hoop through which defense counsel should have jumped; Hance's motion for continuance sufficed. *See Yates v. State*, 941 S.W.2d 357, 364 (Tex. App.—Waco 1997, pet. ref'd) (observing that purpose of requiring a motion for continuance as a predicate step for preserving *Brady* error when the State's belated disclosure of material evidence occurs during trial is to facilitate the defendant's review of the evidence to prevent prejudice to the preparation and presentation of his defense); *see also United States v. McKinney*, 758 F.2d 1036, 1050 (5th Cir. 1985) (noting that when *Brady* material is disclosed during trial, "[t]he courts have uniformly held that . . . the [harm] inquiry is whether the defendant was prejudiced by the tardy disclosure. If the defendant received the material *in time to put it to effective use at trial*, his conviction should not be reversed simply because it was not disclosed as early as it might have and, indeed, should have been." (emphasis added)).

trial court's revocation of its order compelling the digital forensic examination and the continuance granted for its facilitation—was reversible *Brady* error.

#### 4. Article 39.14(h), (k) and Article 39.15(c), (d) Error Reversible

Alternatively, the trial court abused its discretion by foreclosing statutory discovery by Hance under both Article 39.14 and Article 39.15. As set forth in our *Ake* analysis—and illustrated by our *Brady* discussion—although we cannot definitively say that the laptop and its contents were material for *Brady* purposes, they are clearly material—"relevant"—under the Michael Morton Act.[49] *See Watkins*, 619 S.W.3d at 290–91; *cf. Taylor v. State*, 93 S.W.3d 487, 502–03 (Tex. App.—Texarkana 2002, pet. ref'd) (noting—in determining that trial court erred by refusing to allow defendant's expert to inspect hard drive that contained child pornography for which defendant was being prosecuted—that a drug defendant has the right to have an independent expert inspect the "contraband" to determine its chemical makeup and that "[i]t is no different" in child-pornography-possession prosecution to require the State to produce a hard drive containing images "for independent review").

#### a. Rule 44.2(b) Harm Standard Applies

Given that the underlying error Hance asserts is the State's violation of Article 39.14 by failing to comply with its discovery obligations and the trial court's refusal to

---

[49]In his initial brief, filed before *Watkins* was issued, Hance asserted that he could not assess whether the evidence withheld was material under the Michael Morton Act, as well as *Brady*.

enforce them, we ordinarily would conduct a standard harm analysis for nonconstitutional error to determine if a new trial is thereby made necessary. *See Stredic v. State*, 663 S.W.3d 646, 655 (Tex. Crim. App. 2022); *Sopko v. State*, 637 S.W.3d 252, 256–59 (Tex. App.—Fort Worth 2021, no pet.) (conducting harm analysis for nonconstitutional Article 39.14(a) error pursuant to Tex. R. App. P. 44.2(b)). A question remains, however, whether the harm analysis for an Article 39.14(h) violation requires the evaluation of the *Mosley* factors when a mistrial is the remedy denied by the trial court. *See Hallman v. State*, 647 S.W.3d 805, 825, 843 (Tex. App.—Fort Worth 2022, pet. granted) (op. on reh'g) (Wallach, J., plurality opinion) ("Under *Mosley*, the nonconstitutional harm that Hallman suffered was severely prejudicial during the critical guilt–innocence portion of the case."); *id.* at 855 (Walker, J., concurring) ("[T]he State's violation of its statutory duty under either Article 39.14(a) or Article 39.14(h) should be viewed under Rule 44.2(b) and not the denial-of-mistrial standard, which includes outcome-determinative factors and conflates the materiality determination and the analysis of reversible error."); *id.* at 844–45 (Womack, J., dissenting) ("Instead of utilizing the *Mosley* factors, the issue of whether the trial court abused its discretion by denying Hallman's motion for mistrial is best addressed by determining whether the State's violation of Article 39.14(h) affected Hallman's substantial rights—essentially, a harm analysis under Texas Rule of Appellate Procedure 44.2(b).").[50] *But see Saldivar-*

<hr>

[50]We issued our original memorandum opinion in this case on April 21, 2022, concluding that, "because evidence of [Hance]'s proclivities featured heavily in the trial,

123

*Lopez v. State*, 676 S.W.3d 851, 857–58 (Tex. App.—Corpus Christi–Edinburg 2023, no pet.) (citing *Hallman* plurality in evaluating *Mosley* factors for violation of motion in limine error). And no Texas court has decided what harm analysis applies when the State violates Article 39.15(d) under the circumstances presented here.

But because the standard Rule 44.2(b) analysis applies to errors in denying a motion for continuance, *see Velasquez v. State*, No. 04-23-00553-CR, 2024 WL 3056667, at *3 (Tex. App.—San Antonio June 20, 2024, pet. ref'd) (mem. op., not designated for publication)—one of the remedies requested by Hance in the trial court as an alternative to foreclosing his ability to have a defense expert cross-examine the laptop—we do not have the same situation that prompted the harm-analysis dilemma in *Hallman. But cf. Felix v. State*, No. 08-23-00136-CR, 2024 WL 2758715, at *9–10 (Tex. App.—El Paso May 29, 2024, pet. ref'd) (mem. op., not designated for publication) (analyzing denial-of-mistrial complaint after Article 39.14 violation—when content of withheld evidence was unknown because trial court refused a continuance and defense had not had the

---

and at the time of the laptop's discovery the defense could not unring the bell as to what the jury had already heard, the trial court should have concluded that [Hance] had been prejudiced and granted [his] new-trial motion." *Hance*, 2022 WL 1183335, at *5 & n.10 (citing Tex. R. App. P. 44.2(b)). The State filed its motion for rehearing on May 4, 2022, complaining of our failure to conduct a harm analysis, but took no position on what manner of harm analysis we should conduct in reconsidering our decision. Hance filed his response on May 10, 2022, but also took no position on what harm analysis applied. Our *Hallman* decision issued on June 16, 2022. And the court of criminal appeals granted Hallman's petition for discretionary review on October 19, 2022. As of the issuance of this opinion, the court of criminal appeals has not yet resolved the dilemma raised by the plurality, concurring and dissenting opinions in *Hallman*, in either that case or in any other.

opportunity to review it—using only *Mosley* factors when denial of continuance was not raised on appeal). Therefore, we will proceed with a standard Rule 44.2(b) analysis. *See Taylor*, 93 S.W.3d at 503 (citing *Cain v. State,* 947 S.W.2d 262, 264 (Tex.Crim.App.1997), for the proposition that "[i]f concrete data necessary to conduct a harm analysis is absent, we must nevertheless conduct the test, and the absence of information is simply taken into account in determining whether the harmless error test was passed or failed").

Rule 44.2(b) requires us to disregard any nonconstitutional error that does not affect appellant's substantial rights. *Becerra*, 685 S.W.3d at 144. A substantial right is affected when the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Cook v. State*, 665 S.W.3d 595, 599 (Tex. Crim. App. 2023); *see King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if the appellate court has a fair assurance from an examination of the entire record that the error did not influence the jury or that it had but a slight effect. *Macedo v. State*, 629 S.W.3d 237, 240 (Tex. Crim. App. 2021). In deciding that question, we consider (1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence indicating guilt, and (4) whether the State emphasized the complained-of error. *Id.*; *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions;

the State's theory and any defensive theories; closing arguments; and even voir dire, if applicable. *Haley v. State*, 173 S.W.3d 510, 518–19 (Tex. Crim. App. 2005); *Motilla*, 78 S.W.3d at 355–56.

### b. Nature of the Error

The error at issue here was not a run-of-the-mill failure to grant a midtrial continuance because of an unforeseen, prejudicial event. *See, e.g.*, *Riso v. State*, Nos. 04-22-00080-CR, 04-22-00081-CR, 2023 WL 4095942, at *6 (Tex. App.—San Antonio June 21, 2023, no pet.) (mem. op., not designated for publication) (noting that the trial court was able to prohibit testimony or grant a continuance when the State presented undisclosed evidence). Rather, the error, as Hance argued in both his omnibus motion and during the status conference, arose from both a federal due-process violation and a violation of Article 39.14(h), the purpose of which is to protect a defendant's federal *Brady* rights.

Although the trial court initially granted Hance's motion for continuance, things went south for Hance soon thereafter. The trial court's *Ake* violation began when the State withheld the hard drive on the mere allegation that it contained "certain images that cannot definitively be classified as nonchild pornography."[51] The DA's allegation,

---

[51]Although not discussed by either party, we note that the record does not reflect that the State obtained a warrant for the second examination. Assuming that a warrant was necessary—and obtained—for the first examination, the second warrantless search raises a probable-cause concern because the first examination did not find child pornography. *See, e.g.*, *United States v. Huntoon*, No. CR-16-00046-001-TUC-DCB (DTF), 2018 WL 1755788, at *7, *9 (D. Ariz. Apr. 12, 2018) (order), *aff'd*, 796 Fed. App'x 362

however, is not evidence. *See Cary*, 507 S.W.3d at 766 ("[T]he arguments of the parties are of no consequence because arguments are not evidence."); *Rhymes v. State*, 536 S.W.3d 85, 100 (Tex. App.—Texarkana 2017, pet. ref'd) (same). The regulations and obligations of Article 39.15 were never proven to be necessary during the hearing on Hance's omnibus motion. And contrary to the State's mere assertions, the Irving PD Forensic Report was at least some evidence that the laptop did *not* contain any child pornography.

To complicate matters further, although neither the State nor Hance's counsel specifically mentioned Article 39.15 during the status conference, the State's assertion of the possible existence of child pornography on the laptop as its basis for failing to comply with the trial court's order compelling production of the laptop provided the entire context of the court's eventual immateriality ruling. Because the regulations of Article 39.15 were not expressly invoked or proven to be necessary during the hearing on Hance's omnibus motion, however, *Brady* and federal due process provided the sole basis for the trial court's appointment of an expert to determine whether the laptop

---

(9th Cir. 2019) (concluding that police may conduct a second, warrantless search of a computer if that search is limited to the type of contraband for which there was probable cause to initially search, and which was previously discovered, under a search warrant and noting probable-cause concern when child pornography was found during a second warrantless forensic examination after a prior examination had found none). Because neither party addresses this issue, we likewise do not address it. Tex. R. App. P. 47.1.

contained exculpatory or impeachment evidence; Article 39.14 simply does not provide any basis for requiring such an appointment.

Despite Hance's renewing his omnibus motion in the face of the State's noncompliance, the trial court gave Hance's counsel just one hour to personally review the Irving PD EEU's forensic-examination results—without the assistance of his court-appointed forensic expert—and ordered the parties back to trial the next day. The trial court's multifarious error effectively denied Hance an expert, denied Hance an ample opportunity for an expert to examine the computer as mandated by Article 39.15(d), and, as explained above, even denied Hance the use of the favorable inferences available from the face of the Irving PD Forensic Report. The trial court simply reconsidered and denied Hance's motion for continuance based solely upon the mere assurances of the prosecution team, made without any supporting evidence, that the forensic examination the continuance was ordered to facilitate was no longer necessary or appropriate. Thus, under the circumstances of this case, the underlying statutory discovery violation simultaneously implicated three distinct due-process rights: (1) the right to an ample opportunity to prepare a defense; (2) the right to discovery of exculpatory and impeachment evidence; and (3) the right to expert assistance in preparing a defense to a prosecution predicated upon forensic evidence. *See Ake*, 470 U.S. at 74, 76–77, 84, 105 S. Ct. at 1091–93, 1097; *Brady*, 373 U.S. at 87, 83 S. Ct. at 1196–97; *Foster*, 332 U.S. at 137, 67 S. Ct. at 1718; *Carter*, 329 U.S. at 174, 67 S. Ct. at 218; *Adams*, 317 U.S. at 275, 63 S. Ct. at 240. Indeed, by including within the ambit of

"ample opportunity" not only the defendant and defense counsel but also "any individual the defendant seeks to qualify to provide expert testimony at trial," Article 39.15(d) is clearly intended to protect a defendant's due-process rights under *Ake* and *Adams*, much like Article 39.14(h) protects a defendant's due-process rights under *Brady*.

Nevertheless, as the law currently stands, the court of criminal appeals has held that even when a defendant urges both a constitutional violation and a violation of a statute intended to protect the constitutional right so violated, as Hance did here by urging a violation of due process, *Brady*, and Article 39.14(h), we are to conduct a harm analysis for the statutory error under the standard for nonconstitutional error. *See Holder v. State*, 639 S.W.3d 704, 707 (Tex. Crim. App. 2022) (holding a violation of the Texas exclusionary rule, Code of Criminal Procedure Article 38.23(a), subject to Rule 44.2(b) nonconstitutional error harm analysis, overruling *Love v. State*, 543 S.W.3d 835, 846 (Tex. Crim. App. 2016) (holding Article 38.23(a) violation predicated upon concomitant Fourth Amendment violation subject to Rule 44.2(a) constitutional-error harm analysis)).[52]

---

[52]In *Hallman*, the plurality, concurring, and dissenting opinions rejected Hallman's argument that because the purpose of the statute is to protect a defendant's due-process rights under *Brady*, a violation of Article 39.14(h) presents constitutional error subject to a harm analysis under Rule 44.2(a). 647 S.W.3d 805, 824 (Tex. App.— Fort Worth 2022, pet. granted) (op. on reh'g) ("In his supplemental brief, Hallman argues that the proper harm analysis is that of constitutional harm under Rule of Appellate Procedure 44.2(a), requiring reversal unless it can be determined beyond a reasonable doubt that the error did not contribute to his conviction."); *id.* at 844–46 (Womack, J., dissenting); *id.* at 855 (Walker, J., concurring). This very argument is before

Despite its prior representations to the court that it would make the laptop available to Hance, at the April 15 status conference the State doubled-down on its child-pornography allegation, with the DA asserting that the laptop's examination was not "even material evidence inasmuch as we [the State] are not going to be admitting it at trial." But the State had already admitted, and the trial court had found, on April 9 that the laptop evidence was sufficiently material such that it should have been produced to the defense under Article 39.14. Regardless, evidence is material according to Article 39.14 when it has "a logical connection to a consequential fact," *Watkins*, 619 S.W.3d at 290 (quoting numerous editions of Black's Law Dictionary), not because the State might use it; the State cannot prophylactically render evidence immaterial by forswearing its proffer, especially not after having benefitted from its negative inferences against the defense. As we previously noted, the laptop's contents became material evidence when Lorraine testified about the Google searches; after that, the State's intent to further rely on it was irrelevant to whether Hance could have the opportunity to try to rebut it. At the very least, when the State belatedly complied with its *Brady* obligations by producing the Irving PD Forensic Report, the laptop's contents—subject to their memorialized forensic examination—became material.

Despite this evidence, the trial court relied solely on the DA's *ipse dixit* that the hard drive *might* contain child pornography and effectively rescinded its order to

the court of criminal appeals by virtue of its granting Hallman's petition for discretionary review.

130

produce the computer, thus invoking Article 39.15. *See* Tex. Code Crim. Proc. Ann. art. 39.15(d). But the trial court never attempted to determine whether Article 39.15's restrictions applied.

When a defendant is charged with child-pornography possession, such a factual determination is not necessary because the State would have to prove the allegation at trial anyway. *See, e.g.*, *United States v. Battaglia*, No. 5:07cr0055, 2007 WL 1831108, at *2 (N.D. Ohio June 25, 2007) (finding that a grand jury's probable-cause finding that the material at issue was child pornography was sufficient to invoke its protection under the Adam Walsh Act, 18 U.S.C.A. § 3509(m), because the government had to prove it actually was child pornography at trial). Here, however, the State's child-pornography allegation has never been tested by a forensic examination.

Hance raised this Catch-22 at the April 15 hearing, stating, "[F]airness demands that a decision be made about whether there's child pornography on there so a decision can be made regarding whether my expert looks at it at his lab or goes to another person, a [S]tate-run lab, to look at it."[53] *See* Tex. Code Crim. Proc. Ann. art. 39.15(d). Rather than providing either option, the trial court erroneously disregarded the evidence already before it—that the Irving PD EEU initially had not found evidence of any child

_____

[53]In its supplemental briefing, the State contends that Hance did not preserve error under Article 39.15 because "[h]e never mentioned [it]." Although Hance did not specifically cite Article 39.15, he specifically addressed the article's requirements by objecting to the one-hour evidentiary review and requesting a ruling on whether the article's requirements even applied. This is sufficient to preserve error. *See* Tex. R. App. P. 33.1(a)(1); *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021).

pornography on the laptop—and decided that Article 39.15 applied based solely on the State's unsupported, untestable allegation.

Although the trial court applied Article 39.15 without a child-pornography determination, it had already granted Hance a seemingly ample opportunity to examine the hard drive by granting a fourteen-day continuance and appointing a digital forensic expert for Hance. *See id.* But its effective denial of the continuance five days later compounded its initial error by preventing Hance from accessing the hard drive at all— i.e., finding that it was de facto immaterial—and, thus, preventing him from making a record for review on appeal or developing his defense.

### c. Hance's Inability to Make a Record

The State asserts that Hance could have accessed the hard drive at any time after trial resumed because the trial court's written order on Hance's re-urged omnibus motion granted him continuing access to the hard drive. According to the State, the written order was "dated both April 16 and May 16," thus "retrospectively document[ing] that [Hance] was provided an ongoing opportunity to have his expert view the materials." That is not what the record reflects.

The order begins by expressly finding that "the 'laptop and its contents' may contain images and content that constitutes child pornography, the possession of which is prohibited by Penal Code Section 43.261." It then orders "that the State of Texas is not required to release 'the laptop and its contents' to Defendant's expert as previously ordered on April 10, 2019." But the order goes on to require that the " 'laptop and its

contents' shall remain in the care, custody[,] and control of the State as provided by Article 38.45." It then orders the State to "make the 'laptop and its contents' available to the Defendant, the Defendant's Attorney and/or the Defendant's designated expert."

Although the written order does require the State to make Lorraine's computer "and its contents" available to Hance and his expert, the order was issued twenty-eight days after the judgment of conviction and three days after Hance had filed his new-trial motion. The order reflects the following signature date:

Signed this the ___16___ day of MAY April, 2019.

Although the order appears to have been drafted in April 2019, it was signed on May 16, 2019, the same date on which it was filed of record.

Furthermore, the trial court made no mention of its intent to give Hance continued access to the hard drive during the April 15, 2019 hearing in which it ordered the parties back to trial on April 16, 2019. The trial court opened the April 15 hearing by noting its prior continuance order and its having received "multiple texts or some conversations between defense and the [S]tate concerning [the laptop, hard drive, mirrored hard drive, and related investigative reports,] it[s] not being ever transported or anything to this location." After hearing the parties' arguments on Hance's access to the hard drive, the trial court disclosed that it had already planned to resume trial on April 16—despite its prior continuance to April 24—because one juror would be out

133

of town during the week of April 24 and because another may also have had a scheduling conflict. After Hance's counsel's one-hour review of the Irving PD EEU's forensic examination results, the trial court overruled Hance's request for time to allow his expert to examine the hard drive, stating,

> We'll be ready for trial in the morning. I'm going to note your [Hance's] exception on that. But the [S]tate is prohibited from using any piece whatsoever from that analysis in any court and in anything that we do in court for the rest of this trial. I note that exception. . . .
>
> . . . . Let's be ready at 9 o'clock in the morning."

The trial court gave no indication that Hance would have continued access to the hard drive until it issued its May 16, 2019 written order, four days before the May 20, 2019 new-trial-motion deadline and three days after Hance had filed his motion for new trial. *See* Tex. R. App. P. 4.1(a), 21.4(a). Accordingly, the record does not reflect that Hance could have accessed the hard drive to make a record or offer new evidence in his new-trial motion.

### d. Hance's Inability to Develop His Defense to the Google-Search Testimony

As we have already noted, the State presented sufficient evidence of Hance's guilt, including his intent to sexually arouse or gratify himself with Gina. But as we have also pointed out, Lorraine's credibility was significant in proving the date of the offense that the State elected to proceed on.

The trial court's effective denial of Hance's motion for continuance also denied Hance the opportunity to develop his defense beyond simply impeaching Lorraine's

134

Google-search testimony. Offered in conjunction with her daddy–daughter testimony, Lorraine's Google-search testimony suggests Hance's consciousness of guilt or intent and "leads to an inference that . . . [Hance] had the specific intent to arouse and gratify his own sexual desire" by assaulting Gina. *See Stephenson v. State*, 673 S.W.3d 370, 385 (Tex. App.—Fort Worth 2023, pet. ref'd) (holding that defendant's threatening the victim to say nothing about his indecency showed consciousness of guilt); *see also Weinstein*, 421 S.W.3d at 668; *Armstrong*, 2020 WL 5552624, at *12–13. As we previously noted, this "may be one of the strongest indicators of guilt." *Lee*, 866 S.W.2d at 302. Thus, the Google-search testimony was arguably the second most important piece of evidence admitted at trial.

Although the State did not mention the computer or the Google searches after the second day of trial, the consciousness-of-guilt skunk had already been dropped in the jury box. To this point in the trial, the jury was aware only that a phone had been involved in the State's allegations. But Lorraine's testimony established that her computer was also involved. And that computer allegedly contained particularly damning evidence. *See id.* The phone's evidence was admitted, published to the jury, and discussed at length, but the computer was never mentioned again. Although Hance identified the skunk, the trial court prevented him from removing it. *Cf. Rose*, 2023 WL 308170, at *12.

Depending on the contents of the hard drive, the consciousness-of-guilt evidence could have been reframed. Specifically, if the Google searches were not on the

135

hard drive, Hance could have impeached Lorraine's testimony and further questioned her about her discovery of the searches. Indeed, she testified that they would still have been on the computer unless "you clear[ed] the [search] history." Thus, confirming their absence would have allowed Hance to question whether Lorraine had actually observed the searches; whether she had deleted them; and, if so, why. She had already admitted that she had inexplicably deleted the screen shot of the search history from her phone.

Considering the hundreds of thousands of files extracted by the Irving PD EEU's forensic examination, which included "Chrome Web History," "Chrome Web Visits," and "Potential Browser Activity," it is reasonable to assume that Hance's digital forensic expert might also have been able to confirm whether the searches, assuming that they were there, were conducted under a login synchronized with Lorraine's cell phone, as she had testified. Such evidence could also support questioning whether Lorraine had performed the searches herself as either a concerned mother or a vindictive spouse. The record reflects evidence supporting such conclusions. Specifically, the record reflects evidence of Hance's predilection for daddy–daughter pornography, his excessive sex drive, and his sex-education text messages.[54] The record

---

[54]The record reflects text messages sent by Hance to Lorraine suggesting that they teach the children about sex by allowing them to watch Hance and Lorraine having sex. The issue arose when Lorraine texted Hance, saying that she hoped that he would get a work "truck that has bunk beds" because she and the three children would come on the road with him. Hance responded that he and Lorraine would still have "just as much sex" and that the children would have to see it. Hance said this would be a form of sex education. When Lorraine objected, Hance said that he was joking.

also reflects evidence that Lorraine was jealous of Hance's relationship with certain females, including the mother of Hance's daughter, and a married couple with whom Hance had lived and had a sexual relationship.

Either way, Hance's ability to confirm or disprove the Google searches' existence would have bolstered other marginally exculpatory evidence by further questioning Lorraine's veracity on three issues. First, Lorraine testified that Hance "liked it when [she] called him daddy" and implied that she did so against her will because it satisfied him when she did. But in a January 22, 2017 text message retrieved from Hance's cell phone, Lorraine told Hance, "The fact that you like being called daddy is what turns me on." She then explained, "I mean the whole daddy daughter thing doesn't but you like it a lot." In response to Hance's queries as to whether it was only his reaction to the role-playing that she liked, Lorraine responded, "Calling you daddy makes you f[***] harder. . . . That's why I call you daddy." But in this text thread and others, Lorraine categorically denies that she shares Hance's proclivity; thus, this evidence is only slightly relevant to Lorraine's credibility.

Second, Lorraine testified that she and Hance had a "good relationship" in July 2017, and that they would only fight about sex and disciplining the children. But Hance's sister, who lived with Hance and Lorraine for several months, testified that the couple "argued quite a bit" about money. Hance also testified that his relationship with Lorraine was "[p]retty rocky" because they had "bad money issues" and that they were "arguing about money quite a bit."

Third, as we have explained, Lorraine's timeline of events on July 28, 2017, sheds at least some doubt on whether Hance could have been in Newcastle, Texas, when Lorraine said the elected sexual assault occurred.

Considering that the initial outcry came through Lorraine, we cannot say that Hance's inability to impeach or further explore Lorraine's Google-search testimony did not adversely affect the integrity of the process leading to the conviction. *See Wells*, 611 S.W.3d at 410.

### e. Impeachment Evidence

Moreover, there is some indication in the record that the hard drive did contain impeachment evidence. At the April 15 hearing, the DA stated that she had examined the hard drive after the trial court issued its production order and before asking ADA Gregory to take the mirrored hard drive to the Irving PD EEU for another look. She asserted that "there was not any exculpatory evidence [on the hard drive], if anything[,] very inculpatory" and that "[a]s far as [Hance's] saying there's exculpatory -- or at least impeachment material [on the hard drive], that is something he ought to be able to ascertain on his own without an analyst."

In custodial interview video, which was played to the jury after Lorraine's testimony, and later in his trial testimony—after the truncated continuance—Hance corroborated Lorraine's allegation that he had watched daddy–daughter pornography. The Irving PD Forensic Report also confirmed Hance's admission. Thus, the only

impeachment evidence at issue on April 15, 2019, was Lorraine's Google-search allegation.

Although the YCSO had asked the Irving PD EEU to search the hard drive for evidence "to corroborate the victim's testimony" and although the Irving PD EEU had found "[a]rtifacts of internet search history" on the hard drive, the YCSO's "narrowed" scope of the requested examination may have not detected the terms alleged in Lorraine's Google-search testimony. Indeed, the website and internet-search exemplars listed on the Irving PD Forensic Report appear focused on Lorraine's father[–]daughter-pornography allegation reflected in the SANE report. Given the incriminating weight of Lorraine's Google-search allegation, *see Lee*, 866 S.W.2d at 302, it is reasonable to assume that the Irving PD EEU would have included these searches in the exemplars if they had been found on the hard drive. But Hance could not offer their absence as impeachment evidence without opening the door to the State's child-pornography allegation. *See Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009) ("Evidence that is otherwise inadmissible may become admissible when a party opens the door to such evidence."); *see also* Tex. Code Crim. Proc. Ann. art. 38.37, § 2(b) (permitting admission of defendant's separate offenses, including child-pornography possession, in trial for sexual assault of a child).

Regardless, the DA asserted that the searches would have been apparent from a lay examination of the hard drive. But Hance's counsel did not have an opportunity to confirm the DA's assertion because he viewed only the results of the Irving PD EEU's

forensic examination, not the hard drive. If the DA viewed the searches before the Apri 15 hearing and found them to corroborate Lorraine's Google-search testimony, no such discovery was mentioned at the hearing. Thus, there is some evidence that the Google searches were, in fact, not there. If so, the State was obliged to say so. *See Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177 (1959) (holding that a conviction "must fall under the Fourteenth Amendment" when obtained through false evidence that the State allowed "to go uncorrected when it appear[ed]"); *Burkhalter*, 493 S.W.2d at 218 (holding that the State may not knowingly use false evidence to obtain a conviction); *see also Barrera v. State*, No. 04-96-00971-CR, 1998 WL 712915, at *5 & n.3 (Tex. App.—San Antonio Oct. 14, 1998, pet. ref'd) (not designated for publication) (implying that a reviewing court may consider the State's silence in response to a defendant's discovery request when assessing *Brady* disclosures).

### f. Summary

In sum, Lorraine's Google-search testimony released the proverbial skunk into the jury box by implying that Hance had either done or had considered doing the very thing he was charged with. The trial court initially gave Hance a chance to address this issue by making and funding an *Ake* appointment, ordering the State to produce the computer, and providing time for a digital forensic examination of it. Three days later, the State crawfished and withheld the computer on unproven child-pornography allegations. Five days later, the trial court followed suit and reversed its *Ake* appointment without any evidence or a showing from the State that Hance's interest in

an accurate proceeding would be unaffected, that Hance's previous need for an expert was somehow negated or diluted by the possible presence of child pornography on the hard drive, or that Hance could investigate the Google-search allegation without a digital forensic examination. The trial court's multifarious error not only barred any possibility of impeaching Lorraine's consciousness-of-guilt allegation, but it also prevented Hance from even making a record of the evidence that he would have offered. Indeed, it prevented him from reviewing the hard drive, much less performing a digital forensic examination on it—after the State had already conducted its own re-evaluation during the time period that the trial court had originally allotted for the defense.

Although other substantial inculpatory evidence was offered at trial, the multitude of errors in denying Hance an ample opportunity to examine the hard drive meant that Hance had no chance to address the consciousness-of-guilt skunk much less remove it. Given the nature and effect of that error in light of the record as a whole— even given the weight of the inculpatory evidence—we do not have a fair assurance that the trial court's error in effectively denying Hance's motion for continuance had but a slight effect on the jury's verdict. *See* Tex. R. App. P. 44.2(b); *Macedo*, 629 S.W.3d at 240; *cf. Taylor*, 93 S.W.3d at 503–04 (concluding that the defendant was harmed according to Rule 44.2(b) when trial court refused to require State to turn over hard drive containing child pornography that was subject of prosecution to defense expert for independent review because (1) "defense counsel had no opportunity to discover

for himself the errors [that] had the potential to be of critical importance to [the] defense" and counsel's "on-the-fly" and haphazard cross-examination did not provide "sufficient information for more than an analysis of probabilities, rather than facts").

Having determined that the error here was harmful under either Rule 44.2(a) (for *Ake* error) or Rule 44.2(b) (for Article 39.14 error), we sustain Hance's fourth and fifth issues.

**5. Motion for New Trial Withdrawn**

The State asserts in its motion for rehearing that Hance waived his sixth issue by withdrawing his new-trial motion at the hearing. The record reflects that Hance expressly withdrew his new-trial motion at the hearing because he had filed a notice of appeal and that he did not "have any ground or any reason to ask for a new trial." Accordingly, we agree that Hance waived his sixth issue; therefore, we need not address it. *See* Tex. R. App. P. 47.1.

## IV. Conclusion

Having sustained Hance's fourth and fifth issues, concluding that the trial court's errors in denying Hance's expert appointment under *Ake* and in denying his motion for continuance were not harmless, we must now determine the remedy. Although not addressed by the parties, we acknowledge that we "must not affirm or reverse a judgment or dismiss an appeal if . . . (1) the trial court's erroneous action or failure or refusal to act prevents the proper presentation of a case to the court of appeals; and (2) the trial court can correct its action or failure to act." Tex. R. App. P. 44.4(a).

Rule 44.4 applies when the trial court's action on remand can be cabined to address a specific gap in the appellate record that prevents appellate review. *See, e.g.*, *Villafranco v. State*, 654 S.W.3d 753, 757 (Tex. Crim. App. 2021) (holding that abatement and remand under Rule 44.4 is appropriate remedy for a retrospective adversarial Rule 412 hearing for appellant to perfect record to determine admissibility of complainant's prior sexual history); *Montelongo v. State*, 631 S.W.3d 734, 739 (Tex. App.—El Paso 2021, order) (mem. op.) (abating the appeal and remanding under Rule 44.4 for trial court to conduct new-trial hearing to resolve fact issue raised by attorney affidavit related to defendant's ineffective-assistance-of-counsel claim).

The trial court's error here cannot be so cabined because its error specifically prevented Hance from examining the hard drive and produced the very gap at issue. Thus, a post hoc hard-drive examination would not mitigate the harm done by that midtrial error and may also produce evidence beyond the Google searches. *See* Tex. Code Crim. Proc. Ann. art. 39.14(a) (requiring production of all nonprivileged, material evidence). Additionally, the judge who presided over the trial has left the bench. Thus,

the trial court's errors defy correction under Rule 44.4.[55] Accordingly, we reverse the

trial court's judgment and remand the case for a new trial.[56]

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: February 27, 2025

---

[55]"We cannot pretend to be oblivious to the time and expense involved in the presentation of this cause; the voluminous record now before this [c]ourt is sufficient evidence of that. Our intent is not to punish the trial court or the prosecutor for the error committed, but rather to avoid an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Burkhalter*, 493 S.W.2d at 218 (citing *Brady*).

[56]As previously noted, however, Phillip Gregory, who prosecuted this case as an ADA, is now the trial court's presiding judge and is, thus, disqualified from hearing the case. *See* Tex. Const. art. V, § 11 ("No judge shall sit in any case wherein the judge may be interested . . . or when the judge shall have been counsel in the case."); Tex. Code Crim. Proc. Ann. art. 30.02 ("Whenever any case is pending in which the district judge or criminal district judge is disqualified from trying the case, no change of venue shall be made necessary thereby; but the judge presiding shall certify that fact to the presiding judge of the administrative judicial district in which the case is pending and the presiding judge of such administrative judicial district shall assign a judge to try such case in accordance with the provisions of Article 200a, V.A.C.S.").